UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
SR INTERNATIONAL BUSINESS          :
INSURANCE CO. LTD.,                :
                                   :
          Plaintiff-              :
          Counterclaim Defendant, :    01 Civ. 9291 (MBM)
                                   :
     -against-                     :    OPINION AND ORDER
                                   :
WORLD TRADE CENTER PROPERTIES,     :
LLC, et al.,                       :
                                   :
          Defendants-             :
          Counterclaimants.       :
----------------------------------X
WORLD TRADE CENTER PROPERTIES,     :
LLC, et al.,                       :
                                   :
          Counterclaimants,       :
                                   :
     -against-                     :
                                   :
ALLIANZ INSURANCE COMPANY,         :
et al.,                            :
                                   :
          Additional             :
          Counterclaim-Defendants. :
----------------------------------X

APPEARANCES:

BARRY R. OSTRAGER, ESQ.
MARY KAY VYSKOCIL, ESQ.
(Attorneys for Plaintiff-Counterclaim Defendant SR International
Business Insurance Co., Ltd.)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
(212)455-2000

CHRISTOPHER S. FINAZZO, ESQ.
ROBERT F. COSSOLINI, ESQ.
MICHAEL MERNIN, ESQ.
(Attorneys for Plaintiff-Counterclaim Defendant Employers
Insurance of Wausau)
150 John F. Kennedy Parkway, 3rd Floor
Short Hills, NJ 07078
(973) 379-4800

HERBERT M. WACHTELL, ESQ.
PETER C. HEIN, ESQ.
ERIC M. ROTH, ESQ.
(Attorneys for Defendants-Counterclaimants World Trade Center
Properties LLC, Silverstein Properties Inc., Silverstein WTC
Mgmt. Co. LLC, 1 World Trade Center LLC, 2 World Trade Center
LLC, 4 World Trade Center LLC, and 5 World Trade Center LLC)
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY 10019
(212) 403-1000

JOHN H. GROSS, ESQ.
(Attorney for Defendants-Counterclaimants World Trade Center
Properties LLC, Silverstein Properties Inc., Silverstein WTC
Mgmt. Co. LLC, 1 World Trade Center LLC, 2 World Trade Center
LLC, 4 World Trade Center LLC, and 5 World Trade Center LLC)
PROSKAUER ROSE LLP
1585 Broadway
New York, NY 10036
(212) 969-3000

MICHAEL B. MUKASEY, U.S.D.J.

The related entities that have been referred to in this litigation as the Silverstein Parties seek to compel SR International Business Insurance Company ("Swiss Re") to pay actual cash value ("ACV") up to its share of a "one-occurrence" policy limit in the amount of $796,467,568[1] plus prejudgment interest, and have moved for a partial summary judgment. Swiss Re argues that (i) the plain language of WilProp provides for an ACV payout only in the event the insured decides not to rebuild; (ii) even if ACV is available regardless of intent to rebuild, it is not yet due because a binding proof of loss has not been submitted by the Silverstein Parties and accepted by Swiss Re; and (iii) issues of material fact exist as to the correct calculation of ACV. Employers Insurance of Wausau ("Wausau"), another participant in the World Trade Center coverage, agrees with Swiss Re's position that payment is not due because the Silverstein Parties have not submitted a proper proof of loss.[2] For the reasons set forth below, the motion is denied.

---

[1]     This figure accounts for $81,035,432.44 already paid by Swiss Re against the Silverstein Parties' rental value/business interruption insurance coverage.

[2]     The Silverstein Parties initially did not seek relief against Wausau in the instant motion; however, Wausau submitted an opposition brief because "the Court's resolution of the motion may impact many of the issues that are at the center of the remaining disputes between Wausau and the Silverstein Parties." (Wausau Opp'n at 1)  In turn, the Silverstein Parties addressed Wausau's opposition in their reply brief.

The following facts are drawn primarily from the parties' submissions and prior opinions in this litigation, familiarity with which is assumed.

In July 2001, the Silverstein Parties entered into 99-year leases for the North and South Towers of the World Trade Center, buildings 4 and 5 of the World Trade Center, the retail mall, and related subgrade spaces. Insurance was purchased in the amount of $3,546,809,905 per occurrence. (Silverstein Parties' Rule 56.1 Statement ¶¶ 1, 3; Swiss Re's Rule 56.1 Response ¶¶ 1, 3) Swiss Re agreed to underwrite approximately 25 percent of the coverage, or $877,503,000 per occurrence. (Silverstein Parties' Rule 56.1 Statement ¶ 2; Swiss Re's Rule 56.1 Response ¶ 2) Wausau agreed to underwrite approximately $64 million in coverage.[3] (Wausau Opp'n at 3) As a result of the verdict in the Phase I trial of this case, Swiss Re's and Wausau's coverage is controlled by the terms of the WilProp form ("WilProp"), and each is liable to the Silverstein Parties only for its share of a "one-occurrence" policy limit. (Swiss Re's Rule 56.1 Statement ¶ 1; Wausau's Rule 56.1 Response § 1)

