```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------X
SR INTERNATIONAL BUSINESS      :
INSURANCE CO. LTD.,            :
                               :
        Plaintiff-             :
        Counterclaim Defendant,:   01 Civ. 9291 (MBM)
                               :
    -against-                  :   OPINION AND ORDER
                               :
WORLD TRADE CENTER PROPERTIES, :
LLC, et al.,                   :
                               :
        Defendants-            :
        Counterclaimants.      :
-------------------------------X
WORLD TRADE CENTER PROPERTIES, :
LLC, et al.,                   :
                               :
        Counterclaimants,      :
                               :
    -against-                  :
                               :
ALLIANZ INSURANCE COMPANY,     :
et al.,                        :
                               :
        Additional             :
        Counterclaim-Defendants.:
-------------------------------X
```

APPEARANCES:

BARRY R. OSTRAGER, ESQ.
MARY KAY VYSKOCIL, ESQ.
(Attorneys for Plaintiff-Counterclaim Defendant SR International
Business Insurance Co., Ltd.)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
(212)455-2000

MARC WOLINSKY, ESQ.
BEN M. GERMANA, ESQ.
GORDON M. MEAD, JR., ESQ.
(Attorneys for Defendants-Counterclaimants World Trade Center
Properties LLC, Silverstein Properties Inc., Silverstein WTC
Mgmt. Co. LLC, 1 World Trade Center LLC, 2 World Trade Center
LLC, 4 World Trade Center LLC, and 5 World Trade Center LLC)
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY 10019
(212) 403-1000

JOHN H. GROSS, ESQ.
(Attorney for Defendants-Counterclaimants World Trade Center
Properties LLC, Silverstein Properties Inc., Silverstein WTC
Mgmt. Co. LLC, 1 World Trade Center LLC, 2 World Trade Center
LLC, 4 World Trade Center LLC, and 5 World Trade Center LLC)
PROSKAUER ROSE LLP
1585 Broadway
New York, NY 10036
(212) 969-3000

MICHAEL B. MUKASEY, U.S.D.J.

On June 8, 2005, I signed and released to the parties an opinion denying a motion by the entities referred to in this litigation as the Silverstein Parties to compel SR International Business Insurance Company ("Swiss Re") to pay actual cash value ("ACV") up to its share of a one-occurrence policy limit in an amount exceeding $796 million, plus prejudgment interest. That opinion inter alia rejected an argument by the Silverstein Parties that reading the controlling WilProp form not to require an immediate payment of the full amount of ACV would violate New York's statutory fire policy, which guarantees to a policy holder who suffers a loss, as a bare minimum, the lesser of either ACV or "the amount which it would cost to repair or replace the property with material of like kind and quality within a reasonable time after such loss[.]" N.Y. Ins. Law § 3404(e) at 1; see SR Intern. Business Ins. Co. Ltd. v. World Trade Center Properties LLC, 251 F. Supp.2d 250, 257-58 (S.D.N.Y. 2005).

Regrettably, through an oversight for which I must take responsibility, that opinion was not docketed promptly although all parties received it on or about June 8, 2005 and it is reported in a volume of the Federal Supplement with other roughly contemporaneous opinions. More than three months after the opinion was issued, the Silverstein Parties filed a motion for reconsideration, attaching a self-described "Amicus Memorandum of

1

Law" from the New York State Insurance Department, dated September 14, 2005. That memorandum argues that the reading of the WilProp policy form in the June 8 opinion -- insofar as it fails to require the immediate payment of ACV -- violates New York's statutory fire policy because it burdens an insured's entitlement to immediate payment of ACV with the proviso that such immediate payment was required only if an insured elects not to rebuild. The Insurance Department memorandum features an argument by horrible consequence: not requiring immediate payment of ACV to an insured party electing to rebuild would rob that insured of the benefit of a replacement cost policy because "most insureds could not afford to satisfy the requirement to begin rebuilding the property before receiving any payment." Amicus Memorandum at 4. Counsel for the Silverstein Parties contends with studied earnestness that I should defer to this pronouncement from the New York agency charged with supervising and enforcing the state's insurance laws, and change the ruling in the June 8 opinion. See "Memorandum of the Silverstein Parties In Support of Motion Requesting Reconsideration, Etc." at 3.

