UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
SR INTERNATIONAL BUSINESS        :
INSURANCE CO. LTD.,              :
                                 :
        Plaintiff-              :
        Counterclaim Defendant,  :    01 Civ. 9291 (MBM)
                                 :
    -against-                    :    OPINION AND ORDER
                                 :
WORLD TRADE CENTER PROPERTIES,   :
LLC, et al.,                     :
                                 :
        Defendants-             :
        Counterclaimants.        :
----------------------------------X
WORLD TRADE CENTER PROPERTIES,   :
LLC, et al.,                     :
                                 :
        Counterclaimants,       :
                                 :
    -against-                    :
                                 :
ALLIANZ INSURANCE COMPANY,        :
et al.,                          :
                                 :
        Additional             :
        Counterclaim-Defendants. :
----------------------------------X

APPEARANCES:

MARC WOLINSKY, ESQ.
JONATHAN M. MOSES, ESQ.
BEN M. GERMANA, ESQ.
JOSHUA A. MUNN, ESQ.
IAN BOCZKO, ESQ.
MARTIN J.E. ARMS, ESQ.
EDWARD J.W. BLATNIK, ESQ.
(Attorneys for defendants-counterclaimants World Trade Center
Properties LLC, Silverstein Properties Inc., Silverstein WTC
Mgmt. Co. LLC, 1 World Trade Center LLC, 2 World Trade Center
LLC, 4 World Trade Center LLC, and 5 World Trade Center LLC)
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY 10019
(212) 403-1000

JOHN H. GROSS, ESQ.
LOIS D. THOMPSON, ESQ.
(Attorneys for defendants-counterclaimants World Trade Center
Properties LLC, Silverstein Properties Inc., Silverstein WTC
Mgmt. Co. LLC, 1 World Trade Center LLC, 2 World Trade Center
LLC, 4 World Trade Center LLC, and 5 World Trade Center LLC)
PROSKAUER ROSE LLP
1585 Broadway
New York, NY 10036
(212) 969-3000

MILTON H. PACHTER, ESQ.
MEGAN LEE, ESQ.
TIMOTHY G. STICKELMAN, ESQ.
(Attorneys for defendant-counterclaimant the Port Authority of
New York and New Jersey)
225 Park Avenue South, 14th Floor
New York, NY 10003
(212) 435-3435

TIMOTHY G. REYNOLDS, ESQ.
(Attorney for defendant-counterclaimant the Port Authority of New
York and New Jersey)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
4 Times Square
New York, NY 10036
(212) 735-3000

PETER K. ROSEN, ESQ.
(Attorney for defendants-counterclaimants WTC Retail LLC (f/k/a
Westfield WTC LLC), Westfield Corporation, Inc., and Westfield
America, Inc.)
LATHAM & WATKINS LLP
633 West Fifth Street, Suite 4000
Los Angeles, CA 90071
(213) 891-8778

KRISTINE L. WILKES, ESQ.
(Attorney for defendants-counterclaimants WTC Retail LLC (f/k/a
Westfield WTC LLC), Westfield Corporation, Inc., and Westfield
America, Inc.)
LATHAM & WATKINS LLP
600 West Broadway, Suite 1800
San Diego, CA 92101
(619) 236-1234

CATHERINE M. COLINVAUX, ESQ.
(Attorney for counterclaim defendant Allianz Global Risks US
Insurance Company (f/k/a/ Allianz Insurance Company))
ZELLE, HOFMANN, VOELBEL, MASON & GETTE LLP
950 Winter Street, Suite 1300
Waltham, MA 02451
(781) 466-0700

JOHN B. MASSOPUST, ESQ.
THOMAS CASWELL, ESQ.
MARK FEINBERG, ESQ.
ROGER BRANIGAN, ESQ.
(Attorneys for counterclaim defendant Allianz Global Risks US
Insurance Company (f/k/a Allianz Insurance Company))
ZELLE, HOFMANN, VOELBEL, MASON & GETTE LLP
500 Washington Avenue South, Suite 4000
Minneapolis, MN 55415
(612) 339-2020

DALE C. CHRISTENSEN, JR., ESQ.
JOHN J. GALBAN, ESQ.
(Attorneys for counterclaim defendant Allianz Global Risks US
Insurance Company (f/k/a Allianz Insurance Company))
SEWARD & KISSEL LLP
One Battery Park Plaza
New York, NY 10004
(212) 574-1200

ALAN R. MILLER, ESQ.
(Attorney for counterclaim defendants Gulf Insurance Company,
Travelers Indemnity Company, and Industrial Risk Insurers)
ROBINS KAPLAN MILLER & CIRESI LLP
800 Boylston Street, 25th Floor
Boston, MA 02199
(617) 267-2300

HARVEY KURZWEIL, ESQ.
(Attorney for counterclaim defendants Gulf Insurance Company and
Travelers Indemnity Company)
DEWEY BALLANTINE LLP
1301 Avenue of the Americas
New York, NY 10019
(212) 259-8000

ROBERT J. MORROW, ESQ.
(Attorney for counterclaim defendants Gulf Insurance Company and
Travelers Indemnity Company)
HUNTON & WILLIAMS LLP
200 Park Avenue
New York, NY 10166
(212) 309-1275

MICHAEL H. BARR, ESQ.
JANE G. STEVENS, ESQ.
EDWARD J. REICH, ESQ.
JUSTIN N. KATTAN, ESQ.
(Attorneys for counterclaim defendant Royal Insurance Company)
SONNENSCHEIN NATH & ROSENTHAL LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 768-6700

DALE HAUSMAN, ESQ.
(Attorney for counterclaim defendant Zurich American Insurance
Company)
WILEY REIN & FIELDING LLP
1776 K Street, NW
Washington, DC 20006
(202) 719-7000

PAUL R. KOEPFF, ESQ.
(Attorney for counterclaim defendant Zurich American Insurance
Company)
O'MELVENY & MYERS
Times Square Tower
7 Times Square
New York, NY 10036
(212) 326-2026

CAROLYN H. WILLIAMS, ESQ.
PHILIP A. SECHLER, ESQ.
(Attorneys for counterclaim defendant Industrial Risk Insurers)
WILLIAMS & CONNOLLY
725 12th Street, NW
Washington, DC 20005
(202) 434-5000

MICHAEL B. MUKASEY, U.S.D.J.

Before the court are two sets of motions and cross-motions for partial summary judgment arising out of an ongoing appraisal proceeding in the litigation to determine the amount of insurance recoverable for the destruction of the World Trade Center complex ("WTC") on September 11, 2001 ("9/11"). The parties to the proceeding are, on the insurers' side, several of the companies that provided insurance coverage for the WTC on 9/11 ("the Appraising Insurers"[1]), and, on the insureds' side, the Port Authority of New York and New Jersey ("Port Authority"), WTC Retail LLC (f/k/a Westfield WTC LLC), and the Silverstein Parties[2] (collectively, "the Insureds").

In the first set of motions, the Silverstein Parties move for a declaration that the full appraised value of tenant improvements affixed to the WTC and owned by the Insureds be included in the calculation of replacement cost, one of three quantities being determined by the appraisal panel. The Appraising Insurers cross-move in three different motions --

---

[1] The Appraising Insurers, also referred to herein as the "Insurers," are Allianz Global Risks US Insurance Company (f/k/a Allianz Insurance Company); Gulf Insurance Company; Royal Indemnity Company; Travelers Indemnity Company; Zurich American Insurance Company; and Industrial Risk Insurers.

[2] The Silverstein Parties are World Trade Center Properties, LLC; Silverstein Properties Inc.; Silverstein WTC Mgmt. Co. LLC; 1 World Trade Center LLC; 2 World Trade Center LLC; 4 World Trade Center LLC; and 5 World Trade Center LLC.

based on their similar but not identical policies -- for orders that would bar the Silverstein Parties from recovering the full replacement cost of the improvements; limit the Insureds' recovery to their "financial interest" in the improvements; declare that this financial interest is "the unamortized portion of the [Port Authority's] original contribution to the improvements"; and hold that replacement cost coverage is inapplicable to tenant improvements and should not be calculated as to the improvements.

In the second set of motions, some of the Appraising Insurers move for a declaration that the definition of actual cash value ("ACV") in one of the policies -- the Travelers form -- requires application of the "broad evidence rule," which allows the Appraisal Panel to consider any relevant evidence, including market value, tending toward an estimate of the loss caused by the destruction of the WTC. The Silverstein Parties cross-move for a declaration that ACV must be determined according to the plain language of the definition, starting with an estimate of "replacement cost new," deducting for the physical impairments of value specified in the policy, and avoiding any calculation that is based on or incorporates market value.

For the reasons set forth below, the Silverstein Parties' motion to include tenant improvements in replacement cost is granted and the Appraising Insurers' related cross-

motions are denied.  On the second set of motions, the moving
Appraising Insurers' motion to use the "broad evidence rule" to
define ACV is denied, and the Silverstein Parties' cross-motion
relating to the exclusion of market value calculations is
granted.


I.

The following facts are drawn from the parties'
submissions, as well as prior opinions in this litigation,
familiarity with which is assumed.

In July 2001, the Silverstein Parties entered into 99-
year leases with the Port Authority for the commercial space in
the WTC, which comprised the North and South Towers, buildings 4
and 5, the retail mall, and related sub-grade spaces.  Westfield
WTC LLC, now known as WTC Retail LLC ("WTC Retail"),[3] entered
into virtually identical leases for the complex's retail mall.
In connection with these leases, the Silverstein Parties, on
behalf of themselves, the Port Authority, and WTC Retail,
purchased over $3.5 billion of "per occurrence" property
insurance from a group of insurers.  This group included, among
others, Allianz Global Risks US Insurance Company (f/k/a Allianz
Insurance Company), Gulf Insurance Company, Royal Indemnity

_____

[3]     In December 2003, the Port Authority purchased
Westfield's entire leasehold interest in the retail portion of
the WTC complex.

Company, Travelers Indemnity Company, Zurich American Insurance Company, and Industrial Risk Insurers ("IRI"). After the destruction of the WTC, these six insurers, along with the Insureds, agreed to participate in an appraisal to determine various values under their policies (the "Appraisal"). The parties have stipulated (see Ex. 12 to TI Blatnik Decl.[4]) that the purpose of the Appraisal is to determine three specific values: (1) the replacement cost of the WTC; (2) the actual cash value of the WTC; and (3) the rental value loss that resulted from destruction of the WTC. (See id. at 2-3) Questions regarding actual claims made on a replacement cost basis as reconstruction progresses are beyond the Panel's mandate; the provision of the stipulation that describes the replacement cost that the Panel must determine -- Section I.A.1 -- recognizes that "[t]he Insureds will be making claims on a replacement cost basis as moneys are expended to rebuild" but notes that "[t]hose claims are not part of the I.A.1 topic." (Id. at 3, n.5)

A. The Insurance Policies

The coverage provided by each of the Appraising Insurers is governed by one of three policies: Travelers,

---

[4]    All citations to the parties' submissions on the tenant improvements motions will be denoted with "TI." All citations to the actual cash value motion submissions will be denoted with "ACV."

Insurance Services Office ("ISO"), or IRI.[5]  Each is a "binder"

policy, an interim form that covers the insured while the parties

work out a final insurance agreement.  All three policies provide

for "replacement cost" coverage as a supplement to traditional

"actual cash value" coverage through a form or collection of

provisions called a Replacement Cost Endorsement ("RCE").[6]

Although the three RCEs are not identical, their provisions and

methods for determining the amount of replacement coverage are

substantially similar.

Specifically, the Travelers form provides that, in the

event of a covered loss, "the Company will determine the value of

Covered Property at replacement cost as of the time and place of

loss, without deduction for physical deterioration, depreciation,

obsolescence and depletion, except as otherwise provided in this

endorsement . . . ."  (Ex. 1 to TI Munn Decl. at Willis 98580)

This valuation is subject to several conditions, including that

---

[5]     The Travelers policy covers Allianz, Gulf, Travelers,
and Zurich; the ISO policy covers Royal; the IRI policy covers
IRI.

[6]     Replacement cost policies provide greater coverage than
traditional "actual cash value" policies by permitting the
insured to replace damaged or destroyed property with new
property without any deduction.  By paying an extra premium for
replacement cost coverage, the insured can recover on a "new-for-
old" basis instead of the "old-for-old" recovery provided by ACV
coverage.  However, in order to collect this larger amount, the
insured must actually replace the damaged property consistent
with the RCE.  For an extended discussion, see Leo John Jordan,
What Price Rebuilding?, 19 Brief 17 (Fall 1990).

"[t]he Company will not pay for any loss or damage on a replacement cost basis until the property is repaired, rebuilt or replaced." (<u>Id.</u>) If the property is not replaced, the RCE provides that "the value of the property will be determined at 'Actual Cash Value,'" a term defined elsewhere in the RCE as "the cost to repair, rebuild or replace the lost or damaged property, at the time and place of the loss, with other property of comparable size, material and quality, less allowance for physical deterioration, depreciation, obsolescence and depletion." (<u>Id.</u> at Willis 98580, 98582). This definition is the subject of the parties' ACV motions discussed later in this opinion.