---

[3]    Wausau's coverage is composed of a $2 million share of the $10 million primary layer, excess of a $1 million deductible, and a $62.894 million share of the $767 million ninth excess layer, excess of $2.493 billion. Wausau has already paid its $2 million share of the primary layer. (Ex. G to Affidavit of Michael Mernin)

Shortly after the September 11 attack that resulted in the destruction of the insured structures, Larry Silverstein announced his intention to rebuild the lost commercial space at the World Trade Center site. (See e.g., Ex. 3 to Affidavit of Michael C. Ledley ("Ledley Aff.")) On October 22, 2001, Swiss Re sued for a declaration that it bound on WilProp and that the loss resulted from one occurrence. (Ex. 3 to Declaration of Ian Boczko ("Boczko Decl."); Silverstein Parties' Rule 56.1 Statement ¶ 6; Swiss Re's Rule 56.1 Response ¶ 6) Wausau eventually filed its own declaratory judgment action on January 9, 2002. (Ex. C to Affidavit of Michael Mernin ("Mernin Aff.")) On November 7, 2001, in addition to asserting that the September 11 attacks constituted two occurrences, the Silverstein Parties set forth in a counterclaim "that the amount of ACV exceeded a single-occurrence policy limit," but demanded at least partial judgment for payment by Swiss Re of its share of ACV on a single-occurrence basis. (Silverstein Parties' Rule 56.1 Statement ¶ 6; Swiss Re's Rule 56.1 Response ¶ 6; see also Exs. 4 and 7 to Boczko Decl.) The Silverstein Parties eventually filed the same answer and counterclaim against Wausau. (Ex. E to Mernin Aff.)

Also on November 7, 2001, the Silverstein Parties served upon all insurers a "Sworn Statement –- Preliminary Proof of Partial Losses No. 2" ("Preliminary Proof"; Ex. 1 to Boczko Decl.), which stated that ACV of the covered properties exceeded

the $3.5468 billion policy limit. (Id. at ¶ 5)  This Preliminary
Proof contained no supporting documentation.  On November 15,
2001, Swiss Re rejected the Preliminary Proof as insufficient to
constitute a proof of loss.  (Ex. 8 to Boczko Decl.)  Swiss Re
also advised the Silverstein Parties that it understood their
claim for ACV to express an election "not to rebuild" under
WilProp, requested confirmation of that choice, and required
"appropriate, acceptable documentation of the 'actual cash value'
of the insured premises" as well as releases from all insureds in
advance of issuing a lump sum ACV payment. (Id.)  On November
27, 2001, Swiss Re served its replies to the Silverstein Parties'
counterclaims, asserting that it was obligated under WilProp to
pay either replacement costs "as rebuilding progresses" or ACV
"in the event the Insured decides not to repair, rebuild or
replace damaged property." (Ex. 5 to Boczko Decl.)  Wausau
rejected the Preliminary Proof as well because "it provide[d] no
supporting details or other information" for the ACV estimate.
(Ex. D to Mernin Aff.)  On March 6, 2002, Wausau filed its
replies to the Silverstein Parties' counterclaims, asserting that
it was bound on WilProp and that the events of September 11
constituted one "occurrence" for purposes of the coverage
provided by Wausau.  (Ex. F to Mernin Aff.)

        On January 18, 2002, the Silverstein Parties submitted
to all insurers a "Sworn Statement -- First Supplement to

Preliminary Proof of Partial Losses No. 2." ("Supplement"; Ex. 2
to Boczko Decl.) The Silverstein Parties claimed again that the
ACV "far exceed[ed] $3,546,809,905 per occurrence single policy
limit." (Silverstein Parties' Rule 56.1 Statement ¶ 10) In the
Supplement, the Silverstein Parties also asserted "that at least
two occurrences took place" on September 11 for purposes of
insurance coverage and stated that they intended to rebuild the
covered properties. (Ex. 2 to Boczko Decl. at 2) The ACV was
calculated as follows: $3,234,223,518 for one occurrence, based
on a combination of ACV for the North Tower and half of the sum
of the ACVs for 4 World Trade Center and 5 World Trade Center;
and $3,263,657,527 for another occurrence, based on a combination
of the ACV for the South Tower and half of the sum of the ACVs
for 4 World Trade Center and 5 World Trade Center. (Id.)