For reasons described briefly below, the motion is denied.

The current version of Local Civil Rule 6.3, which controls reargument motions, requires that they be made within

ten days after "entry" of the ruling to be reargued, although the previous version required the motion to be made with ten days after "docketing" of the ruling. It is an exquisitely delicate question, which I need not and do not resolve in this opinion, whether "entry" and "docketing" mean the same thing. To be sure, as noted earlier, the opinion in question was not docketed for months after it was issued to the parties and to the various reporting services that give the public access to court opinions. One point of imposing a time limit on reargument motions would seem to be that they must be made promptly after the challenged ruling so that obvious oversights can be corrected and the litigation can move on in an orderly fashion. Here, the Silverstein Parties stand on the technical ground that so long as the June 8 opinion was not docketed, it was not "entered", and therefore their time to file a reargument motion was extended indefinitely. To be sure, docketing provides a bright-line standard for judging the timeliness of reargument motions, and a losing party might well monitor the docket so as to make certain when its time to make such a motion commences to run. However, the image of the Silverstein Parties crouched in some metaphoric starting block for more than three months, awaiting the sound of a docket entry, is risible.

The Silverstein Parties' delay undermines the whole point of time limits on reargument motions. In a close case,

3

where a decision had not been docketed and a party acted within a few weeks, a delay past the ten days might be disregarded. However, more than three months would appear to be unreasonable. Under ordinary circumstances, I might reject the Silverstein Parties' argument out of hand, and simply hold that they should have acted much sooner. But the circumstances here are not ordinary, principally because the motion itself is otherwise so flawed and overreaching as to invite a more substantive, not to mention a more satisfying, response. Accordingly, the defects of the Silverstein Parties' motion, apart from its timing, are set forth below in ascending order of seriousness.

First, the governing Rule requires that a reargument motion be accompanied by "a memorandum setting forth concisely the matters or controlling decisions which counsel believes the court has overlooked." Of course, in order for something to have been "overlooked," it must have existed and been called to the court's attention when the motion was briefed. See Eisenmann v. Greene, 204 f.3d 393, 395 n.2 (2d Cir. 2000). Unless I am assumed to have had psychic and prophetic gifts at the time I wrote the June 8 opinion, and thus to have been able to imagine and predict that the Silverstein Parties' response to an adverse ruling would be to find their way to the appointee of a financially interested ally and to secure the memorandum filed by the New York State Insurance Department in this case, it cannot

4

be asserted that I "overlooked" that memorandum. Which is to say, the Silverstein Parties' motion violates the governing Local Rule that prescribes the content of a reargument motion.

        Second, although the Silverstein Parties portray the Insurance Department memorandum as the disinterested pronouncement of a guardian of the public welfare, I find it impossible to overlook the interest of New York State and its elected officials, including the chief executive who appointed the Superintendent of Insurance, in the outcome of this litigation. Or, as Justice Frankfurter once put it, "there comes a point where this Court should not be ignorant as judges of what we know as men." <u>Watts</u> v. <u>Indiana</u>, 338 U.S. 49, 52 (1949) (plurality opinion). There is nothing improper in that interest -- which is to secure as much financial support as possible from private sources, as quickly as possible, to pay for the restoration of the World Trade Center site. Nor is it that this court would not wish to have the views of one who came as what the Insurance Department claims to be -- <u>amicus curiae</u>, a friend of the court. It is rather that this court knows the difference between a friend of the court and a friend of one of the litigants. When a public entity aligned with one who has an interest in the outcome of a case submits a memorandum, in direct response to an opinion of this court that is adverse to that interest -- a memorandum that does not contain so much as a

5

syllable alleged to have existed before the date of the court's opinion -- that memorandum will have to stand or fall not on the purported authority of its source but solely on its own internal logic.