The ISO policy, as modified by applicable "Optional Coverages," provides replacement cost coverage (<u>see</u> Ex. A to TI Kattan Decl. at ROY 05550) whereby the insurer must "determine the value of Covered Property in the event of loss . . . at [Replacement Cost (without deduction for depreciation)] as of the time of loss or damage." (<u>Id.</u> at ROY 05548) However, as under the Travelers policy, the insurer "will not pay on a replacement cost basis for any loss or damage: (1) Until the lost or damaged property is actually repaired or replaced; and (2) Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage." (<u>Id.</u> at ROY 05550-51)

Finally, the IRI RCE, like the Travelers and ISO

6

policies, conditions replacement coverage on repair, rebuilding, or replacement. (Ex. 3 to TI Munn Decl. at IRI 06719) However, the RCE contains a time limitation:

> In consideration of the increased premium . . . the coverage under this policy applicable only to property as shown in paragraph D. below is hereby extended to cover such property to the amount actually expended by or in behalf of the Insured to repair, rebuild or replace within two (2) years from the date of loss or damage, at the same or at another site, such property which has been damaged. (Id. at IRI 06719-20)

That provision is subject to certain valuation conditions explained in more detail below.

Under all three policies, the actual amount of replacement cost proceeds payable is determined by reference to a set of "loss settlement" provisions. Under each, the insurer's liability is either the hypothetical cost of rebuilding what was destroyed, the amount actually spent rebuilding, or the policy limits, whichever is the least. Specifically, under Section A.1 of the Travelers Replacement Cost form, coverage is the least of:

> a. The cost to repair, rebuild or replace, at the same site, the lost, damaged or destroyed property, with other property of comparable size, material and quality; or
>
> b. The actual amount incurred by the Insured that is necessary to repair, rebuild or replace the lost, damaged or destroyed property; or
>
> c. The Limit of Insurance . . . . (Ex. 1 to TI Munn Decl. at Willis 98580)

7

Similarly, pursuant to Section G.3.e of the ISO policy, coverage is the least of "(1) the Limit of Insurance . . . (2) The cost to replace the lost or damaged property [at the original premises] with other property . . . [o]f comparable material and quality and . . . [u]sed for the same purpose; or (3) The amount actually spent that is necessary to repair or replace the lost or damaged property."  (Ex. 2 to TI Munn Decl. at ROY 95551)  Finally, under the IRI RCE, the insured receives the lesser of "the cost to repair, rebuild or replace on the same site with new materials of like kind and quality, whichever is the smallest"; "the actual expenditure incurred in repairing, rebuilding or replacing on the same or another site, whichever is the smallest"; or the overall policy limits. (Ex. 3 to TI Munn Decl. at IRI 06719, 06720).

All three policies provide coverage for the kinds of property that comprise tenant improvements.  The Travelers "Property Coverage" form states that coverage is provided "for Covered Property . . . for which the Insured has an insurable interest" and then defines such property to include "Buildings . . . including: (1) Completed additions; (2) Fixtures, including outdoor fixtures; [and] (3) Machinery and equipment permanently attached to the building . . . ."  (Ex. 1 to TI Munn Decl. at Willis 98514)  The ISO "Building and Personal Property Coverage Form" likewise extends coverage to "Covered Property" and defines such property in an almost identical manner.  (See Ex. 2 to TI

8

Munn Decl. at ROY 05539)  The IRI policy covers in its "Property Damage" section "real property in which the Insured has an insurable interest" and then, in Paragraph D of the RCE, gives replacement coverage only to "[b]uildings and structures, building equipment, plant equipment, machinery, machine parts, office furniture, office equipment, . . . and leasehold Improvements and Betterments except all such property which is obsolete or useless to the Insured . . . ."  (Ex. 3 at TI Munn Decl. at IRI 06616, 06720)  This "obsolete or useless" language is unique to the IRI policy.

Finally, the Travelers and ISO policies –- but not the IRI policy –- contain an additional clause in their general coverage provisions limiting the insured's recovery to its "financial interest" in the property covered by the policies. (See Ex. 3 to TI Munn Decl. at WILLIS 96576 ("The Company will not pay the Insured more than the Insured's financial interest in the Covered Property."); Ex. 2 to TI Munn Decl. at ROY 05547 ("We will not pay you more than your financial interest in the Covered Property.")) Neither policy defines the term "financial interest" or mentions the term in the RCEs.

B. The Master and Tenant Leases

The Insureds' interests in tenant improvements are defined in two sets of leases: (1) the various leases between the

9

individual WTC space tenants and the Port Authority (the "Tenant Leases") for the renting of office and retail space within the WTC; and (2) the 99-year leases between the Silverstein Parties, WTC Retail, and the Port Authority (the "Master Leases") for the leasing of the WTC.  Under these latter leases, the Silverstein Parties and WTC Retail assume the various obligations held by the Port Authority under the Tenant Leases, as well as additional obligations to the Port Authority itself.

1. <u>The Tenant Leases</u>

Under the Tenant Leases, non-removable improvements affixed to the premises by tenants become the property of the Port Authority upon installation, and the tenants lose any right to remove them.  For example, the lease between the Port Authority and tenant Harris Beach & Wilcox, LLP, one of over 400 tenants in the WTC (TI Appraising Insurers Rule 56.1 Statement ¶ 12), provides that Harris Beach could not erect any "structures, . . . [or] improvements, . . . or install any fixtures in or on the Premises (other than [removable] trade fixtures) without prior consent of the Port Authority" and that, regardless of whether consent was obtained, "the same shall immediately become the property of the Port Authority, and the Lessee shall have no right . . . to change or remove the same either during the term or at the expiration thereof."  (Ex. 17 to TI Blatnik Decl. at

15; <u>see also</u> Ex. 5 to TI Munn Decl. (Rosenberg & Estis Report for Market Insurers) at 5 (noting that "once improvements are installed within the demised premises, the office space leases provide that the same become the property of the landlord"); <u>id.</u> at 6 (reaching same conclusion for retail leases))

The Tenant Leases establish also that the Port Authority must repair or rebuild the premises, including such improvements, in the event of certain casualty losses. For example, the lease between the Port Authority and tenant Regus Business Centre states that in the event of a casualty loss, the Authority will, depending on the time it would take to repair the damage to the premises, either repair the damage, terminate the lease as to the damaged portion of the premises, or terminate the lease entirely, with corresponding rent abatements. (<u>See</u> Ex. H to TI Appraising Insurers Rule 56.1 Statement at 8) The lease provides also that if the damage will take over 90 days to repair, and the tenant is so notified, the tenant may terminate the lease as well. (<u>Id.</u>) The Port Authority's obligations under this and other Tenant Leases are assumed by the Silverstein Parties and WTC Retail through the Master Leases. (<u>See, e.g.</u>, Ex. F. to TI Appraising Insurers Rule 56.1 Statement at 171-72)


2. <u>The Master Leases</u>

Under Section 11 of the Master Leases, "[a]ll

improvements, fixtures, machinery, apparatus, and fittings
affixed to the Premises . . . shall be a part of the Premises and
shall be, or become, the property of the Port Authority on the
Commencement Date, or upon installation thereof . . . and legal
title thereto shall be and remain in the Port Authority."  (Ex. 6
to TI Munn Decl. at 151; see also Ex. 7 to TI Munn Decl. at 149)

This property is part of the "premises" leased by the Port
Authority to the Silverstein Parties and WTC Retail for 99 years
(see Ex. 6 to TI Munn Decl. at 59-60) and is among the property
that the Silverstein Parties and WTC Retail have an obligation to
rebuild.  Section 15 of the Master Leases sets out the rebuilding
obligation: In the event that any portion of the WTC is destroyed
by fire or other casualty "or by reason of any cause whatsoever,"
the Silverstein Parties (or WTC Retail)

> at [their] sole cost and expense, and whether
> or not such damage or destruction is covered
> by insurance proceeds sufficient for the
> purpose . . . shall rebuild, restore, repair
> and replace the Premises . . . and any
> structures, improvements, fixtures and
> equipment, furnishings and physical property
> located thereon substantially in accordance,
> to the extent feasible, prudent and
> commercially reasonable, with the plans and
> specifications for the same as they existed
> prior to such damage or destruction or with
> the consent in writing of the Port Authority
> . . . make such other repairs, replacements,
> changes or alterations as is mutually agreed
> to by the Port Authority and [the Silverstein
> Parties (or WTC Retail)] . . . . (Ex. F to TI
> Appraising Insurers Rule 56.1 Statement at
> 171-72)

The parties agree, at least for the purposes of these motions, that the Silverstein Parties are in the process of rebuilding the WTC.[7] (See, e.g., TI Appraising Insurers Mem. 10-11; TI Appraising Insurers Reply Mem. 7, 8)

## II.

Whether the terms of an insurance policy are ambiguous is a question of law for the court to decide. Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, 136 F.3d 82, 86 (2d Cir. 1998). Ambiguity exists when a contract term suggests "more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co., 345 F.3d 154, 184 (2d Cir. 2003) (internal quotation marks omitted); see also Zurich Am. Ins. Co. v. ABM Indus., Inc., 397 F.3d 158, 164 (2d Cir. 2005). When the terms of an insurance policy, whether a binder or final policy, "are clear and unambiguous, the court should look no further than the language of the policy" itself. Citigroup, Inc. v. Indus.

---

[7]     This opinion expresses no view as to what effect, if any, the recent agreement to give the Port Authority a leadership role in the rebuilding of the Freedom Tower has on the obligations of any insurer.

Risk Ins., 336 F. Supp. 2d 282, 287 (S.D.N.Y. 2004), aff'd, 421 F.3d 81 (2d Cir. 2005); see also World Trade Ctr. Props., 345 F.3d at 184.  However, "extrinsic evidence is admissible to determine the parties' intentions with respect to the incomplete and unintegrated terms of a binder."  World Trade Ctr. Props., 345 F.3d at 184.

This court has jurisdiction to resolve the parties' present dispute despite the ongoing appraisal proceeding because the Appraisal Panel may not decide questions of law.  See Duane Reade Inc. v. St. Paul Fire & Marine Ins. Co., 411 F.3d 384, 389 (2d Cir. 2005) ("It is well established that the scope of coverage provided by an insurance policy is a purely legal issue that cannot be determined by an appraisal, which is limited to factual disputes over the amount of loss for which an insurer is liable.").  In other words, an "appraisal resolves only a valuation question leaving all other issues for resolution at a plenary trial."  Penn Cent. Corp. v. Consol. Rail Corp., 56 N.Y.2d 120, 127, 451 N.Y.S.2d 62, 66 (1982); see also Kawa v. Nationwide Mut. Fire Ins. Co., 664 N.Y.S.2d 430, 432 (Sup. Ct. Erie County 1997) (observing that "appraisal extends merely to the specific issues of cash value and the amount of loss").

Although a court generally reviews disputed questions of law after an appraisal is complete, this timing is not mandatory.  Here, the Appraisal Panel has asked unanimously that

14

the court resolve the pending motions while the proceeding is ongoing.  (See Ex. 1 to TI Miller Reply Decl.)  In the interests of efficiency, I will do so, but this should not be read to invite a demand for immediate adjudication of every dispute the parties may have over the interpretation of the Travelers, ISO, and IRI policies.  Rather, in cases where the parties' dispute implicates the values the Panel is determining under the stipulation, the court will decide whether the dispute is appropriate for immediate disposition.  This result is consistent with the stipulation, which provides that the Panel's sole purpose is to determine replacement cost, actual cash value, and rental loss, and not, for example, to assess the viability of claims made for reimbursement of actual replacement expenses. (See Ex. 12 to TI Blatnik Decl. at 2-3; see id. at 3 n.5 (stating that the Insureds' replacement cost claims are "not part of the I.A.1 topic"))

III.

        Turning first to the tenant improvements motions, it is undisputed that the tenant improvements at issue –- fixtures which were permanently attached to the tenants' offices and stores –- are property covered by the policies.[8]  (See TI

_____

        [8]    This opinion does not deal with removable items and other personal property over which the tenants retained ownership.  It pertains only to permanently affixed improvements

Silverstein Parties (SP) Mem. 6-9; TI Appraising Insurers Mem. 4)
The definition of covered property in all three policies plainly
encompasses tenant improvements. (<u>See</u> Ex. 1 to TI Munn Decl.
(Travelers form) at WILLIS 98514 (stating that covered property
includes "[c]ompleted additions," "[f]ixtures," and "[m]achinery
and equipment permanently attached to the building"); Ex. 2 to TI
Munn Decl. (ISO form) at ROY 05539 (same); Ex. 3 to TI Munn Decl.
(IRI form) at IRI 06616, 06720 (extending coverage to all real
property in which the insured has an "insurable interest," and
listing "[b]uildings and structures," "building equipment,"
"machinery," and "leasehold Improvements and Betterments" as
covered in RCE))

It is also not disputed that the Insureds had an
"insurable interest" in the improvements, a prerequisite to any
property insurance recovery. (<u>See, e.g.</u>, Appraising Insurers TI
Mem. 18 ("Undeniably, Silverstein had an insurable interest in
the 9/11 Tenant Improvements . . . .")) To have an "insurable
interest," an insured must be in "such a relation or connection
with, or concern in, such subject matter that [it] will derive

_____

that were the property of the Insureds under the Space Tenant and
Master Leases. According to the Silverstein Parties, such
improvements include, among other things, "structural steel work
supporting floors, duct work, internal staircases, marble floors,
ceilings, doors, walls, electrical conduits and outlets,
plumbing, and fire protection installations." (TI Silverstein
Parties (SP) Mem. 5; <u>see also</u> TI SP Rule 56.1 Opp'n Statement ¶
I.7)

pecuniary benefit or advantage from its preservation, or will suffer pecuniary loss or damage from its destruction . . . ." Scarola v. Ins. Co. of N. Am., 31 N.Y.2d 411, 413, 340 N.Y.S.2d 630, 631-32 (1972) (internal quotation marks omitted). The Insureds, as the owners of the improvements, suffered pecuniary loss when they were destroyed.[9]

The parties' disagreement centers on what this insurable interest is and how it ought to be valued. The Silverstein Parties argue that the improvements should be treated the same way as the buildings to which they were attached -- that is, like the WTC's "core and shell," they should be included in replacement cost at their full appraised value. The Insurers, noting that many of the tenants that occupied space on 9/11 have terminated or abandoned their leases, contend that the improvements cannot be valued at full replacement cost because they will never be "replaced." Instead, they argue that the

---

[9]     Although the immediate motion was brought by the Silverstein Parties, the insurance policies at issue concern the interests of the Silverstein Parties, WTC Retail, and the Port Authority. All of these entities are parties to the appraisal proceeding, and the values being determined by the Appraisal Panel reflect their aggregate interests. (See, e.g., Ex. 12 to TI Blatnik Decl. at 2 (stating that Panel is to determine replacement cost of "the insured premises located at the World Trade Center Complex"; and that this includes "1, 2, 4, and 5 World Trade Center and all common areas and sub-grade levels including the mall and retail level")) Accordingly, throughout this opinion, the court will evaluate the joint interest of the Insureds' under the policies, not just the Silverstein Parties' more limited interest as lessor.