    According to Swiss Re and Wausau, both the Preliminary
Proof and the Supplement were based on the ACV provisions of the
Travelers' Insurance Company policy, not those of WilProp.
(Swiss Re's Rule 56.1 Statement ¶¶ 13, 18-19) In addition, they
contend that the Preliminary Proof "on its face [was] not a final
proof of loss since it was 'Subject to Revision' and listed many
items as 'T.B.D.'" (Swiss Re's Rule 56.1 Response ¶ 10 (quoting
SR Int'l Bus. Ins. Co. Ltd. v. World Trade Ctr. Props. LLC, No.
01-9291, 2003 WL 1344882, at *3 (S.D.N.Y. Mar. 18, 2003))) They
argue also that "the fact that the Silverstein Parties [chose] to

denominate their document as a 'preliminary proof of loss' indicates that they did not wish to trigger the commencement of any time limits under their insurance contracts." (Swiss Re's Rule 56.1 Response ¶ 10 (quoting SR Int'l, 2003 WL 1344882, at *4)) In rejecting the Supplement as a proof of loss, Swiss Re reiterated "that the coverage Mr. Silverstein procured expressly provides that 'actual cash value' of the property will be paid only 'in the event the Insured decides not to repair, rebuild or replace damaged property.'" (Ex. 10 to Boczko Decl.) Wausau rejected the Supplement to the extent that the Silverstein Parties "intended to present a claim based upon a claim that the loss involve[d] two occurrences and seek a payment in excess of the limit of liability of the insurance program." (Ex. G to Mernin Aff.)

On August 1, 2002, Swiss Re submitted two appraisal reports to the Silverstein Parties. The first, submitted "on behalf of all insurers," was authored by real estate appraiser Jonathon Held. He calculated ACV as of September 11, 2001 under WilProp at $3.666 billion ("Held Report"; Ex. 25 to Boczko Decl.), which exceeds the insurance program's one-occurrence policy limit of $3.5468 billion. The second report, submitted only on Swiss Re's behalf, was authored by appraiser David Pearson, who initially calculated ACV under WilProp to be $2.156 billion and later revised the figure to $2.17 billion. ("Pearson

6

Report"; Ex. 24 to Ledley Aff. (first version); Ex. 26 to Boczko
Decl. (revised version))

The Pearson and Held Reports calculate ACV differently.
The Silverstein Parties contend that Pearson's approach "is
inconsistent with what Mr. Held testified at deposition was the
general and typical insurance industry practice." (Silverstein
Parties' Rule 56.1 Statement ¶ 14; Ex. 31 to Boczko Dep. at 304-
07) Pearson did not use as a starting point what it would cost
to rebuild the actual covered properties that were destroyed on
September 11. (Silverstein Parties' Rule 56.1 Statement ¶ 14)
Instead, according to the Silverstein Parties, Pearson "chose to
start with totally different hypothetical, non-existent
buildings: four generic 50-story office buildings assertedly
containing square footage equivalent to that of the building that
did exist pre-9/11." (Silverstein Parties' Rule 56.1 Statement ¶
14; Ex. 26 to Boczko Decl. at 8; Ex. 32 to Boczko Decl. at 299)
Swiss Re claims that Pearson's method of calculating ACV was
proper under WilProp. (Swiss Re's Rule 56.1 Response ¶ 14)

In this motion for partial summary judgment, the
Silverstein Parties demand that Swiss Re pay ACV up front. Swiss
Re argues that under the plain language of WilProp, the
Silverstein Parties are not entitled to ACV unless they (i) elect
not to rebuild, and (ii) submit a binding proof of loss setting
forth the full and final calculation of ACV. (Swiss Re's Rule

56.1 Response ¶ 16)  Moreover, according to Swiss Re, "no claim is 'due and payable' until Swiss Re accepts the proof of loss supporting such claim or the amount of loss is determined in an appraisal or judicial proceeding."  (Swiss Re's Rule 56.1 Statement ¶ 16; Ex. 12 to Ledley Aff. at SRIWTC 0353)  Wausau, too, contends that no binding proof of loss has been submitted or accepted.

II.