Which brings me to the principal defect in this submission. The argument underlying the Insurance Department's memorandum is as follows: Because the June 8 opinion holds that a party insured under the WilProp form that elects to rebuild after suffering a loss is not entitled to immediate payment of ACV, it renders "illusory" the policy's promise of replacement cost because "most insureds could not afford to satisfy the requirement to begin rebuilding the property before receiving any payment." Amicus Memorandum at 4. Thus, the Insurance Department argues that it is necessary to provide to an insured that elects to rebuild a fund from which to draw so as to initiate rebuilding, and that fund should consist of a payment of ACV.

This argument is notable for three weaknesses. First, a lump-sum payment of ACV -- again, the actual value of the entire destroyed property -- likely would be far greater than the cost to "begin rebuilding the property", however one might define that elastic phrase. Certainly, ACV is likely to be less than the total cost of rebuilding, but it bears no ascertainable relationship to whatever sum it would take for a party to "begin

6

rebuilding the property." Therefore, insofar as the Insurance Department argues the necessity of providing funds to "begin rebuilding the property", its insistence on immediate payment of ACV purports to justify a payment that exceeds the necessity the Insurance Department has hypothesized.

Second, New York's standard fire policy contains a provision directing an appraisal proceeding if the parties cannot agree on the amount of ACV. The process for conducting such an appraisal is that the parties select appraisers and the court appoints a referee pursuant to New York Insurance Law § 3408, and they then proceed to what is essentially an arbitration. That is the process for resolving disputes as to ACV, and it seems obvious that it cannot possibly generate a consistently speedy payment. In fact, parties to this case are involved now in such a proceeding, which can already be described as protracted and is likely to be yet more so. The notion that ACV is in general a reliable source of early payment to jump-start rebuilding efforts is simply unrealistic.

Third, even if ACV were paid immediately, the Insurance Department's hypothetical insured would run out of money before the project was completed, ACV necessarily being less than the cost of rebuilding. In the scenario apparently envisioned by the Insurance Department, where an insured must pay costs before being reimbursed by its insurer, there would come a time when

this hypothetical insured would use up its ACV funds and again would become unable to pay. An up-front payment of ACV might delay that eventuality, but could not avoid it. Payment of ACV is no solution to the problem as the Insurance Department apparently has defined it.

In sum, the Insurance Department's argument would provide for payment of an arbitrary sum in excess of what it says is necessary, often at a time that may be so long delayed as to imperil rebuilding efforts, and would not solve the problem of the impecunious insured for whose benefit the argument allegedly is advanced. It thus appears that the Insurance Department's argument manages remarkably to prove too much and too little simultaneously. One basic flaw here lies in an assumption underlying the Insurance Department's argument -- that an insured must pay substantial costs out of its own pocket before it can obtain payment from an insurer. That assumption seems entirely unfounded. There is a big difference between incurring costs and paying them. When the June 8 opinion stated that under WilProp "the Silverstein Parties will have to provide Swiss Re with partial proofs of loss to collect insurance as replacement costs are incurred," 381 F. Supp.2d at 256, that language was not meant to suggest, nor can it reasonably be read to suggest, that insurance can be collected only as replacement costs are paid. One who decides to rebuild can incur costs simply by making that

8

decision in the sense that the decision to rebuild generates activities like planning and design that often cost money. There is no reason why an insurer obligated to pay replacement cost is not obligated also to pay those costs in a manner timely enough to assure that replacement actually occurs. Nothing in the court's reading of WilProp as described in the June 8 opinion suggests that the rule should be otherwise.[1]

For the above reasons, the Silverstein Parties' motion for reargument is denied.

SO ORDERED:

Dated: New York, New York
January 11, 2006

Michael B. Mukasey,
U.S. District Judge

---

[1] That appears to be the point behind footnote 2 on page 5 of the Insurance Department's memorandum, which tells me that such interim payments are routine, and that the Insurance Department has not received complaints that insurers withhold payments to insureds who choose to repair until repairs are made. The Silverstein Parties read that footnote as evidence of a custom and practice of paying ACV up front to insureds who have elected to rebuild. I decline to hallucinate such evidence in that footnote.

9