17

Appraisal Panel should value only "the unamortized portion of the Port Authority's original contribution to these improvements," the amount they claim constitutes the limit of the Insureds' actual interest in the improvements. (TI Appraising Insurers Mem. 5) For the most part, they suggest that this smaller amount should be included in replacement cost, consistent with the position that they have already taken in the appraisal proceeding, where they have included a "tenant improvement loss" of over $220 million in replacement cost. (See TI Appraising Insurers Reply Mem. 7; Ex. 4 to TI Munn Decl. at 30; Ex. R to TI Appraising Insurers Rule 56.1 Statement at II-C 1) At times, however, they argue that tenant improvements cannot be included in replacement cost at all and that the Insureds can recover only their "financial interest" in the improvements on an ACV basis. (See, e.g., TI Royal Mem. 2; TI IRI Mem. 2; TI Appraising Insurers Reply Mem. 4)

To put these arguments in context, it is important first to consider what it is that the Appraisal Panel is valuing. The Panel's stipulated mandate is to determine the "[r]eplacement cost of the insured premises located at the World Trade Center Complex pursuant to the provisions of the Travelers, IRI, and any other policy . . . ." (Ex. 12 to TI Blatnik Decl. at 2) This amount is plainly the hypothetical replacement cost figure that, under the loss settlement provisions of all three RCEs, must be

compared to actual replacement expenditures and the policy limits to determine the amount of coverage. The figure "is really nothing more than a hypothetical measuring device" that caps the insurer's liability if and only if the insured qualifies for replacement cost recovery. Johnson v. Colonial Penn Ins. Co., 487 N.Y.S.2d 285, 287 (Sup. Ct. Essex County 1985); accord Kumar v. Travelers Ins. Co., 211 A.D.2d. 128, 131, 627 N.Y.S.2d 185, 187 (4th Dep't 1995). The calculation of hypothetical replacement cost says nothing about the insured's actual entitlement to replacement cost recovery, an issue that is properly considered if and when the insured actually seeks reimbursement for rebuilding expenses. Indeed, the Appraisal Panel has no authority to consider this underlying coverage question and this court's opinion does not attempt to answer it.

Under the unambiguous terms of the Travelers, ISO, and IRI policies, hypothetical replacement cost must include tenant improvements at their full appraised value. At the time of loss, the improvements were fully owned by the Insureds, legally part of the WTC "premises," and covered property under all three policies. As such, the improvements are part of the "insured premises" being valued by the Appraisal Panel at replacement cost (see Ex. 12 to TI Blatnik Decl. at 2) and are subject to the same loss settlement provisions as the buildings to which they were attached. These provisions direct the Panel to determine "[t]he

cost to repair, rebuild or replace, at the same site, the . . . destroyed property with other property of comparable size, material and quality." (Ex. 1 to TI Munn Decl. at WILLIS 98580; <u>see also</u> Ex. 2 to TI Munn Decl. at ROY 05551; Ex. 3 to TI Munn Decl. at IRI 06719) Whatever it would cost to replace the destroyed improvements with "property of comparable size, material and quality" must therefore be included in hypothetical replacement cost. Try as they might to avoid this straightforward result, the Insurers offer no sound basis for including the improvements in hypothetical replacement cost at anything less than full value.

A. Likelihood of Actual Replacement

      The Insurers first argue that the improvements are not eligible for replacement cost recovery because they will never be rebuilt for the 9/11 space tenants and rebuilding is a condition precedent to payment under the RCEs. (<u>See, e.g.</u>, TI Appraising Insurers Mem. 15-18; TI Appraising Insurers Reply Mem. 1, 3-13) For the most part, this argument is directed at the Insureds' ultimate right to collect replacement proceeds, a coverage issue that is separate from the Panel's calculation of hypothetical replacement cost and is not properly before the court. However, to the extent the argument suggests that the improvements cannot be valued at replacement cost by the Panel, it is without merit

for several reasons.

As an initial matter, although actual replacement is a condition precedent to collecting replacement proceeds, it is not a condition precedent to valuing hypothetical replacement cost, which is all the Panel is authorized to do and the only issue of immediate concern. To the contrary, the facts underlying several cases demonstrate that hypothetical replacement cost is routinely calculated prior to the determination of whether a policyholder is entitled to recover replacement cost. See, e.g., D.R. Watson Holdings, LLC v. Caliber One Indem. Co., 15 A.D.3d 969, 969, 789 N.Y.S.2d 787, 787 (4th Dep't 2005); Harrington v. Amica Mut. Ins. Co., 223 A.D.2d 222, 224, 645 N.Y.S.2d 221, 222 (4th Dep't 1996); Kumar, 211 A.D.2d at 130, 627 N.Y.S.2d at 186; Conway v. Farmers Home Mut. Ins. Co., 31 Cal. Rptr. 2d 883, 883 (Ct. App. 1994); Hess v. N. Pac. Ins. Co., 859 P.2d 586, 586 (Wash. 1993); Blanchette v. York Mut. Ins. Co., 455 A.2d 426, 427 (Me. 1983); Kolls v. Aetna Cas. & Sur. Co., 378 F. Supp. 392, 400 (S.D. Iowa), aff'd, 503 F.2d 569 (8th Cir. 1974). This timing makes sense because the early calculation of hypothetical replacement cost informs the insured of the upper limit on the funds available for rebuilding and can thus influence the insured's decision as to whether and how to rebuild. Consistent with this practice, Section I.A.1 of the parties' stipulation, which describes the replacement cost calculation, acknowledges

that the Insurers may challenge the Insureds' right to receive replacement proceeds as the Insureds undertake rebuilding, but states that such "claims are not part of the I.A.1 topic." (Ex. 12 to TI Blatnik Decl. at 3) Thus, the determination of whether the Insureds can have their loss paid on a replacement cost basis is not, as the Insurers contend, a "threshold issue" that must be resolved prior to the calculation of hypothetical replacement cost. (See TI Appraising Insurers Reply Mem. 3)

Nor does the possibility that some improvements may not be replaced warrant their exclusion from the hypothetical replacement cost figure itself. Hypothetical replacement cost is an estimate of the costs of reproducing the destroyed property as it stood at the time of loss, not a calculation of the projected cost of the actual replacement property. Because, as discussed below, the replacement property need only be "functionally similar" to its predecessor, it is inevitable that certain elements of the destroyed property will not be reproduced. Although the costs of these elements are not included in the actual replacement cost, they are included in the hypothetical replacement cost, which concerns only the projected expense of replacing what was destroyed. See, e.g., Mazzocki v. State Farm Fire & Cas. Co., 1 A.D.3d 9, 13, 766 N.Y.S.2d 719, 722 (3d Dep't 2003) (stating that hypothetical replacement cost could include estimate for general contractor's profit and overhead despite

uncertainty that such expense would be incurred); <u>Kolls</u>, 378 F.

Supp. at 400 (fact that shopping center owner did not replace

portion of shopping center for tenant that terminated lease after

loss had no effect on value of hypothetical replacement cost).[10]

In any event, even if the possibility of actual

replacement were somehow a condition precedent to either the

calculation of hypothetical replacement cost or the inclusion of

the improvements in that cost, the Insurers cannot show that the

improvements will not be "replaced" under the RCEs.  As an

initial matter, I am not persuaded by the Insurers' argument

that, in assessing replacement, the improvements should be

considered separately from the buildings to which they were

attached.  (<u>See</u> TI Appraising Insurers Reply Mem. 11-13) In fact,

the policies, the Master Leases, and the stipulation suggest

otherwise.  The Travelers and ISO policies include the

improvements within the larger definition of "Building" (<u>see</u> Ex.

1 to TI Munn Decl. at WILLIS 98514; Ex. 2 to TI Munn Decl. at ROY

05539); the Master Leases state that the improvements, like the

WTC core and shell, are part of the "the Premises" (<u>see, e.g.</u>,

Ex. 6 to TI Munn Decl. at 151); and the stipulation directs the

---

[10]     The <u>Kolls</u> Court did not apply the RCE because the
insured had spent less to replace the property than it had
already collected in ACV proceeds.     <u>See</u> 378 F. Supp. at 400.
The key point for present purposes is that the owner's decision
not to rebuild the portion of the shopping center belonging to a
former tenant did not require the cost of that tenant's space to
be deducted from either hypothetical replacement cost or ACV.

Panel to determine, in the aggregate, the "[r]eplacement cost of the insured premises located at the World Trade Center Complex," which is defined as "1, 2, 4, and 5 World Trade Center and all common areas and sub-grade levels including the mall and retail level . . . ." (Ex. 12 to TI Blatnik Decl. at 2).  In addition, the Insurers have failed to identify a single case where a court considered the replacement of improvements or any other fixtures separately from the buildings to which they were attached when both were owned by the insured.  If the improvements and WTC "core and shell" are evaluated together, the Insurers' argument must fail because the Insurers concede that the Insureds are attempting to replace the WTC within the meaning of the RCEs. (See TI Appraising Insurers Mem. 10; TI Appraising Insurers Reply Mem. 8)

Moreover, even considered separately from the WTC "core and shell," the improvements are still eligible for replacement cost coverage.  In assessing whether rebuilt property constitutes a replacement, courts have determined that "functional similarity" between the property destroyed and the replacement property is all that an RCE requires.  For example, courts have held that a homeowner could use replacement proceeds to build a different kind of home at another location, see, e.g., Kumar, 211 A.D.2d at 132, 627 N.Y.S.2d at 187; Johnson, 487 N.Y.S.2d at 287; Davis v. Allstate Ins. Co., 781 So. 2d 1143, 1144-45 (Fla. Dist.

Ct. App. 2001), and that a commercial property owner could spend replacement funds on a far larger building at another site, see S & S Tobacco and Candy Co. v. Greater New York Mut. Ins. Co., 617 A.2d 1388, 1388-91 (Conn. 1992). See generally 12 Couch on Ins. 3d § 176:65 (1998 & Supp. 2005) (noting that even where replacement is built at new location, "functional similarity is all that has been required to conclude that the new property replaced the old"). Against this backdrop, and in the absence of any policy provision or extrinsic evidence suggesting otherwise, there is no basis for a requirement that strict congruity of tenants is required for new improvements to constitute "replacements" of old improvements. Because the Insureds have said they will construct a new office and retail complex that will presumably include tenant improvements, this court cannot say at this stage that the destroyed improvements will not be "replaced" and should be excluded from hypothetical replacement cost.[11]

---

[11] The Insurers may still challenge the Insureds' claims for replacement dollars when such claims are submitted. For example, if, as the Insurers predict, the costs of new tenant improvements are incurred by new tenants rather than the Insureds, the Insurers could argue that such costs must be excluded from the "actual" replacement cost figure under the loss settlement provisions. See, e.g., Harrington, 223 A.D.2d at 228, 645 N.Y.S.2d at 225 ("Replacement cost coverage inherently requires a replacement . . . and costs (expenses incurred by the insured in obtaining the replacement) . . . ." (emphasis added)); Paluszek v. Safeco Ins. Co. of Am., 517 N.E.2d 565, 567-68 (Ill. App. Ct. 1987) (refusing to allow homeowner to recover for repairs made by buyer who purchased home from insured after

B. Post-9/11 Events

       The Insurers argue that the decision by several tenants to terminate or abandon their leases after 9/11 somehow diminishes the Insureds' interest in the improvements and reduces the amount that may be included for improvements in hypothetical replacement cost.  (<u>See, e.g.</u>, TI Appraising Insurers TI Mem. 2, 5, 15-18; TI Appraising Insurers Reply Mem. 1, 8-11)

       However, a policyholder's insurable interest is not diminished by post-loss events that relieve the insured of certain obligations or otherwise serve to reduce the amount of loss; "it is the insurable interests existing at the time of loss which determine the rights and liabilities as between the insured and insurer."  <u>Welch</u> v. <u>Commercial Mut. Ins. Co.</u>, 463 N.Y.S.2d 1011, 1014 (Sup. Ct. Ulster County 1983); <u>see</u> <u>Eshan Realty Corp.</u>

---

loss).  However, such an argument has no bearing on hypothetical replacement cost, and is entirely premature because the Insureds have not even begun to outfit new tenant spaces.