The Silverstein Parties maintain that Swiss Re has no basis for refusing to pay ACV.  Swiss Re relies principally on the language of WilProp in arguing that the policy allows payment of ACV instead of replacement cost only "in the event the Insured decides not to repair, rebuild, or replace damaged property." (Ex. 12 to Ledley Aff. at SRIWTC 0346)  The Silverstein Parties claim that the relevant language lends itself to another reading -- that an election to rebuild does not foreclose an up front ACV payment -- and that Swiss Re's reading of WilProp is foreclosed by New York's standard fire insurance policy and "settled principles of insurance law and practice that replacement coverage is an add-on, not a substitute for ACV."  (Silverstein Parties' Mem. of Law in Supp. of Mot. for Summ. J. at 15)

A.   WilProp Language

The "Valuation" section of WilProp provides as follows:

8

> With respect to all insured property (unless
> specifically addressed elsewhere in the
> policy), the payment for loss shall be on a
> "replacement cost" basis. "Replacement Cost"
> includes all fees, costs, charges and
> expenses) . . . incurred by [or] on behalf of
> the insured to reassemble, rebuild, reclaim,
> reconstruct, repair, replace, or restore
> insured property with due diligence and
> dispatch and with new (or at the sole option
> of the insured, other) items, property or
> materials of like kind and quality, either at
> the site of the loss or, at the sole option
> of the insured, another site.
>
> ...
>
> Except as may be otherwise provided above, in
> the event the insured decides not to repair,
> rebuild, or replace damaged property, this
> policy will pay for the "actual cash value"
> of the property.
>
> ...
>
> For the purposes of adjustment under the
> policy "Actual Cash Value" means:
> 1. The replacement cost (as defined above)
> less a reasonable allowance for observable
> physical deterioration; but not less than;
> 2. The "market value" of the insured
> property . . . at the time and place of loss.

(Ex. 12 to Ledley Aff. at SRIWTC 0344-0346)

In order to prevail on their summary judgment motion,

the Silverstein Parties must demonstrate that their proposed

interpretation of WilProp is the only reasonable one.[4]  See

Hanson v. McCaw Cellular Comm., Inc., 77 F.3d 663, 667 (2d Cir.

---

[4]  It bears mention that the Silverstein Parties once
"readily acknowledge[d] that [WilProp] is susceptible to a
meaning such as that [Swiss Re] urges on whether ACV gets paid if
[the insured] intends to rebuild."  (Ex. 2 to Ledley Aff. at 50)

1996) (summary judgment in a contract dispute appropriate only if the contract term at issue "lend[s] itself to only one reasonable interpretation").

According to Swiss Re, Wilprop plainly makes "replacement cost basis" the default method of payment for property damage, except in the event the Silverstein Parties elect not to "repair, rebuild, or replace" the covered properties, in which case WilProp allows for payment of ACV of the property. (Swiss Re Opp'n at 14-15)  In other words, the insured may "elect[] not to rebuild," forgo the right to rolling replacement cost payments, and instead "recoup a one-time lump sum payment of the lower ACV of the property in full and final satisfaction of the insurer's obligations." (Id. at 15)  Swiss Re argues that absent such an election, "WilProp plainly mandates payment 'shall be' on a replacement cost basis paid as actual rebuilding costs are incurred by the insured." (Id.)

According to the Silverstein Parties, WilProp "does not state that if the insured decides to rebuild, it does not receive ACV" and Swiss Re's reading is a "horrible fallacy" of logic. (Silverstein Parties' Reply Mem. at 10)  Moreover, according to the Silverstein Parties, the "Payment of Loss" section of WilProp allows for collection of "partial payments by filing a proof of loss for a partial payment" pending final adjustment of a loss. (Ex. 23 to Boczko Decl. at SRIWTC 0353)  They argue that payment

of ACV as "partial payment" of the property damage loss is due even if the Silverstein Parties have elected to rebuild and future replacement cost claims are contemplated.  (Silverstein Parties Mem. of Law in Supp. of Mot. for Summ. J. at 15)  In support, the Silverstein Parties assert that replacement cost coverage is "universally understood as an ACV add-on, intended to fill the gap between ACV and replacement cost, not replace the insured's basic ACV indemnification."  (Id. (citing cases))  They conclude that Swiss Re's interpretation of WilProp "radically . . . depart[s] from settled law and industry practice such that an insured that seeks to rebuild would forfeit its entitlement to an upfront payment of ACV," especially with respect to WilProp, which was developed as a "pro-insured" policy document.  (Id.)

The plain language of the "Valuation" section -- providing for ACV "in the event" the insured elects not to rebuild -- operates as a condition precedent to making a claim for ACV.  See Wards Co. v. Stanford Ridgeway Assocs., 761 F.2d 117, 121 (2d Cir. 1985) ("the 'in the event' clause . . . a condition precedent to the operation of the remainder of the entire section -- is fulfilled").  The "Payment of Loss" section, on which the Silverstein Parties rely, addresses the manner of payment, not the method of valuation.  Indeed, consistent with Swiss Re's reading of the "Valuation" section, the Silverstein Parties will have to provide Swiss Re with partial proofs of loss

to collect insurance as replacement costs are incurred.