       For this reason, the Insurers' heavy reliance on <u>Harrington</u> (<u>see</u> TI Appraising Insurers Reply Mem. 10-11; TI Royal Reply Mem. 2) is misplaced.  The question in <u>Harrington</u> was whether the insured, owner of a home destroyed by fire, could <u>collect</u> replacement cost proceeds for costs incurred by a third party who was under a land contract to purchase the property to replace the home, <u>see</u> <u>Harrington</u>, 223 A.D.2d at 223-25, 645 N.Y.S.2d at 221-23, <u>not</u> whether the hypothetical replacement cost figure under the policy's loss settlement provisions could even be calculated.  In fact, the insurer in <u>Harrington</u> had already calculated the hypothetical replacement cost and supplied the insured with its estimate before challenging (or learning of) the insured's claim for the expenses incurred by the third party. <u>See</u> <u>Harrington</u>, 223 A.D.2d at 224, 645 N.Y.S.2d at 222.

v. <u>Stuyvesant Ins. Co.</u>, 12 A.D.2d 818, 818, 210 N.Y.S.2d 256, 257 (2d Dep't 1961), <u>aff'd</u>, 11 N.Y.2d 707, 225 N.Y.S.2d 962 (1962) (refusing to reduce policyholder's recovery by proceeds received from sale of damaged property after loss); <u>Alexandra Rest.</u> v. <u>New Hampshire Ins. Co.</u>, 272 A.D.2d 346, 351-52, 71 N.Y.S.2d 515, 521-22 (1st Dep't 1947), <u>aff'd</u>, 297 N.Y. 858 (1948) (allowing lessee to recover full value of damaged improvements it owned even though improvements were rebuilt by landlord at no cost to tenant); <u>Rosenbloom</u> v. <u>Maryland Ins. Co.</u>, 258 A.D. 14, 16, 15 N.Y.S.2d 304, 306-07 (4th Dep't 1939) (allowing insured to recover full value for warehouse destroyed by fire even though planned sale of property to third party still went through after loss). Because the Insureds fully owned the improvements at the time of loss and even bore the legal obligation to rebuild them, there is no question that they had an insurable interest in the improvements' full value. This interest must be reflected in hypothetical replacement cost, which, by its plain terms, measures only the theoretical cost of replacing that which was destroyed "with other property of comparable size, material and quality" and does not turn on events that transpired after the loss. (Ex. 1 to TI Munn Decl. at WILLIS 98580)

Similarly irrelevant are facts known at the time of loss that could have reduced the destroyed property's value at some point after the loss. For example, in <u>Federowicz</u> v. <u>Potomac</u>

27

Ins. Co., 7 A.D.2d 330, 183 N.Y.S.2d 115 (4th Dep't 1959), an insurer sought to offer evidence showing that a policyholder who owned a building destroyed by fire was under an eviction order and obligation to remove the building at time of loss.  See 7 A.D.2d at 332, 183 N.Y.S.2d at 117-18.  The Appellate Division refused to consider the evidence as going to the value of the building to the insured, explaining that the insured was "entitled to recover the value of the building as it stood, without regard to the fact that he might shortly thereafter be required to remove it."  Federowicz, 7 A.D.2d at 334, 183 N.Y.S.2d at 119; accord Cigna Prop. & Cas. Ins. Co. v. Verzi, 684 A.2d 486, 490-91 (Md. 1996) (refusing to reduce insured's recovery for building even though building had been slated for demolition; and stating that "the facts to be considered in evaluating an insured's pecuniary loss are those in existence at the time of loss").  Thus, the Insurers' disputed claim that the tenant improvements had no value to the Insureds because the improvements would become worthless at the end of the tenant leases also has no bearing on insurable interest or hypothetical replacement cost.[12]

---

[12]     The Insurers' claim is "disputed" because the Silverstein Parties have offered at least enough evidence to call into question the Insurers' assertion that the improvements were worthless to the Insureds at the end of the tenants' leases. (See, e.g., Exs. 2, 3, 4, 5 to TI Blatnik Decl.)

C. "Financial Interest" Provision

         The above analysis is not altered by a provision in the Travelers and ISO policies stating that the insurer "will not pay the Insured more than the Insured's financial interest in the Covered Property."  (Ex. 1 to TI Munn Decl. at WILLIS 98576) The Insurers assert that this provision drastically reduces the Insureds' stake in the improvements to the unamortized portion of the Port Authority's original investment in the improvements, an amount that purportedly represents their full financial expectancy from the property.  (<u>See</u> TI Appraising Insurers Mem. 14, 18-26; TI Appraising Insurers Reply Mem. 13-24)  However, the Insurers arrive at this conclusion by relying entirely on the post-9/11 decision by some tenants to abandon or terminate their leases.  (<u>See</u> TI Appraising Insurers Reply Mem. 14 n.11 (conceding that "[i]f the 9/11 tenants <u>were</u> requiring Silverstein to replace the 9/11 Tenant Improvements, then Silverstein's 'financial interest' in the Improvements would equal Replacement Cost"))  However, like insurable interest, financial interest is measured at the time of loss.   Thus, in <u>Nationwide Mutual Fire Insurance Co.</u> v. <u>Nationwide Furniture, Inc.</u>, 932 F. Supp. 655 (E.D. Pa. 1996), a case cited by the Insurers, the Court interpreted a "financial interest" clause to limit the property owner's recovery to the sale proceeds it was to recover under a land contract already entered into at the time of loss, but

refused to reduce the owner's recovery by the amount it actually received when it sold the property after the loss.  See id. at 659.  Only the pre-loss sale amount mattered because the Court was obligated to "freeze the picture" on the date of loss and "focus on [the insured's] financial interest at the time of loss, and not on later events."  Id.  The Court explained, "We apply the language of the insurance contract to the facts as they existed at that point in time.  Whatever happens to the seller's financial interest thereafter is of no concern to the insurance company."  Id.

Similarly, in JAM Inc. v. Nautilus Ins. Co., 128 S.W.3d 879 (Mo. Ct. App. 2004), the Court was evaluating the financial interest of a policyholder who was a shareholder in a three-person corporation that owned an apartment building damaged by fire.  Id. at 883-86.  The Court concluded that the insured's financial interest was the full amount of the policy despite his partial ownership because he had agreed with his co-shareholders that he would procure insurance for the building "such that his failure to obtain proper insurance rendered him potentially liable for the full amount of the insurance proceeds to which the corporation would be entitled in the event of a loss."  Id. at 895 (emphasis added).  That this potential liability never materialized because the policyholder bought out his fellow shareholders soon after the loss did not affect the "financial

30

interest" analysis. See id. at 885-86. Likewise, in American Motorists Insurance Co. v. IDEC Corp., No. C-01-20821-JF, C-02-1723-JF, 2004 WL 2095699 (N.D. Cal. Sept. 20, 2004), the Court refused to use a policy's "financial interest" provision to reduce recovery where the insured sold the damaged property after the loss for a large sum. Id. at *2. The Court noted that "[o]n the date of the vandalism, [the insured] was the sole and unconditional owner of the property" and thus suffered a pecuniary loss recognizable under the financial interest clause based on the loss of various materials that were stolen from the property. See id. at *3-*4. The policyholder's post-loss sale did not affect the financial interest analysis. See also Sirius Am. Ins. Co. v. Young's Capital Co., LLC, No. C05-338 (JLR), 2005 WL 1287965, at *2 (W.D. Wash. May 25, 2005) (measuring existence of financial interest at time of loss, not at time of subsequent transaction conveying insured property and assigning claims to new party).

The "financial interest" provision in the Travelers and ISO policies thus provides no basis for reducing the Insureds' interest in the improvements or the amount included for improvements in hypothetical replacement cost. At the time of loss, the Insureds held full title to the improvements and faced the possibility of having to rebuild them for the tenants at their own expense, an ownership position that gave them a

financial interest in the improvements' full value.  (See, e.g.,
Ex. 15 to TI Munn Decl. (Annotated Guide to ISO Forms) at V.J.7
("As property owner, the insured's financial interest in covered
property is its full actual cash value or replacement cost
value."[13]))  That some space tenants abandoned their leases after
9/11 does not diminish this interest and certainly does not limit
the improvements' value in hypothetical replacement cost to the
unamortized portion of the Port Authority's original contribution
to the improvements.[14]  The Insurers concede that "legal title

_____

[13]     I may consider this industry publication because the
court is to "consider the customs, practices, usages and
terminology as generally understood in the particular trade or
business in identifying ambiguity within a contract."  World
Trade Ctr. Props., 345 F.3d at 186 (internal quotation marks
omitted).

[14]     Although the Insurers argue that a contrary result is
compelled by language in a concurring opinion in Federowicz, that
case is of no assistance.  (See TI Appraising Insurers Mem. 19-
21; TI Appraising Insurers Reply Mem. 14-16)  According to the
Insurers, Federowicz stands for the proposition that a "financial
interest" clause limits an insurer's liability to the insured's
ultimate financial loss because a concurring opinion in
Federowicz advocated a rule that would consider a broader array
of evidence to more accurately measure the loss suffered by the
insured from the casualty at issue.  Putting aside that the
concurrence's proposed rule was rejected by the majority and thus
does not bind this court, and that the case did not concern a
"financial interest" clause or mention the term at all, the
concurring opinion still does not help the Insurers get around
the time of loss problem that dooms their argument.  The evidence
that the concurring judge wanted to include -- the policyholder's
pending eviction order and planned demolition of the building --
existed at the time of loss and went to the property's value at
that time.  Nowhere does the Federowicz concurrence suggest that
it is appropriate to consider events after the date of loss such
as the tenants' termination of their office and retail leases; if
it did, it would contradict the long string of cases cited

and 100% financial interest probably do coincide most of the time." (TI Appraising Insurers Reply Mem. 18-19) This is one of those times.

D. The Original Financing of the Improvements

The Insurers suggest that the way the improvements were financed is relevant to replacement cost. (See TI Appraising Insurers Mem. 1, 12-13) They note that, by 9/11, the Insureds had recovered through monthly rent much of the "tenant improvement allowance" they purportedly provided each tenant to build the improvements,[15] and conclude that the Insureds' interest in the improvements should be reduced pro tanto. But even if the Insureds' had been fully reimbursed for the improvements -- or had not paid for them in the first place -- they would be entitled to recover the improvements' full value so long as they owned them at the time of loss. As a general

_____

earlier in this opinion rejecting that view.

[15]     This financing history is the source of the Insurers' claim that the Insureds are entitled to only "the unamortized portion of the Port Authority's contribution to the 9/11 Tenant Improvements," a hypothetical income stream representing the remaining portion of each tenant's rent that would have "reimbursed" the Insureds for the tenant improvement allowances. (TI Appraising Insurers Mem. 5-6) It should be noted that this stream is entirely theoretical because the tenants' monthly rent itself did not earmark any amount as relating to tenant improvements, nor did the Silverstein Parties book or amortize the improvements separately. (See TI SP Rule 56.1 Opp'n Statement ¶¶ 3, 4, 5)

matter, how the Insureds acquired their ownership is irrelevant. Thus, in Foley v. Manufacturers & Builders' Fire Insurance Co., 152 N.Y. 131, 134-35 (1897), the Court of Appeals permitted a property owner to recover the full value for partially constructed buildings he owned even though a contractor had paid for all of the materials that went into the buildings and bore the risk of loss. As the Court explained, "The fact that the improvements on land may have cost the owner nothing . . . in no way affects the liability of an insurer. . . ." Id. at 135; accord Nolan v. Firemen's Ins. Co. of Newark, 146 A. 679, 679-80 (N.J. Sup. Ct. 1929) (holding that property owner could recover for greenhouse erected by tenant where ownership of structure passed to property owner under terms of lease); cf. Bank of Taiwan New York Agency v. Granite State Ins. Co., No. 03 Civ. 0682 (DAB)(AJP), 2003 WL 21540664, at *9 (S.D.N.Y. July 9, 2003) (holding that tenant could not recover replacement proceeds for WTC improvements it erected because ownership had passed to lessor once improvements were affixed to WTC). Thus, the Insurers' safari into the financing of improvements under New York City real estate trade practice is a digression, and does not change how the improvements should be valued under the insurance policies.