WilProp differs from many insurance company forms that present the insured with an explicit choice between ACV and replacement cost recovery. For example, the Travelers form provides that "[f]or property to which replacement cost valuation applies, the Insured may make a claim for loss or damages on an 'Actual Cash Value' basis instead of on a replacement cost basis." (Ex. 17 to Ledley Aff. at WILLIS 98580) Moreover, it expressly allows the insured to switch to a replacement cost basis from an ACV basis upon providing notice within 180 days of date of loss or damage. (Id.); see also Zaitchick v. Am. Motorists Ins. Co., 554 F. Supp. 209, 217 (S.D.N.Y. 1982) (finding that insurance contract expressly permitted insured to obtain ACV and then replacement cost election). The same language appears in the policy form developed by ISO Properties. (Ex. 27 to Ledley Aff. at ISOP 087)

However, the choice between ACV and replacement cost expressly provided in Travelers, ISO, and other contracts, with an option to shift from ACV to replacement cost, cannot be read into WilProp's plain language. Nothing on the face of WilProp offers a choice structured in that way. Under New York law, "[t]he cardinal principle for the construction and interpretation of insurance contracts –- as with all contracts –- is that the intentions of the parties should control" and "[u]nless otherwise

indicated, words should be given the meanings ordinarily ascribed to them and absurd results should be avoided." <u>World Trade Center Properties, L.L.C. v. Hartford Fire Ins. Co.</u>, 345 F.3d 154, 183-84 (2d Cir. 2003). Insurance policies should be examined "in light of the business purposes sought to be achieved by the parties and the plain meaning of the words chosen by them to effect those purposes." <u>Id.</u> at 184; <u>see also</u> <u>In re Estates of Covert</u>, 97 N.Y.2d 68, 76, 735 N.Y.S.2d 879, 884-85 (2001) ("It is unquestionably the rule that '[c]ontracts of insurance, like other contracts, are to be construed according to the sense and meaning of the terms which the parties have used, and if they are clear and unambiguous the terms are to be taken and understood in their plain, ordinary and proper sense.'") (quoting <u>Hartol Prods. Corp.</u> v. <u>Prudential Ins. Co. of Am.</u>, 290 N.Y. 44, 47, 47 N.E.2d 687, 689 (1943)). The parties could have included an option to collect ACV up front while reserving the right to make a replacement cost claim within a certain time period if the Silverstein Parties decided to rebuild. Instead, the plain language of WilProp yields not merely a sensible result, but one that gives the Silverstein Parties potentially greater coverage than what is statutorily required under New York insurance law. <u>See</u> <u>infra</u>.

B.   New York Standard Fire Policy

         The Silverstein Parties argue also that Swiss Re's

13

interpretation of WilProp is foreclosed by New York's standard

fire insurance policy.  Under state law, a fire insurance policy

must include "terms and provisions no less favorable to the

insured than those contained in the standard fire policy"

prescribed by the statute.  N.Y. Ins. L. § 3404(f)(1)(a).  The

statutory "standard fire insurance policy of New York" is a form

policy that includes minimum terms of coverage required by the

state.  Hence, to the extent a particular policy omits or

detracts from the minimum protections afforded by the standard

fire policy, the provisions of the standard policy control and

the non-compliant policy is "enforceable as if it conformed with

[the] requirements or prohibitions" of the standard policy.

Bersani v. Gen. Accident Fire & Life Assurance Corp., 36 N.Y.2d

457, 460, 369 N.Y.S.2d 108, 111 (1975) ("purported agreement that

the insureds would not pursue a claim which would arise under the

policy, standing alone, or engrafted upon the terms of the

standard policy, was and is against public policy" and hence

void); see also Fox-Knapp, Inc. v. Employers Mut. Cas. Co., 725

F. Supp. 706, 709-10 (S.D.N.Y. 1989) ("New York courts have

consistently held that if a one year limitations period has been

included in a fire insurance contract, the contract is

enforceable, but the limitations period is extended to the two-

year limitations period provided in the Standard Fire Policy")

(citing cases).  "The standard policy is the minimum level of

coverage permissible for an insurance company to issue," <u>Lane</u> v.

<u>Sec. Mut. Ins. Co.</u>, 96 N.Y.2d 1, 5, 724 N.Y.S.2d 670, 671 (2001),

and an insurer is free to offer policy terms more favorable to

the insured than those contained in the standard policy. <u>See</u>

<u>1303 Webster Avenue Realty Corp.</u> v. <u>Great Am. Surplus Line Ins.</u>

<u>Co.</u>, 63 N.Y.2d 227, 231, 481 N.Y.S.2d 322, 323 (1984).