E. The Space Tenants' Use Interests

　　　　　Similarly without merit is the Insurers' assertion that the tenants' exclusive possession and control of the improvements during their leases reduces the value of the Insureds' interest as owners.  The Insurers cite the tenants' use interests to bolster their theory that the Insureds' interest is limited to the unamortized portion of the Port Authority's original contribution to the improvements.  However, they fail to support this argument with a single case involving an insured who actually owned property at issue, and instead offer a string of cases that concern tenants seeking recovery for "use interests" in improvements they did not own (see TI Appraising Insurers Reply Mem. 21-22), or cases that are otherwise plainly inapposite.  See C-Suzanne Beauty Salon, Ltd. v. Gen. Ins. Co. of Am., 574 F.2d 106, 112-13 (2d Cir. 1978); Daeris, Inc. v. Hartford Fire Ins. Co., 193 A.2d 886, 888-89 (N.H. 1963); Harris v. North Carolina Farm Bureau Mut. Ins. Co., 370 S.E.2d 700, 703 (N.C. Ct. App. 1988); Atlanta Eye Care, Inc. v. Aetna Cas. & Sur. Co., 364 S.E.2d 634, 635 (Ga. Ct. App. 1988).[16]  Where the

_____

[16]　　Contrary to the Insurers' suggestion (see TI Appraising Insurers Mem. 16 n.7; TI IRI Reply Mem. 19), the WTC tenants have not been able to recover replacement cost proceeds for their improvements precisely because the improvements were owned by the Insureds, not by the tenants.  See Bank of Taiwan New York Agency v. Granite State Ins. Co., No. 03 Civ. 0682 (DAB)(AJP), 2003 WL 21540664, at *8 (S.D.N.Y. July 9, 2003) ("The leasehold improvements are, by the Policy definition and the Port Authority lease, 'property of others,' i.e., the property of the

insured owns the destroyed property, the insured has an interest in the property's full value, see Foley, 152 N.Y. at 134-35; Girard Ins. Co. v. Taylor, 6 A.D.2d 359, 362, 177 N.Y.S.2d 42, 46-47 (3d Dep't 1958), even where the insured is a tenant, see Modern Music Shop, Inc. v. Concordia Fire Ins. Co. of Milwaukee, 226 N.Y.S. 630, 636 (Mun. Ct. 1927). This interest is not diminished simply because portions of the property at issue are occupied by residential or commercial sub-tenants exercising their right to use those portions at the time of loss. See Conway, 31 Cal. Rptr. 2d at 883-85 (considering full value of property and lacking any mention of "use interest" deduction in evaluating insured's recovery for tenant-occupied building); Kolls, 378 F. Supp. at 393 (same); Girard, 6 A.D.2d at 361-62, 177 N.Y.S.2d at 45-46 (same); Machson v. Wausau Underwriters Ins. Co., 1986 WL 8179, at *1 (Del. Super. Ct. 1986) (same); see also Nolan, 146 A. at 679-80 (affirming property owner's recovery for greenhouse erected and used by tenant, because greenhouse "becam[e] a part of the freehold and the property of the landlord" once erected).

The Insurers' argument proves far too much. Taken at face value, it would give a landlord a much greater award after destruction of unoccupied property than after destruction of

─────────────────

Port Authority, not the [tenant]. Accordingly, the Banks' use interest is covered, but only for actual cash value, not replacement cost.").

36

otherwise identical occupied property, a result that is facially absurd and betrays the weakness of the Insurers' argument. Thus, there is no basis for reducing the value of the improvements in hypothetical replacement cost based upon the office and retail tenants' use interests.

## F. IRI's Additional Arguments

IRI's arguments based on unique provisions of its policy are no more persuasive. First, IRI argues that the tenant improvements should not be valued at replacement cost because the IRI RCE extends only to "the amount actually expended by or on behalf of the Insured to repair, rebuild or replace within two (2) years from the date of loss" and this two-year period has elapsed without any tenant improvement expenditures. (See TI IRI Mem. 8-9; TI IRI Reply Mem. 3-17; Ex. 3 to TI Munn Decl. at IRI 06719) Although this may prove a viable argument if and when the Insureds actually submit a replacement cost claim -- assuming that IRI's coverage is not exhausted by ACV and rental loss claims -- it has no impact on the valuation of hypothetical replacement cost, which is the only issue before the Panel and this court.[17]  To be sure, at the appropriate time, and on the

---

[17]     Judge Cedarbaum reached a similar conclusion when confronted with IRI's two-year provision in the 7 World Trade Center litigation and related appraisal, observing that the appraisal panel's valuation of the replacement cost of 7 WTC was not affected by "whether the RCE is applicable or not" and that

appropriate motion, this court may have occasion to decide

whether IRI's replacement cost coverage applies to particular

replacement expenditures incurred after September 11, 2003,

whether such expenditures are for tenant improvements or anything

else.[18] But this particular question of coverage, which likely

implicates all claims the Insureds may make for replacement

proceeds, is not properly presented on the parties' motions

concerning the Panel's valuation of the hypothetical replacement

cost of tenant improvements as they stood on 9/11.

IRI argues next that tenant improvements should not be

valued at replacement cost because Paragraph D of the IRI RCE

excludes from coverage "all such property which is obsolete or

useless to the Insured." (Ex. 3 to TI Munn Decl. at IRI 06720)

According to IRI, the improvements are "useless" because the

tenants abandoned their leases after 9/11 and usefulness is

measured "at the time of the replacement cost claim."  (Id. at

IRI 06720; TI IRI Reply Mem. 17-18; see also TI IRI Mem. 9-10)

Unlike IRI's argument regarding the two-year provision, I must

---

adjudicating the two year issue was premature when the insureds
had not yet presented to IRI an actual replacement cost claim.
(See Ex. 21 to TI Blatnik Decl. at 2-4, 6-7)

   [18]   Contrary to IRI's suggestion (see TI IRI Reply Mem. 1-
2, 3-4), the panel itself did not request that this court
specifically determine the effect of the two-year limitation; it
simply asked, in general terms, that the court hear the parties'
motions concerning "ACV, tenant improvements and . . . Lease
Section 6 requirements." (Ex. 1 to TI Miller Reply Decl.)

consider this argument now because the provisions of the IRI RCE
-- including the loss settlement clauses -- are "applicable only
to property as shown in [P]aragraph D."  (Ex. 3 to TI Munn Decl.
at IRI 06719)  If the improvements at issue are not property
covered by Paragraph D, they are not subject to the loss
settlement provisions and should not have their hypothetical
replacement cost valued at all.  Rather, as set out in Paragraph
F, "the value of any <u>other</u> insured property . . . shall be the
actual cash value at the time and place of loss."  (<u>Id.</u> at 06720)
Turning to Paragraph D itself, the provision cannot reasonably be
construed as IRI suggests. Paragraph D, in pertinent part,
provides:

> If at time of loss, as covered under the
> conditions of this policy, claim is made on a
> replacement basis as provided by this [RCE],
> then the provisions of this endorsement shall
> apply to the following property only:
>
> Buildings and structures, building equipment,
> . . . and leasehold Improvements and
> Betterments <u>except all such property which is
> obsolete or useless to the Insured</u> . . . .
> (Ex. 3 to TI Munn Decl. at IRI 06720
> (emphasis added))

The obvious purpose of Paragraph D is to exclude from replacement
coverage any property that is obsolete or useless to the insured
<u>at the time of loss</u> because it would be unfair to allow the
insured to collect replacement proceeds to rebuild or replace
property that was of no use or value when it was destroyed.  Such

39

an interpretation of Paragraph D comports with the "time of loss" principles discussed earlier in this opinion, the purposes of replacement cost coverage, and common sense.  IRI's suggested interpretation, on the other hand, strains credulity.  According to IRI, at the time of the replacement cost claim, IRI and the policyholder are supposed to somehow determine whether the property, which has already been destroyed, could be deemed "obsolete" or "useless" before destruction because "events and circumstances surrounding that property after the loss" have retroactively reduced its pre-loss value and hypothetical replacement cost to nothing.  (TI IRI Reply Mem. 18 n.11)  Not only does such an interpretation lack support in the policy or the case law, but it would also lead to absurd results.  For example, suppose, as IRI suggests, an unforeseen event outside the policyholder's control occurs 90 days after the loss that renders the insured's property "useless."  (<u>See</u> TI IRI Reply Mem. 18)  Under IRI's interpretation, if the policyholder filed a replacement cost claim on the 89th day after the loss, he would recover full replacement proceeds for the destroyed property.  However, if he happened to wait until the 91st day, he could recover nothing.  It is simply inconceivable that any policyholder would pay the increased premium demanded by the IRI RCE (<u>see</u> Ex. 3 to TI Munn Decl. at IRI 06719) for coverage that could vary based on particular events unrelated to the loss

itself and beyond the insured's control.

Therefore, the question posed by Paragraph D is whether the tenant improvements were "useless" to the Insureds at the time of loss. Given that hundreds of rent-paying tenants were using the improvements on 9/11 and the evidence offered by the Insureds demonstrating that the improvements had value at the end of the office and retail tenant leases (see Exs. 2-5 to TI Blatnik Decl.), the answer is plainly no. IRI's suggestion that, in the alternative, the "useless" provision instead limits the Insureds' recovery to purported "financial interest" in the improvements –- the unamortized portion of the Port Authority's original contribution -- again misreads Paragraph D. That paragraph excludes useless property from coverage, but says nothing about how property that is not "useless" is to be valued. Nor is IRI's "financial interest" result compelled by general principles of indemnity. (See TI IRI Mem. 11-13) As discussed earlier, the Insureds fully owned the improvements at the time of loss and had both an insurable interest and a financial interest in their full value. The Panel accordingly must include the improvements in hypothetical replacement cost at full appraised value.

IV.

Certain of the Appraising Insurers[19] move for a
"partial summary judgment declaring that the Appraisal Panel must
consider all evidence that bears on the actual cash value of the
covered property."  The Silverstein Parties cross-move "for
partial summary judgment respecting the determination of actual
cash value under the Travelers form."

The Travelers form provides that "[i]f the property is
not repaired, rebuilt or replaced as soon as reasonably possible
after the loss or damage, the value of the property will be
determined at 'Actual Cash Value.'"  (Ex. A to ACV Insurers Rule
56.1 Statement at WILLIS 98580)  The bland labels the parties
affix to their motions give no hint of the convoluted arguments
they advance in aid of interpreting the Travelers form's
definition of ACV:

> 'Actual Cash Value' means the cost to repair,
> rebuild or replace the lost or damaged
> property, at the time and place of the loss,
> with other property of comparable size,
> material and quality, less allowance for
> physical deterioration, depreciation,
> obsolescence and depletion.  (Id. at WILLIS
> 98582)

The Insurers argue that the above definition requires

---

[19]     The moving Insurers are Allianz, Gulf, Travelers, and
Zurich.  The term "the Insurers" in this Part refers only to
these entities.  The parties agree that, for the purpose of
determining ACV as to the moving insurers, the Travelers form
governs.  (ACV Insurers Mem. 2 n.1; ACV SP Mem. 1)

the Appraisal Panel to "consider all pertinent evidence, including market value, that a real estate appraiser would normally consider in evaluating the actual cash value and depreciation of real property," and that the definition requires the Panel to "consider evidence of both economic and functional obsolescence, as well as physical deterioration." (ACV Insurers Mem. 2) The Insurers describe the relief they seek in an alternative formulation as "an order . . . declaring that the Appraisal Panel must apply the 'broad evidence rule,' considering all of the evidence that bears on the 'physical deterioration,' 'depreciation,' and 'obsolescence' of the World Trade Center at the time of the loss, including its market value." (Id. at 19) The Silverstein Parties request a ruling that ACV "should be determined in accordance with the plain meaning of its definition." (ACV SP Mem. 4) Accordingly, reason the Silverstein Parties, the court should instruct the Appraisal Panel to "(1) begin with a replacement cost new estimate; (2) subtract from that estimate 'physical deterioration, depreciation, obsolescence and depletion,' all of which concern physical aspects of the World Trade Center as it stood on the morning of September 11, 2001; and (3) not consider calculations based on or incorporating 'market value.'" (Id.) For the following reasons, the Insurers' motion is denied and the Silverstein Parties' cross-motion is granted.

A.  The Broad Evidence Rule

          The "broad evidence rule" favored by the Insurers was

formulated by the New York Court of Appeals in <u>McAnarney</u> v.

<u>Newark Fire Insurance Co.</u>, 247 N.Y. 176 (1928), as a default rule

when a policy contains no definition whatsoever of the term

"actual cash value."  Even before examining the particulars of

the rule itself, it is useful to pause here to consider the logic

of the Insurers' position in relation to the origin of the broad

evidence rule.  The Insurers are claiming that the Travelers form

presents a definition of ACV which, although it mentions neither

the broad evidence rule nor market value, does nothing more than

put in place a rule that, whatever its status now,[20] was

conceived as a default rule in New York and is the "most widely

accepted test" for ACV, <u>Zochert</u> v. <u>Nat'l Farmers Union Prop. &</u>

<u>Cas. Co.</u>, 576 N.W.2d 531, 533 (S.D. 1998) -- a rule that allows

reference to market value.  Which is to say, the Travelers form

uses specific words to achieve the same result that would have

been achieved in many jurisdictions by leaving a blank space, but

without mentioning what to the Insurers are the most salient

features of the broad evidence rule.  Particularly when one

considers that the function of ACV in the Travelers form is to

---

          [20]     The Silverstein Parties state in a footnote that New
York insurance regulations have "limit[ed] the application" of
the broad evidence rule.  (ACV SP Mem. 10 n.*)  That issue is
irrelevant to the disposition of the motions now before this
court, and I mean to imply no view with respect to it.

44

limit the insured's recovery if the property is not rebuilt, if the parties had wished only to cap recovery at market value they could easily have said "In no event shall the insured recover more than the market value of the property."  The Insurers' position seems, at a minimum, counter-intuitive.  But let us not be too hasty.  Detailed analysis will yield further reasons for rejecting the Insurers' argument.