> The standard fire policy provides for coverage
>
> TO THE LESSER AMOUNT OF EITHER:
>
> 1) THE ACTUAL CASH VALUE OF THE PROPERTY AT
> THE TIME OF THE LOSS, OR
> 2) THE AMOUNT WHICH IT WOULD COST TO REPAIR
> OR REPLACE THE PROPERTY WITH
> MATERIAL OF LIKE KIND AND QUALITY WITHIN A
> REASONABLE TIME AFTER SUCH LOSS. . . .

N.Y. Ins. L. § 3404(e) at 1. The Silverstein Parties contend

that the WilProp "Valuation" section, as construed by Swiss Re,

grants less protection to the insured than the above language in

the standard policy.

> Swiss Re's plain-language reading of the WilProp

"Valuation" section does not "impermissibly restrict[] the

coverage mandated by statute." <u>Lane</u>, 96 N.Y.2d at 5, 724

N.Y.S.2d at 670. <u>Lane</u> involved a fire insurance policy that

excluded coverage for loss resulting "from intentional acts by

'an insured,'" defining "an insured" as "you and, if residents of

your household, your relatives." 96 N.Y.2d at 4, 724 N.Y.S.2d at

670. The standard policy provides that damages will be

disclaimed only "for loss occurring . . . while the hazard is

increased by any means within the control or knowledge of the insured" with no further definition of the term "insured." 96 N.Y.2d at 5, 724 N.Y.S.2d at 670. The insurance company in Lane disclaimed coverage because the homeowner's son who set fire to the home was included as "an insured" under the offending policy. The New York Court of Appeals held that "when applied" to the circumstances, the "an insured" language in the defendant insurer's policy impermissibly "offers an innocent party significantly less coverage than the language 'the insured'" in the standard policy. 96 N.Y.2d at 4-5, 724 N.Y.S.2d at 670.

The standard policy does not require an ACV payment up front or give the insured a right to elect between ACV and replacement cost recovery, regardless of whether the insured decides to rebuild. Unlike a shorter limitations period, see 1303 Webster Avenue Realty Corp., 63 N.Y.2d at 231, 481 N.Y.S.2d at 323; cf. G.E. Capital Mortg. Servs. v. Daskal, 211 A.D.2d 613, 615, 621 N.Y.S.2d 106, 107-08 (2d Dep't 1995), or the noncompliant provision in Lane, conditioning an ACV payment on an election not to rebuild does not operate to preclude recovery. Instead, as would be expected with a "pro-insured" form drafted by insurance brokers, the WilProp provision is more favorable to the Silverstein Parties because they can recover full replacement cost, which the parties do not dispute is greater than ACV. Under the standard policy, ACV would be the most the Silverstein

16

Parties could recover.  Alternatively, the Silverstein Parties still can recover ACV if they elect not to rebuild.  Put another way, they can choose to receive more insurance than is guaranteed under the statutory policy by electing to rebuild, or receive the same amount of insurance guaranteed under the statutory policy by electing not to rebuild.  WilProp does not compromise the Silverstein Parties' minimum entitlement "to the lesser amount of either (1) the actual cash value of the property at the time of the loss, or (2) the amount which it would cost to repair or replace the property. . . ."  N.Y. Ins. L. § 3404(e) at 1.

Moreover, in contrast with the policies that the Silverstein Parties deem more typical, WilProp on its face does not condition replacement cost recovery on the completion of reconstruction.  (Compare Ex. 17 to Ledley Aff. at WILLIS 98580 (Travelers form; no replacement cost proceeds "until the property is repaired, rebuilt or replaced") and Ex. 27 to Ledley Aff. at ISOP 087 (ISO form; same) with Ex. 12 to Ledley Aff. at SRIWTC 0344 (WilProp; "replacement cost" constitutes any cost "incurred," with no condition of completion of reconstruction)); see also Zaitchick, 554 F. Supp. at 217.  Where "the purpose of an action on a fire insurance policy is to attempt to put the insured in as good a position as he would have been had no fire occurred," the WilProp policy, as construed by Swiss Re, more than suffices.  Harrington v. Amica Mut. Ins. Co., 223 A.D.2d

222, 226, 645 N.Y.S.2d 221, 223 (4th Dep't 1996) (quoting

Incardona v. Home Indem. Co., 60 A.D.2d 749, 400 N.Y.S.2d 944,

945 (2d Dep't 1977)).


III.