In _McAnarney_, the Court of Appeals, faced with a policy that awarded the insured the "actual cash value" of a destroyed building but did not define that term, rejected default approaches to ACV that either would have made "the market value of the buildings destroyed . . . the exclusive measure of the [insured's] loss," _id._ at 181, or would have treated "cost of reproduction less physical depreciation" as "the sole measure of damage," _id._ at 183.  Instead, the _McAnarney_ Court held:

> Where insured buildings have been destroyed, the trier of fact may, and should, call to its aid, in order to effectuate complete indemnity, every fact and circumstance which would logically tend to the formation of a correct estimate of the loss.  It may consider original cost and cost of reproduction; the opinions upon value given by qualified witnesses; the declarations against interest which may have been made by the assured; the gainful uses to which the buildings might have been put; as well as any other fact reasonably tending to throw light on the subject.  _Id._ at 184.

The Insurers acknowledge that the definition of ACV in the Travelers form prevents the mere default application of the

broad evidence rule. (ACV Insurers Reply Mem. 5-6) Nonetheless, they argue that the Travelers definition, "by its unambiguous terms, requires consideration of the same factors and the same evidence as application of the 'broad evidence rule' . . . ." The Insurers intimate also that the McAnarney Court's recognition of the central role that indemnity plays in insurance law requires treating the Travelers form's ACV definition as a restatement of the broad evidence rule. (ACV Insurers Mem. 8-10; ACV Insurers Reply Mem. 1) As set forth below, neither McAnarney nor the concept of indemnity in the large makes the Insurers' interpretation of the definition reasonable.

1. McAnarney

As noted above, supra, pp. 44-45, if the parties intended the Travelers form to provide an "embodiment," "adaptation," or "codification" of the broad evidence rule as described in McAnarney, they chose a singularly indirect way of making their wishes known. I agree with the Insurers that interpretation of the ACV definition in the Travelers form "appears to be a question of first impression" (ACV Insurers Reply Mem. 2) in the sense that neither the Insurers, nor the Silverstein Parties, have cited, nor has this court found, a case in which disputed language in an insurance contract is the same as the language at issue here. However, numerous cases in

addition to McAnarney apply the broad evidence rule and none express that rule as a formula that deducts four discrete elements from replacement cost, as does the Travelers language. See, e.g., Gervant v. New England Fire Ins. Co., 306 N.Y. 393, 398 (1954) ("[T]he trier of fact should listen to all pertinent evidence on the subject [of loss]."); Incardona v. Home Indem. Co., 60 A.D.2d 749, 750, 400 N.Y.S.2d 944, 945 (4th Dep't 1977) ("The general rule in New York is that the trier of facts 'may consider . . . any . . . fact reasonably tending to throw light upon the subject.'" (quoting McAnarney, 247 N.Y. at 184)); Kramnicz v. First Nat'l Bank of Greene, 32 A.D.2d 1009, 1010, 302 N.Y.S.2d 22, 27 (3d Dep't 1969) (same); Sebring v. Firemen's Ins. Co. of Newark, 227 A.D. 103, 104, 237 N.Y.S. 120, 122 (4th Dep't 1929) ("The trier of the fact, charged with the duty of ascertaining the damages which an insured has sustained when his buildings have been burned, is entitled to consider for what it is worth any fact which reasonably tends to throw light upon that subject."). Nor do secondary sources express the broad evidence rule in language remotely similar to the language in the Travelers form. See, e.g., 12 Couch on Insurance 3d § 175:33 (1998) ("Under [the broad evidence rule], the trier of facts may consider any evidence tending to the formation of a correct estimate of the value of the insured property.").

In view of the highly inclusive language courts have

used to express the broad evidence rule ("all pertinent evidence," Gervant, 306 N.Y. at 398; "any . . . fact reasonably tending to throw light on the subject," Incardona, 60 A.D.2d at 750, 400 N.Y.S.2d at 945), I find it inconceivable that if the parties had sought to incorporate that rule into the Travelers form, they would not have used some facially inclusive language instead of listing only particular factors.

With no authority to support their position, and faced with a form that contains none of the inclusive language that courts and commentators use to describe the broad evidence rule, the Insurers argue that, because the terms "physical deterioration," "depreciation," and "obsolescence" appear in the Travelers form, and allegedly "guided" the New York Court of Appeals in McAnarney, the Travelers form requires application of the McAnarney methodology for determining ACV. (ACV Insurers Mem. 8) I find nothing in McAnarney to support the view that that Court was "guided" by those terms to the result it reached. To be sure, the quoted terms do appear in the opinion, McAnarney 247 N.Y. at 180-81, 185, but the McAnarney Court did not in any sense pronounce itself "guided" by those terms in establishing the broad evidence rule. It did not treat them as the touchstone of its holding, or suggest a chain of logic beginning with the need to apply the concepts underlying these three terms and leading inexorably to a duty to consider "every fact and

48

circumstance which would logically tend to a formation of a correct estimate of the loss," McAnarney, 247 N.Y. at 184, including market value.  The Insurers contend that this logical chain is implicit in the McAnarney Court's definition of "depreciation" as "a fall in value" or "reduction in worth" that "includes obsolescence."  Id. at 185.  The implication the Insurers find is that the McAnarney definition of depreciation did not just mean "a" fall in value, but any fall in value regardless of context, and the only way to account for any fall in value is to apply the broad evidence rule.  As appears below, the Insurers' reasoning does not withstand analysis.

First, the Insurers' argument takes a reading of "depreciation" appropriate to the McAnarney Court's specific analysis of what to do when an insurance policy contains no definition of actual cash value, and imposes it on the Travelers form, which does contain such a definition, even though the reading in the one context is unquestionably inconsistent with the reading in the other.  New York's standard fire insurance clause in force at the time of McAnarney insured property owners to the extent of "actual cash value (ascertained with proper deductions for depreciation) of the property at the time of loss or damage."  Id.  After setting forth the broad evidence rule as described above, the Court commented that "[t]he word (depreciation) means, by derivation and common usage, a fall in

value; reduction of worth." Id. at 185 (internal quotation marks omitted). It is incorrect to view this statement about the general meaning of the term as suggesting that "depreciation" cannot refer to a fall in value attributable to a particular cause, and still stay true to its "derivation and common usage"; the statement quoted from McAnarney certainly did not imply that the mere appearance of the term "depreciation" in a policy requires a fact-finder to consider any piece of evidence relevant to a fall in value, no matter what other language appears in the policy.

McAnarney's discussion of "depreciation" appears after the Court had already determined that the broad evidence rule applied, and thus it is appropriate, when dealing with a case controlled by McAnarney, to treat the term as expansively as that rule allows. The Insurers' motion asks this court to do precisely the reverse. The Insurers ask for a determination that the broad evidence rule applies based on an expansive reading a priori of "depreciation" so as to compel application of the broad evidence rule. That is, the Insurers ask the court to use a definition of "depreciation" that assumes the applicability of the broad evidence rule in order to determine that the broad evidence rule applies. An argument that starts out by assuming the desired result is something less than compelling.

Further, the broad evidence rule concerns not only the

type of evidence that a fact-finder may consider, but also the fact-finder's discretion in assigning importance to the evidence. Under the broad evidence rule, fact-finders may place "such weight as they deem proper" on any factor relevant to the value of destroyed property. Sebring, 227 A.D. at 104, 237 N.Y.S. at 122. The rule itself provides no guide to how fact-finders should process the broad array of information before them. The broad evidence rule makes value "a matter of opinion based on all the evidence and, at best, . . . one of approximation." Giulietti v. Conn. Ins. Placement Facility, 534 A.2d 213, 216 (Conn. 1987) (quoting Richard v. A. Waldman & Sons, Inc., 534 A.2d 307, 310 (Conn. 1967)) (internal quotation mark omitted). A fact-finder might, for example, place great weight on a single purchase price or expected profits and little weight on some downwardly adjusted replacement cost. By contrast, the definition of ACV in the Travelers form resolutely avoids any such unguided exercise, but instead prescribes a formula for calculating ACV, directing the fact-finder how to proceed: Take the cost of duplicating the damaged or destroyed building in pristine form, and deduct from that amounts attributable to four particular factors. Such a formulation, which forbids the fact-finder from seizing upon any factor and according that factor preeminence in a final determination of value, is virtually the antithesis, and is certainly not the equivalent, of the broad

evidence rule.

2.  <u>Indemnity</u>

The Insurers suggest also that the concept of indemnity
compels an interpretation of the Travelers form consistent with
the broad evidence rule.  (ACV Insurers Mem. 8-10; ACV Insurers
Reply Mem. 1)  The Insurers are certainly correct that
"[i]ndemnity is the basis and foundation of all insurance law,"
<u>McAnarney</u>, 247 N.Y. at 184, and that the purpose of indemnity is
to "repay the owner . . . such sum of money as will, as nearly as
possible, place such owner . . . financially in the identical
position in reference to the building destroyed," <u>Andrews</u> v.
<u>Empire Coop. Fire Ins. Co.</u>, 103 N.Y.S.2d 177, 180 (Sup. Ct.
Cayuga County 1951).  However, that broad concept, to the extent
applicable here, does not compel a finding that the language in
the Travelers form embodies the broad evidence rule.

In aid of complete indemnity, the broad evidence rule
lets the fact-finder consider "all the one hundred and one . . .
things that go to fix the value of any property." <u>Butler</u> v.
<u>Aetna Ins. Co. of Hartford</u>, 256 N.W. 214, 216-17 (N.D. 1934).
However, "[t]he most common and obvious criticism" of this
approach "is the lack of certainty or predictability that use of
the rule entails." Harold H. Reader III, <u>Modern Day Actual Cash</u>
<u>Value: Is It What the Insurers Intend?</u>, 22 Tort & Ins. L.J. 282,

52

287 (1987).  The Insurers would have this court read the
Travelers form, which calls for a four-factor deduction from
replacement cost, as a direction to account for the "one hundred
and one" factors that bear upon a property's value.  The broadly
phrased theoretical principles of property insurance law do not
require that all insurance contracts be read to provide complete
indemnity, assuming such a goal is attainable; nor do they
override contractual language that forgoes the unbounded fact-
finding of the broad evidence rule in favor of a more predictable
method of determining ACV.  When the Insurers focus on broad
principles and not on the actual words at hand, these broad
principles become the grin on the Cheshire cat:  When the
Insurers are all done, the cat -- the text of the Travelers
policy -- disappears, and all that is left is the grin.  Lewis
Carroll, <u>Alice in Wonderland</u> 67 (Grosset & Dunlap 1972) (1865).
That is no way to read an insurance policy, or indeed any other
document.

B. "Replacement Cost Less"

        It is apparent from the foregoing discussion that the
definition of ACV in the Travelers form does not mean simply the
broad evidence rule; now it is necessary to consider what certain
words used in that definition do mean.  The ACV formulation in
the Travelers form modifies the definition of ACV that the

<u>McAnarney</u> Court rejected as a default rule –- "replacement cost less depreciation," where depreciation is a synonym for physical deterioration.  <u>See</u> <u>McAnarney</u>, 247 N.Y. at 180, 183, 186.  This definition sacrifices the elusive, and perhaps illusory, goal of complete indemnity, in favor of predictability.  <u>See</u> Note, <u>Valuation and Measure of Recovery Under Fire Insurance Policies</u>, 49 Colum. L. Rev. 818, 821-22 (1949).  The definition of ACV in the Travelers form specifies additional deductions from replacement cost –- physical deterioration, obsolescence and depletion -- but this modification of the test rejected in <u>McAnarney</u> does not change the inherently limiting structure of the definition (x minus a, b, c and d), or grant the fact-finder free rein to determine a property's "true commercial value –- represented by rentals, prospective profits, usefulness to the present owner, location, and age."  <u>Id.</u> at 822.

Of the four deductions from replacement cost specified in the Travelers form, the parties dispute principally two –- "depreciation" and "obsolescence."  The Silverstein Parties argue that the deductions are all "physical" –- either because the adjective "physical" applies to each of the nouns in the series of deductions, or because the specified deductions are inherently "physical" when used in an insurance contract.  In particular, the Silverstein Parties claim that this "physical" gloss means that "depreciation" in the Travelers form is similar to and often

overlaps with physical deterioration, but the two concepts are not identical because "physical depreciation connotes a greater focus on aging"; "obsolescence," the Silverstein Parties argue, is an entirely distinct concept from both depreciation and physical deterioration. (ACV SP Reply Mem. 9) The Insurers argue that "depreciation" is a "broad term which is generally understood as encompassing functional <u>and</u> economic obsolescence,[21] as well as physical deterioration, and which permits consideration of market value to calculate these figures." (ACV Insurers Reply Mem. 12 (emphasis in original)) With respect to "obsolescence," both the Silverstein Parties and the Insurers rely on a distinction between "functional obsolescence" and "economic obsolescence" that courts and commentators have drawn when considering market value appraisal for existing properties, usually for tax assessment or eminent domain purposes. (ACV Insurers Mem. 15, 17; ACV SP Mem. 30-33) The Insurers claim that obsolescence in the Travelers form encompasses both functional and economic obsolescence. (ACV Insurers Mem. 18) The Silverstein Parties maintain that the "physical" constraints on the definition make only functional obsolescence relevant. (ACV SP Mem. 30)

For the reasons explained below, "when viewed

---

[21]    The functional/economic dichotomy is defined and discussed below. (<u>See</u>, <u>infra</u>, pp. 57-65)

objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business," World Trade Ctr. Props., 345 F.3d at 184, the Insurers' definitions of depreciation and obsolescence are not reasonable and the meaning of the Travelers form is unambiguous.  Moreover, even if one were to regard the plain language of the ACV definition as allowing for multiple meanings of depreciation and obsolescence, neither the Silverstein Parties nor the Insurers have presented any extrinsic evidence that would require fact-finding by a jury, and the court may define the terms itself.  See id. ("Once a court finds that a contract is ambiguous, it may look to extrinsic evidence to determine the parties' intended meaning.  If factfinding is necessary to determine the parties' intent, however, the matter must be submitted to the finder of fact.") (citation omitted)); Mellon Bank, N.A. v. United Bank Corp., 31 F.3d 113, 116 (2d Cir. 1994) ("[I]n order for the parties' intent to become an issue of fact barring summary judgment, there must also exist relevant extrinsic evidence of the parties' actual intent.").  Indeed, the parties appear to concede that there is no actual extrinsic evidence of the parties' intent with respect to the ACV language at the time the Travelers form was put in place.  (See ACV Insurers Reply Mem. 5 ("Silverstein agrees that

56

the . . . definition is unambiguous . . . ."); (ACV SP Mem. 36

("Travelers drafted and selected the operative actual cash value

definition at issue without any involvement of the insureds."))