Wausau does not appear to argue or adopt Swiss Re's

position that the plain language of WilProp provides for ACV only

if the Silverstein Parties elect not to rebuild.  Instead, Wausau

argues simply that the Silverstein Parties have not presented a

final sworn proof of loss as required by WilProp, and that

without such a proof payment is not due and Wausau cannot be

deemed in breach of its insurance obligations.  WilProp provides:

> The Insured shall render a signed and sworn
> proof of loss to the Insurer . . . stating:
> the place and time of the loss, damage, or
> expense; the interest of the Insured and all
> others; the value of the property involved in
> the loss; and the amount of loss, damage, or
> expense.

(Ex. 12 to Ledley Aff. at SRIWTC 0353)  The Silverstein Parties

respond first that Wausau did not comply with New York Insurance

Law Section 3407(a) because it failed to make a written demand

for proof of loss.  The statute provides:

> The failure of any person insured against
> loss or damage to property under any contract
> of insurance . . . to furnish proofs of loss
> to the insurer or insurers as specified in
> such contract shall not invalidate or
> diminish any claim of such person insured
> under such contract, unless such insurer or
> insurers shall, after such loss or damage,

18

> give to such insured a written notice that it
> or they desire proofs of loss to be furnished
> by such insured to such insurer or insurers
> on a suitable blank form or forms.

N.Y. Ins. L. § 3407(a).  The Silverstein Parties misread both

parties' obligations.  Under New York law, "failure of the

insured to file proof of loss within [the specified time period]

is an absolute defense to an action on the policy, absent waiver

of the requirement by the insurer or conduct on its part

estopping its assertion of the defense."  Igbara Realty Corp. v.

New York Prop. Ins. Underwriting Ass'n, 63 N.Y.2d 201, 209-10,

481 N.Y.S.2d 60, 61-62 (1984).  Section 3407(a) protects insureds

from unwittingly waiving their right to coverage altogether

through delay in submitting proofs of loss.  It does not

invalidate an express policy provision requiring the insured to

provide a proof of loss before payment is due.  See Do-Re Knit,

Inc. v. Nat'l Union Fire Ins. Co., 491 F. Supp. 1334, 1338

(E.D.N.Y. 1998) (finding insured's argument that "no proof of

loss need be furnished by an insured unless the same is formally

demanded by the insured" was a "tortured construction" of N.Y.

Ins. L. § 172, the statutory predecessor to Section 3407).

Regardless, the Silverstein Parties contend that their

Preliminary Proof and Supplement were valid proofs of loss in

compliance with WilProp.  In response, Wausau dismisses the two

documents as unacceptable and non-binding because they are based

on (i) the valuation provision of the Travelers form, not

19

WilProp; and (ii) the claim that "at least two occurrences took place on September 11, 2001."  (Ex. 2 to Boczko Decl. at 2)

New York law does not prescribe a form for proof of loss.  <u>See</u> <u>SR Int'l</u>, 2003 WL 1344882, at *3 (citing <u>Yaccarino</u> v. <u>St. Paul Fire & Marine Ins. Co.</u>, 150 A.D.2d 771, 542 N.Y.S.2d 660 (2d Dep't 1989)).  "As a general rule, notice and proof requirements are liberally construed in favor of the insured." <u>Yaccarino</u>, 150 A.D.2d at 772, 542 N.Y.S.2d at 661.  "Accordingly, substantial rather than strict compliance with the provisions for proof of loss statements is all that is required."  <u>Id.</u>  The purpose of a proof of loss "is that the insurer may be able intelligently to form some estimate of his rights and liabilities before he is obliged to pay."  <u>Wachtel</u> v. <u>Equitable Life Assur. Soc. of United States</u>, 266 N.Y. 345, 352, 194 N.E. 850, 852 (1935) (quoting <u>O'Reilly</u> v. <u>Guardian Mut. Life Ins. Co.</u>, 60 N.Y. 169, 173 (1875)).

It appears from Wausau's responses to the Preliminary Proof and Supplement that Wausau understood its rights and liabilities, at least insofar as they were presented by the Silverstein Parties; Wausau objected specifically to the Silverstein Parties' two-occurrence position and stated that it would review the Silverstein Parties' ACV calculation.  (<u>See</u> Ex. G to Mernin Aff.)  However, Wausau's understanding of the purported proofs at the time they were submitted is beside the

point.  The Silverstein Parties note that their counterclaim for
ACV payment of one policy limit is distinct from any "issue [of]
whether [the insureds are] additionally liable based upon a
determination that the events of September 11 constitute more
than one 'occurrence.'"  (Silverstein Parties' Reply at 19)  If
so, and given that Wausau bound on WilProp and hence is liable
only for its share of a one-occurrence policy limit, one must
wonder at the Silverstein Parties' insistence that the
Preliminary Proof and Supplement, which allocate ACV on a two-
occurrence basis, is sufficient or even relevant as to Wausau.