As described below, the only extrinsic evidence cited by either

side comes from opinions and actions of experts hired to

calculate values for the appraisal proceeding, flourished by the

Insurers as evidence of custom, practice, or usage; that evidence

is unequal to the task.


1.  Obsolescence

        The Insurers' interpretation of depreciation

encompasses both functional and economic obsolescence, a

distinction that has its origins in one particular method for

calculating a property's market value; therefore, it is helpful

at the outset to discuss the relevance of that distinction to the

Travelers form.  New York courts that have reviewed

determinations of an existing property's market value for tax

assessment or eminent domain purposes, have noted that market

value may be established in a variety of ways.  See, e.g., Lia v.

Town of Niskayuna, 300 A.D.2d 876, 876-78, 752 N.Y.S.2d 136, 137-

38 (3d Dep't 2002).  One way of calculating a property's market

value is known as the "replacement cost new less depreciation"

method, whereby the replacement cost of improvements on a piece

of land, less physical deterioration, functional obsolescence,

and economic obsolescence, is added to the market value of the land itself.  See City of Troy v. Kusala, 227 A.D.2d 736, 737 & n.2, 740, 642 N.Y.S.2d 717, 718 & n.2, 720 (3d Dep't 1996); Long Island Lighting Co. v. Assessor for the Town of Brookhaven, 202 A.D.2d 32, 42-43, 616 N.Y.S.2d 375, 381-82 (2d Dep't 1994).

In Putnam Theatrical Corp. v. Gingold, 16 A.D.2d 413, 228 N.Y.S.2d 93 (4th Dep't 1962), the Appellate Division defined functional obsolescence, as follows:

> [L]oss of value brought about by failure or inability to deliver full service.  It includes . . . any loss of value by reason of short-comings or undesirable features contained within the property itself.  It is loss of utility and failure to function due to inadequacies of design and deficiencies in the property.  16 A.D.2d at 417, 228 N.Y.S.2d at 97 (internal quotation marks and citations omitted).

"Economic obsolescence," the Court continued, "is loss of value brought about by conditions that environ a structure, such as a declining location or the downgrading of a neighborhood resulting in reduced business volume."  Putnam, 16 A.D.2d at 417, 228 N.Y.S.2d at 98.  Applying these definitions with respect to a theater, the Court determined that the "unnecessarily large size" of the theater and "its design for stage shows that are no longer held" were evidence of functional obsolescence.  Putnam, 16 A.D.2d at 419, 228 N.Y.S.2d at 99.  Evidence of economic obsolescence consisted of "the change in the entertainment habits of the people, the emergence of television, the increasing

variety of entertainment available to the public and the development of drive-in-theaters." Id.

Later tax assessment and eminent domain cases have restated the Putnam dichotomy, see, e.g., City of Troy, 227 A.D.2d at 740, 642 N.Y.S.2d at 720; Long Island Lighting Co., 202 A.D.2d at 42-43, 616 N.Y.S.2d at 382, and provided further examples of the two types of obsolescence. In Long Island Lighting Co., the Appellate Division wrote that "overbuilding or excess capacity may . . . be a proper consideration in estimating" functional obsolescence. See Long Island Lighting Co., 202 A.D.2d at 42-43, 616 N.Y.S.2d at 382 (quoting Onondaga County Water Dist. v. Bd. of Assessors of Town of Minetto, 45 A.D.2d 258, 262, 357 N.Y.S.2d 235, 239 (4th Dept. 1974)) (internal quotation mark omitted). That Court also explained further the causes of economic obsolescence: "Economic obsolescence reflects a reduction in the value of property caused by factors extraneous to the property itself, such as changes in population characteristics and economic trends, excessive taxes and governmental restrictions." Long Island Lighting Co., 202 A.D.2d at 43, 616 N.Y.S.2d at 382 (quoting Transcon. Gas Pipe Line Corp. v. Bernards Township, 545 A.2d 746, 763 (N.J. 1988)) (internal quotation mark omitted).

When one considers the setting in which the distinction between "functional" and "economic" obsolescence arose, and

examines the Travelers form itself, there appears little doubt that "obsolescence" as used in the Travelers form does not encompass economic obsolescence.  Moreover, this conclusion does not depend on the Silverstein Parties' grammatically strained reading of the ACV definition or their claim that the terms in question are inherently physical when used in a property insurance contract.  However, any discussion of why it is inappropriate to import the concept of economic obsolescence into the Travelers form must be preceded by an explanation of how functional and economic obsolescence differ.

It is no wonder that the dichotomy engenders confusion. The ultimate source of any obsolescence is a factor extrinsic to the property; on the other hand, the extent to which an extrinsic factor leads to obsolescence depends, at least generally, on the physical features of the property in question.  A building cannot become outdated unless events in the wider world make it so.  In Putnam, for example, entertainment habits likely were one reason why the stage shows for which the theater had been designed were no longer being performed, and the types of entertainment that the theater could provide depended on its physical attributes. Overbuilding and excess capacity -- both the product of external factors that influence whether physical features of a structure are necessary -- are considered to reflect functional obsolescence; governmental restrictions, which have the potential

to dictate the physical configuration of a piece of property and
what use that property can be put to, may be said to cause
economic obsolescence.[22]  Thus, when the cases refer to changes
in the "conditions that environ a structure" as being the
hallmark of economic obsolescence, or to "undesirable features
contained within the property itself" as the hallmark of
functional obsolescence, they cannot be saying that there is no
intersection between the two.

Rather, the language used to describe functional
obsolescence suggests that its defining feature is a limit on
usefulness set by physical conditions inherent at the time of
construction.  As the Putnam Court stated, functional
obsolescence is loss of value "brought about by failure or
inability to deliver full service" and caused by "inadequacies of
design and deficiencies in the property."  16 A.D.2d at 417, 228
N.Y.S.2d at 97.  That is, "full service" is a maximum measure of
utility fixed by the physical limitations of the property.  Only
by replacing or modifying that property can one surmount these
limitations.  Otherwise, the forces leading to functional

---

[22]     McAnarney dealt with a malt factory that was rendered
useless by the National Prohibition Act.  See McAnarney, 247 N.Y.
at 185.  The Insurers and Silverstein Parties dispute whether the
obsolescence in McAnarney was functional or economic, because the
external limitation created by a governmental restriction
rendered the property useless in light of its internal
capabilities.  (ACV SP Mem. 27; ACV Insurers Reply Mem. 6 n.2)
The McAnarney Court, applying the broad evidence rule, had
nothing to say regarding different categories of obsolescence.

obsolescence cause utility to drift downward from the maximum. To illustrate, excess capacity is a type of functional obsolescence because it measures the extent to which the physical dimensions of the property cannot be used. Similarly, development of wireless access to the internet might cause functional obsolescence by reducing the use of a building's traditional network infrastructure.

Economic obsolescence, on the other hand, seems directly connected to a decline in income or rise in operating costs associated with a piece of property, and thus does not implicate an absolute maximum usefulness bounded from the outset by the physical limitations of that property. The causes of economic obsolescence listed in <u>Long Island Lighting Co.</u> –– changes in population characteristics and economic trends, excessive taxes and governmental restrictions –– may lead to functional obsolescence by creating the grounds for, say, excess capacity, but they diminish market value and create economic obsolescence whenever they cause income to decrease or operating costs to increase. Conversely, the same factors can enhance market value by increasing income or decreasing operating costs. Unlike functional obsolescence, which is defined by factors that measure only decreases in value from a ceiling established at the time of construction, and thus can push market value only below replacement cost less physical deterioration, not above it,

economic obsolescence has a flip side -- positive changes in income and operating costs -- that can push market value above replacement cost less physical deterioration.  This potential for gain, in turn, reveals why the term "obsolescence" in the Travelers form's ACV definition cannot include economic obsolescence: the term "obsolescence" in the Travelers form is, literally by definition, always a deduction from replacement cost, never an addition to it; the form says "<u>less</u> allowance for . . . obsolescence," and not, for example, "<u>with</u> allowance for . . . obsolescence."

There are significant differences between the "replacement cost new less depreciation" method used in market appraisals of existing properties for tax assessment and eminent domain purposes, on the one hand, and the use of a "replacement cost less" formula in the Travelers form, on the other.  These differences show why tax assessment and eminent domain cases do not bear on the "replacement cost less" formula in the Travelers form, much less require that that formula include economic obsolescence.  The definition of ACV in the Travelers form cannot accommodate the flip side of economic obsolescence, which presents the potential for a gain in value; however, the market appraisal setting has at least two ways of incorporating increase in value resulting from changes to the environs of a property. First, in the market appraisal setting, "replacement cost less

depreciation" is added to the market value of the land to arrive at a property's total market value.  See City of Troy, 227 A.D.2d at 737 & n.2, 740, 642 N.Y.S.2d at 718 & n.2, 720.  It may not be possible to separate the effects of external factors on the land from the effects of those factors on the improvements, so an increase in property values due to extrinsic factors -- the flip side of economic obsolescence -- may end up reflected in the value of the land.  Cf. McAnarney, 247 N.Y. at 183 ("[B]uildings, independently of the land upon which they stand, are never the subject of market sales.")  Second, in market appraisals, "replacement cost new less depreciation" is only one method for calculating market value, Lia, 300 A.D.2d at 876-78, 752 N.Y.S.2d at 137-38; "income capitalization," which "entails the accumulation of such data as the actual income and operating expenses of the subject property," is an alternative method for calculating market value.  City of N.Y. v. 2641 Concourse Co., 250 A.D.2d 304, 306, 680 N.Y.S.2d 533, 535 (1st Dep't 1998).  A property's market value may equal or even exceed replacement cost thanks to an increase in projected income, regardless of physical deterioration.  In the market appraisal setting, it makes sense for "replacement cost new less depreciation" to treat any factor diminishing profitability as obsolescence, be it functional or economic, because there are ways to account for positive shifts in value that can serve as counterweights to a low value

64

established by looking only at replacement cost less physical deterioration. The distinction between the two forms of obsolescence is simply not as important in the appraisal setting because nothing of consequence turns on the distinction.

But the Travelers form allows for no such counterweight to low value, because it contains only a "replacement cost less" formulation. If the definition of ACV in the Travelers form were meant as a proxy for market value, it would make no sense to apply a formula -- "replacement cost <u>less</u>" -- that can incorporate factors affecting market value only when they would decrease the market value of property below replacement cost less physical deterioration, but not when they would increase market value to greater than replacement cost less physical deterioration.

Further, as suggested above, <u>supra</u>, pp. 44-45, if the parties to the Travelers form had intended ACV to measure market value so as to mimic the "replacement cost new less depreciation" method in market appraisals, and thereby include economic obsolescence, one would have expected the parties to use language reflecting this intention, either referring to market value explicitly, which they do elsewhere in the Travelers form, or expressing the deductions from replacement cost in full, as the courts in the tax assessment and eminent domain cases do. For example, the Travelers form specifies that "fine arts" will be

valued at the least of restoration cost, replacement cost, or "market value." (Ex. A to ACV Insurers Rule 56.1 Statement at WILLIS 98581) The Insurers argue that the term "market value" was used there because it would not make sense to measure the worth of a van Gogh painting "by calculating the cost to paint it again and deducting for physical deterioration of the canvas, age, and the use of an obsolete varnish." (ACV Insurers Reply Mem. 17 n.12) That is reasonable as to van Gogh paintings, but irrelevant. The real question is whether one would expect to see the term "market value" either as a definition of ACV, or used to describe part of the "replacement cost less" formula to calculate ACV, if the parties had intended the definition to mirror "replacement cost new less depreciation" method in market appraisals. The question answers itself, and the parties' failure to do so speaks loudly against the Insurers' interpretation of the deductions.

2. <u>Depreciation</u>

The above analysis of obsolescence pretty much moots any dispute over the meaning of depreciation. If the ACV definition in the Travelers form excludes economic obsolescence and does not replicate the "replacement cost new less depreciation" method used in market appraisals of existing properties, then "depreciation" cannot be read as the Insurers

would read it: as a composite term to cover the value of physical deterioration, functional obsolescence, and economic obsolescence, and to account for any difference between replacement cost and market value. (ACV Insurers Mem. 15-17) However, as appears below, there are additional reasons why the Insureds' interpretation of "depreciation" is reasonable, and the Insurers' is not.