In addition, factual issues exist as to whether the ACV
valuations in the purported proofs are based on the valuation
provisions of the Travelers or the WilProp form.  The Silverstein
Parties maintain that the Preliminary Proof and Supplement are
not based on the Travelers Form and that regardless, the
documents "set forth the amount of the Silverstein Parties' ACV
claim under any of the potentially applicable policy forms."
(Silverstein Parties' Reply at 18)  However, when the Silverstein
Parties submitted the two documents, they were aggressively
pursuing their claim -- since rejected by a jury -- that Wausau
and all of the other insurers had agreed to bind coverage on the
Travelers Form.  (Silverstein Parties' Answer to Wausau's Compl.
for Decl. J. at ¶¶ 49, 91 (Ex. E to Mernin Aff.); see also Letter
from Herbert Wachtell to Barry Ostrager of 11/20/2001 (Ex. 14 to

Ledley Aff.) at 1) ("As you well know, Swiss Re's coverage obligations . . . are governed by the Travelers form . . ., not the superseded WilProp 2000 form."))  Moreover, it is apparent from correspondence between the Silverstein Parties' counsel and appraisers that the ACV estimate in the Supplement had been prepared "in accordance with the Actual Cash Value definition . . . in [the] Travelers Policy."  (Exs. K through N to Supplemental Affidavit of Michael Mernin ("Mernin Supplemental Aff."))

The Silverstein Parties' claim that the submitted proofs apply regardless of the policy form may be true to the extent that ACV valuations under both Travelers and WilProp exceed $3.546 billion.  However, other appraisals suggest that the valuation provisions of the Travelers form and WilProp are materially different and that one or the other may yield an ACV figure less than a single occurrence policy limit.  The Held Report presents different ACV figures under the two forms.  (See Ex. I to Mernin Aff. (determining that ACV is $1.787 billion under Travelers and $3.666 billion under WilProp)  The Pearson Report offers yet other ACV figures.  (See Ex. 26 to Boczko Decl. at 6 (determining that ACV is $1.88 billion under Travelers and $2.17 billion under WilProp))  The method of ACV calculation is significant for Wausau because its excess coverage of $75 million does not attach unless ACV is determined to exceed $2.493 billion.

Even assuming that the Preliminary Proof and Supplement together constitute an adequate "proof of loss," the same factual issues bear on whether Wausau was justified in rejecting them. The standard fire policy provides that "[t]he amount of loss for which [the insurer] is liable shall be payable sixty days after proof of loss . . . is received by [the insurer] and ascertainment of the loss is made either by agreement . . . or by the filing with [the insurer] of an award. . . ." N.Y. Ins. L. § 3404(e) at 2. WilProp substantially tracks this language, but provides for payment within 30 days of "presentation <u>and acceptance</u> of proof of loss by [the] insurer." (Ex. 12 to Ledley Aff. at SRIWTC 0353) (emphasis added) Both WilProp and the standard fire policy provide for payment of loss only after the amount of loss has been agreed to, appraised, or adjudged.

At this stage, with issues of material fact still outstanding, Wausau cannot be deemed in breach of its obligations under WilProp. <u>See</u> <u>Rubin</u> v. <u>Williams</u>, 245 A.D.2d 181, 182, 666 N.Y.S.2d 184, 185 (1st Dep't 1997) (insurer's failure to make partial payment of disputed claim before appraisal proceeding was not breach of contract because parties had not yet agreed on amount of loss); <u>232 Broadway Corp.</u> v. <u>Calvert Ins. Co.</u>, 149 A.D.2d 694, 695, 540 N.Y.S.2d 324, 325 (2d Dep't 1989) (payment of claim not due until submission of proof of loss and ascertainment of loss amount); <u>Catalogue Serv., Inc.</u> v. <u>Ins. Co.</u>

of N. Am., 74 A.D.2d 837, 837-38, 425 N.Y.S.2d 635, 637 (2d Dep't 1980) (same); see also Gould Investors, L.P. v. Gen. Ins. Co. of Trieste & Venice, 737 F. Supp. 812, 816 (S.D.N.Y. 1990) (insurer's letter stating that consideration of insured's claim depended on more detailed account of damages was not an outright denial of claim in breach of policy).

The issue of whether the Silverstein Parties are entitled to pre-judgment interest on their ACV claims need not be addressed.

*                    *                    *

For the reasons set forth above, the Silverstein Parties' motion for partial summary judgment is denied.

SO ORDERED:

Dated:     New York, New York
           June 8, 2005

Michael B. Mukasey
U.S. District Judge

24