Although the Insurers quote appraisal literature, dictionaries, and case law concerning market appraisals to support their position, none of the quoted definitions shed light on the "terminology as generally understood in the <u>particular</u> trade or business" involved in this litigation -- the property insurance industry. <u>See</u> <u>World Trade Ctr. Props.</u>, 345 F.3d at 184 (quoting <u>Morgan Stanley Group Inc.</u> v. <u>New England Ins. Co.</u>, 225 F.3d 270, 275 (2d Cir. 2000)) (internal quotation mark omitted) (emphasis added). The Insurers' reliance on these sources obscures that "depreciation" in the insurance context is often used interchangeably with "physical deterioration," <u>see</u> <u>Dickler</u> v. <u>Cigna Prop. & Cas. Co.</u>, 957 F.2d 1088, 1098-99 (3d Cir. 1992).[23] The <u>McAnarney</u> Court itself used "depreciation" as a

[23]     Both parties argue that <u>Dickler</u> supports their respective positions, attaching greater significance to the Third Circuit's holding than the reasoning of that case can fairly bear. (ACV SP Mem. 22, 25-26; ACV Insurers Reply Mem. 7-9)  On the one hand, the Court's equation of depreciation with physical deterioration when considering a contract defining ACV as "replacement cost less depreciation" does not necessarily endorse

synonym for physical deterioration when describing the

"replacement cost less" approach, despite the broad definition it

gave the term standing alone.   See McAnarney, 247 N.Y. at 186

(holding that the trial judge erred by instructing the jury to

consider only "the cost of reproduction less depreciation").   The

Insurers are correct that the Silverstein Parties' "physical"

interpretation of "depreciation" in the Travelers form, the

second item in a list of deductions, risks redundancy with

"physical deterioration," the first term.   (ACV Insurers Reply

Mem. 9-10)   However, it is true also that interpreting

depreciation as a catch-all that subsumes the terms surrounding

it, or simply as an abstract place-holder between replacement

---

the Silverstein Parties' proposition that "[i]n the context of
property insurance, depreciation is . . . an inherently physical
claim."   (SP Mem. 22)   The Court recognized that "physical
deterioration is not the only possible definition of
depreciation," ultimately relying upon the "principle that
ambiguities in an insurance contract must be construed in favor
of the insured," Dickler, 957 F.3d at 1099, a principle I have
held inapplicable to the present litigation even when contract
language at issue is ambiguous (see Tab 15 of ACV Colinvaux Reply
Aff. at 2215-16).   On the other hand, the Court's statement that
the distinction between "replacement cost less depreciation" and
the broad evidence rule "would make no sense if the term
'depreciation' subsumed within it the very factors taken into
account under the 'broad evidence' rule," id. at 1098, does not
lead to the conclusion that "line item deductions" for
depreciation and obsolescence "manifest[] an intent to
incorporate all of the evidence considered under the broad
evidence rule" (ACV Insurers Reply Mem. 9).   The Dickler Court
did not consider that parties might forgo both traditional rules,
as they have here, and reach some middle ground that comes closer
to complete indemnity than "replacement cost less physical
deterioration" but still avoids the free-for-all of the broad
evidence rule.

cost and market value, is not just redundant, but also is
fundamentally inconsistent with the other language in the
definition.

A reading of depreciation that sweeps in every factor
that might touch upon the commercial value of a property also
would be inconsistent with the interpretive principle cited by
the Silverstein Parties -- noscitur a sociis -- "a word is known
by the company it keeps," Gustafson v. Alloyd Co., 513 U.S. 561,
575 (1995) (applying noscitur a sociis to interpret a provision
of the Securities Act of 1933); see also Dole v. United
Steelworkers of Am., 494 U.S. 26, 36 (1990) ("The traditional
canon of construction, noscitur a sociis, dictates that words
grouped in a list should be given related meaning." (internal
quotation marks omitted)); Harris v. Allstate Ins. Co., 309 N.Y.
72, 76-77 (1955) (applying noscitur a sociis to interpret an
automobile insurance policy), and what Judge Conner of our court
has described as "its cousin ejusdem generis," ESI, Inc. v.
Coastal Corp., 61 F. Supp. 2d 35, 75 (S.D.N.Y. 1999), the two
principles at times applied together to statutes or contracts
such that where general words follow specific words in an
enumeration, "the general words are construed to embrace only
objects similar in nature to those objects enumerated by the
preceding specific words." See Washington State Dep't of Soc. &
Health Servs. v. Guardianship Estate of Keffeler, 537 U.S. 371,

384 (2003) (quoting <u>Circuit City Stores, Inc.</u> v. <u>Adams</u>, 532 U.S. 105, 114-15 (2001)) (internal quotation mark omitted).[24]  Each of the other nouns in the Travelers form's list of deductions is a type of depreciation, understood in its broadest sense as a "fall in value."  Treating the second factor in the list as a composite term embracing all manner of influences on value not only would create redundancy, but also would distinguish that term in kind from the surrounding language.  The Silverstein Parties' interpretation of "depreciation" suggests redundancy with "physical deterioration", but at least it does not make "depreciation" fundamentally incongruous with other listed deductions.

The Insurers argue that, if one looks to the underlying purpose of the contract, "a much more convincing application of <u>noscitur</u> <u>a</u> <u>sociis</u>" would recognize that the deductions should account for "both physical and non-physical factors," with the addition of "non-physical factors" apparently transforming the deductions into a collective expression of any dollar amount between replacement cost and market value.  (ACV Insurers Reply Mem. 11-12)  That result may be "convincing" to one who wishes to

---

[24] <u>Noscitur a sociis</u> and <u>ejusdem generis</u> are properly described as "cousins," <u>Coastal Corp.</u>, 61 F. Supp. 2d at 75, because of their mutual relationship to a broader and more familiar jurisprudential principle: <u>Si ambulat velut anas, et tetrinnit velut anas, et cum anatibus versatur, est scilicet anas</u>.

be convinced, but it has nothing to do with <u>noscitur a sociis</u> or any other interpretive principle, and nothing to do with the narrower, "physical" definitions of depreciation and obsolescence that serve the purpose of a contract that contains none of the embracing terms used to describe the broad evidence rule, but rather uses a particular and restrictive formula.

C.  Market Value

The Silverstein Parties ask that this court instruct the Appraisal Panel to disregard all "calculations based on or incorporating 'market value.'"  (ACV SP Mem. 39)  The above analysis has demonstrated that the definition of ACV in the Travelers form is not a restatement of the broad evidence rule, which would allow the Appraisal Panel to consider any estimation of market value to whatever extent it wished in arriving at an amount for ACV.  It has shown also that the four deductions, in whole or in part, are not simply an abstract variable between replacement cost and market value.  Beyond these plainly improper uses of market value, the Insurers have not suggested any other way in which market value may be relevant; and, as mentioned above, the plain language of the definition makes no mention of market value despite use of the concept elsewhere in the Travelers form.  Therefore, I agree with the Silverstein Parties that market value should play no role in the Appraisal Panel's

calculations of ACV.

D.  The Factual Record

The Insurers cite disparate items of what the parties call "the factual record," apparently to suggest that custom, practice, usage, or terminology as generally understood in the property insurance industry, supports their interpretation of ACV as used in the Travelers form.  This evidence does not inject ambiguity into the above analysis, much less establish that the Travelers form's definition of ACV is a restatement of the broad evidence rule.  As a threshold matter, a party does not establish custom and usage simply by presenting particular occasions on which experts appeared to endorse its interpretation of a technical term.  "[C]ustom and usage evidence must establish that the omitted term is 'fixed and invariable' in the industry in question."  British Int'l Ins. Co. Ltd. v. Seguros LA Republica, S.A., 342 F.3d 78, 84 (2d Cir. 2003) (quoting Hutner v. Greene, 734 F.2d 896, 900 (2d Cir. 1984)).  None of the extrinsic evidence offered by the Insurers shows that their interpretation of the language in the Travelers ACV definition is "fixed and invariable" throughout the property insurance industry.

Rather, the Insurers seize upon some statements of experts retained by the Silverstein Parties, ripped from context, and also seek to argue distinctions between the Travelers form

72

and the WilProp form.  However, turning snippets of evidence

against their source does not show that the ACV definition in the

Travelers form has the "fixed and invariable" meaning the

Insurers would assign to it, and textual analysis of the WilProp

form has no bearing whatever on the task at hand.

The Insurers point out that the Silverstein Parties had

initially employed the consulting group Cambridge Horizon to

formulate an ACV claim, and that Cambridge Horizon's calculations

took into account both functional and economic obsolescence,

treated depreciation as a composite term, and relied on a

methodology that considered market value "by indirect statistical

means."  (ACV Insurers Reply Mem. 18-20)  That, however, provides

no basis for finding that the Travelers form's definition of ACV

is reasonably subject to any interpretation other than the one

described above.  The deposition testimony of two of the

Cambridge Horizon consultants suggests that they recognized the

incongruity in the Travelers form's language created by a broad

interpretation of depreciation, but did not consider ways to

correct for it.  (See Tab 6 of ACV Colinvaux Reply Aff.

(Morrongiello Dep.) at 141, 186 (defining depreciation as "loss

in value due to any cause," but later listing obsolescence and

physical deterioration as factors affecting value); Tab 7 of ACV

Colinvaux Reply Aff. (Kosinski Dep.) at 67 (stating that

"depreciation is basically covered by the areas of physical

deterioration, obsolescence and depletion," although conceding that this definition creates a "possible redundancy"). That Silverstein's experts might have shown a high tolerance, not for mere redundancy, but for substantive inconsistency, does not mean that the parties did, or that this court should. It does not obscure that treating depreciation as a composite term, as these experts did, conflicts with the rest of the language in the ACV definition.

Neither is it significant that Deloitte & Touche, which the Silverstein Parties subsequently employed to formulate an ACV claim, considered economic obsolescence in their calculations. (ACV Insurers Reply Mem. 19-20) The Insurers themselves disclose that Deloitte & Touche took account of economic obsolescence because "it was likely to 'be a point of contention.'" (Id. at 20-21 (quoting Ex. 5 to ACV Blatnik Aff. (Ellsworth Dep.) at 400)) If ambiguity were created by recognizing that the meaning of a term might prove controversial in a high-stakes insurance lawsuit, there could be no such thing as an unambiguous insurance contract.

Continuing their discussion of Deloitte & Touche's calculation of ACV, the Insurers claim that the methodology used by that firm "offered a mathematical substitute for the real world fair market value which [the Silverstein Parties] would have this [c]ourt exclude." (Id. at 21) The Silverstein Parties

disagree. (ACV SP Reply Mem. 17-18)  Regardless, even if Deloitte & Touche's methodology "may be used to accomplish" a determination of market value (ACV Insurers Reply Mem. 21 (emphasis added)), that does not bear on the definition of ACV in the Travelers form, or mean that it embodies market value or the broad evidence rule.

Indeed it is notable that the extrinsic evidence cited by the Insurers includes no statement by any appraisal expert to the effect that the Travelers form's definition is a "codification" of the broad evidence rule, or any explanation of why the Travelers form contains no inclusive language usually associated with the broad evidence rule but rather a formulation that mirrors the conventional "replacement cost less depreciation" test.

Finally, the Insurers contrast the Travelers form's definition of ACV with the definition of ACV in the WilProp form, noting that the Wilprop definition "allows deduction [from replacement cost] only for 'observable physical deterioration'" and "assumes . . . that the resulting number most likely will be different from and more than the market value of the property." (ACV Insurers Mem. 5 (emphasis in original))  This distinction reveals nothing about how insurers and insureds have applied the formulation of ACV in the Travelers form or how insurers and insureds who have wished to integrate the broad evidence rule

into their contracts have done so.  At most, this comparison with
the WilProp form shows that the deductions in the Travelers form
account for more than "observable physical deterioration," a
conclusion self-evident from the above analysis.[25]

*           *           *

For the reasons set forth above, the Silverstein
Parties' motion regarding tenant improvements is granted and all
of the Appraising Insurers' cross-motions relating to tenant
improvements are denied.  Tenant improvements must be included in
the Appraisal Panel's replacement cost figure at full appraised
value.

The Insurers' motion to apply the "broad evidence rule"
to ACV is denied and the Silverstein Parties' cross-motion
relating to the exclusion of market value computations is
granted.  The broad evidence rule does not apply; the Appraisal
Panel should determine ACV according to the plain meaning of the
definition in the Travelers form, beginning with an estimate of
replacement cost and making deductions from that estimate for

---

[25]     In a footnote, the Insurers argue also that "the
Travelers form condition limiting recovery to the Insured's
'financial interest' in the destroyed property confirms that the
[ACV] definition must be interpreted to avoid giving Silverstein
a windfall."  (ACV Insurers Reply Mem. 6 n.3)  That clause is
contained in the "general conditions" of the Travelers form, to
which "[a]ll coverages included in [the] policy are subject."
(Ex. B. to ACV Insurers Rule 56.1 Statement at WILLIS 98571,
WILLIS 98576)  I see no connection between this general limiting
clause, which would work presumably to reduce recovery under any
measure, and the definition of ACV.

physical deterioration, depreciation, obsolescence, and

depletion, all of which concern "physical" aspects of the WTC as

explained in this opinion. Market value calculations do not bear

on ACV.

SO ORDERED:

Dated:    New York, New York          Michael B. Mukasey
          July 25, 2006                U.S. District Judge