**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------- -X
-
SR INTERNATIONAL BUSINESS INSURANCE                    :
COMPANY, LTD.,                                         :
                                                       :          **01 Civ. 9291 (HB)**
        **Plaintiff-Counterclaim Defendant,**          :          **and related actions**
                                                       :
                -v-                                    :
                                                       :          **OPINION AND ORDER**
WORLD TRADE CENTER PROPERTIES LLC, et                  :
al.,                                                   :
                                                       :
        **Defendants-Counterclaimants.**               :
                                                      -X
--------------------------------------------------------------------
-

**HAROLD BAER, JR., District Judge:**

The above-captioned action and related matters pertain to the ongoing dispute between

those who had a property interest in the World Trade Center ("WTC") complex on September

11, 2001, and those who provided insurance for the properties.  A subset of those insurers bring

the current motion to prevent the policyholders from recovering more than it would cost to

replace the covered buildings as they stood immediately prior to the September 11 attacks.  The

policyholders cross-move for a declaration that they can recover the additional amount it would

cost to make the rebuilt WTC safe, modern, and politically palatable.  Because the policies

unambiguously support the insurers' position, their motion is granted in part.  The policyholders'

motion is denied.

## I.      BACKGROUND

The following facts are undisputed, except where otherwise noted.  They are taken from

the parties' submissions, as well as from previous Opinions issued in this litigation.  Familiarity

with these Opinions is assumed.

In July 2001, Silverstein Properties, Inc. and several related parties ("Silverstein") entered into 99-year leases with the Port Authority of New York and New Jersey ("Port Authority") for the commercial space in the WTC complex, which included the Twin Towers and two other buildings destroyed on September 11, 2001.  Westfield WTC LLC ("Westfield"), now known as WTC Retail LLC, entered into virtually identical leases for the WTC retail mall. In connection with these leases, Silverstein obtained primary and excess insurance coverage on behalf of his entities, the Port Authority, and Westfield (collectively, the "Insureds") for the WTC[1] from a group of approximately two dozen insurers.  The insurance was in the amount of slightly more than $3.5 billion on a "per occurrence" basis.  See generally World Trade Ctr. Props., LLC v. Hartford Fire Ins. Co., 345 F.3d 154, 159-60 (2d Cir. 2003)

Almost none of the insurers had issued final policies at the time of the September 11 attacks.  Instead, the WTC was insured under multiple temporary contracts, known in the industry as "binder" policies.  A binder typically does not contain the detailed terms of a final policy, but allows an insured party to have interim coverage while such terms are negotiated.  It is a "fully enforceable present contract of insurance."  World Trade Ctr. Props., LLC v. Hartford Fire Ins. Co., 345 F.3d at 167 (citation omitted).  Three such binder policies are at issue here: (1) the Travelers policy, which binds Allianz Global Risks US Insurance Company (f/k/a Allianz Insurance Company), Gulf Insurance Company, Travelers Indemnity Company, and Zurich American Insurance Company; (2) the Insurance Services Office ("ISO") policy, which binds Royal Indemnity Company; and (3) the IRI policy, which binds Industrial Risk Insurers ("IRI").[2]

All three contracts provide coverage on a "replacement cost" basis.[3]  Although precise

---

[1]  For ease of discussion, "World Trade Center" and "WTC" are used throughout this Opinion to refer to the properties covered by the insurance policies at issue here.

[2] See generally Statement of Undisputed Facts In Support of Certain Appraising Insurers' Motion for Summary Judgment on Insureds' Lease "Section Six" Claim ("Insurers' Statement of Facts"), ¶¶ 1-7; Industrial Risk Insurers' Local Rule 56.1 Statement of Undisputed Facts In Support of Its Motion for Summary Judgment to Exclude Lease Section Six Compliance from Replacement Cost ("IRI Statement of Facts"), ¶¶ 1, 3- 7.

[3] See Insurers' Statement of Facts ¶¶  3, 4-6; IRI Statement of Facts ¶¶ 1, 4.

definition of replacement cost is contested in the present motions, the basic concept is simple: it is the amount it would cost to replace or repair the covered property.  This stands in contrast to "actual cash value" or "ACV" coverage, which, because it simply measures the value of the property as it existed before loss, takes depreciation into account.  As the Honorable Michael B. Mukasey, to whom these cases were previously assigned, has explained,

> Replacement cost policies provide greater coverage than traditional "actual cash value" policies by permitting the insured to replace damaged or destroyed property without any deduction.  By paying an extra premium for replacement cost coverage, the insured can recover on a "new-for-old" basis instead of the "old-for-old" recovery provided by ACV coverage.

SR Int'l Bus. Ins. Co. Ltd. v. World Trade Ctr. Props. LLC, 445 F.Supp.2d 320, 333 n.6 (S.D.N.Y. July 25, 2006).

The Insureds and the six insurers bound by the Travelers, ISO, and IRI policies (the "Appraising Insurers") are in the midst of an appraisal process (the "Appraisal") to determine certain measures of the WTC's value.[4]  The Appraisal Panel, as provided for in the underlying insurance policies, will resolve disputes as to valuation of the Insureds' loss.  See SR Int'l Bus. Ins. Co. Ltd. v. World Trade Ctr. Props. LLC, 2002 U.S. Dist LEXIS 15272 (S.D.N.Y. Aug. 19, 2002) (granting insurer Allianz's motion to enforce its right to appraisal).[5]  The parties subsequently stipulated that the Panel will place dollar figures on: (1) the replacement cost of the WTC; (2) the actual cash value of the WTC; and (3) the rental value that was lost through the destruction of the WTC.  Although these values will almost certainly affect the amount of the Insureds' recovery, questions regarding actual claims that might be made under the policies are

---

[4]  See Insurers' Statement of Facts ¶¶  23-27; Statement Pursuant to Local Rule 56.1 In Opposition to Motion for Summary Judgment Filed by Allianz and Four Other Insurers Seeking to Preclude the Appraisal Panel from Considering Lease Section 6 Costs In Determining Replacement Cost and in Support of Insureds' Cross-Motion ("Insureds' Statement of Facts") ¶¶ 23-27.

   The Appraising Insurers bringing this Motion will be paying coverage for two occurrences under their policies – one for each of the Twin Towers.  See SR Int'l Bus. Ins. Co. Ltd. v. World Trade Center Prop's. LLC, No. 04-cv-4500, 2006 U.S. App. LEXIS 25879 (2d Cir. Oct. 18, 2006).

[5]  Subsequently, other insurers were permitted to join the Appraisal.  See, e.g., SR Int'l Bus. Ins. Co. Ltd. v. World Trade Center Prop's. LLC, 2004 U.S. Dist. LEXIS 25642 (S.D.N.Y. Dec. 1, 2004).

not part of the Appraisal.  See SR Int'l, 445 F.Supp.2d 320, 326.

Here, regarding replacement cost, the Appraising Insurers move for summary judgment and seek a declaration that the Insureds' replacement cost recovery is capped at the amount it would cost to rebuild the WTC precisely as it existed on September 11, 2001.[6]  The Insureds cross-move[7] for summary judgment and seek a declaration that, in determining replacement cost, the Appraisal Panel ("Panel") should consider the additional expenses that would be required to adapt the structures' design to the changed legal, physical, and political environment of post-9/11 New York.  (For reasons explained below, the parties refer to these expenses as "Lease Section 6" costs.)  The Insureds currently estimate that such costs will total approximately $700 million.[8]  Measurement of these costs is complicated, however, by the fact that Silverstein does not actually intend to rebuild the Twin Towers or anything like them at or near Ground Zero.  As a result, the Lease Section 6 costs are almost entirely hypothetical.

**A.**      **The Policies**

1.  Travelers

The Travelers policy describes its replacement cost coverage in a stand-alone document.[9]

---

[6]  The Appraising Insurers also seek a declaration that the Insureds may not recover any amount under the "ordinance or law" provisions of the policies, or, in the alternative, that such recovery is limited by the policies' "ordinance or law" sub-limits.  The Insureds do not, however, appear to seek any recovery under the "ordinance or law" provisions of the policies.  Instead, they argue that the Lease Section 6 expenses, as described in this Opinion, are recoverable as part of their general replacement cost coverage.  As a result, this portion of the Appraising Insurers' motion is denied as moot.

[7]  The Insureds' cross-motion appears to be nothing more than an effort to provide themselves with an additional opportunity to respond to the Appraising Insurers' arguments.  Other than denial of the Appraising Insurers' motion, no meaningful relief is sought through the cross-motion.  As the Appraising Insurers correctly note, if such procedural gamesmanship were allowed, the opponent of any motion could simply "cross-move" for denial of the motion and thereby obtain the last word on the issue.  The Insureds' purported reply memorandum is therefore construed as an unauthorized sur-reply, and is stricken.

[8]  Declaration of Jonathan M. Moses, May 31, 2006 ("Moses Decl."), Exs. 10, 11, 12 (expert reports provided by Insureds).

[9]  See generally Insurers' Statement of Facts ¶¶  1-3 and Exhibits at Tab 1, Tab 2 (copies of relevant sections of Travelers policy).

It provides, in relevant part:

> In the event of a covered loss or damage, the [insurer] will determine the value of Covered Property at the <u>replacement cost as of the time and place of loss</u>, without deduction for physical deterioration, depreciation, obsolescence and depletion, except as otherwise provided in this endorsement or as stipulated by any other endorsement(s) attached to this policy. This replacement cost valuation is subject to the following conditions:
>
> 1. The [insurer] will not pay more on a replacement cost basis than <u>the least of</u>:
>
> a. The cost to repair, rebuild, or replace, <u>at the same site</u>, the lost, damaged or destroyed property, with other <u>property of comparable size, material and quality</u>; or
>
> b. The actual amount incurred by the insured that is necessary to repair, rebuild or replace the lost, damaged or destroyed property; or
>
> c. The Limit of Insurance applicable to the lost, damaged or destroyed property.

(Emphasis supplied.)

It also contains a provision expressly excluding from the calculation of replacement cost any increased expenses "attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property unless a Limit of Insurance is specified for Ordinance or Law in the Supplemental Coverage Declarations." In a separate form that is part of the binder, however, coverage for such expenses is added to the policy, subject to a sub-limit:[10] "[T]he [insurer] will pay for: ... The increased cost to repair, rebuild or construct the Covered Property caused by the enforcement of building, zoning, land use or any other ordinance or law when the Covered Property is insured for replacement cost."

2. <u>ISO</u>

The ISO Building and Personal Property Coverage Form states that the value of the covered property will be determined based on the "Replacement Cost (without deduction for depreciation) ... <u>as of the time of loss or damage</u>."[11] It further provides that the insurer

---

[10] The parties disagree as to the amount of the sub-limit. That dispute is not presented in this motion practice.

[11] <u>See generally</u> Insurers' Statement of Facts ¶¶ 4-6 and Exhibits at Tab 3, Tab 4 (copies of relevant section of ISO

will not pay more for loss or damage on a replacement cost basis than <u>the least of</u> (1), (2), or (3) ... below:

(1) The Limit of Insurance applicable to the lost or damaged property; or

(2) The cost to replace the lost or damaged property with other property:
     (a) <u>Of comparable material and quality;</u> and
     (b) Used for the same purpose; or

(3) The amount actually spent that is necessary to repair or replace the lost or damaged property.

(Emphasis supplied.)

In language virtually identical to that of the Travelers policy, the ISO contract excludes from replacement cost "increased cost attributable to enforcement of any ordinance or law regulating the construction, use, or repair of any property."  In a section labeled "Additional Coverages," the ISO policy adds such coverage to the contract, again subject to a sub-limit:

In the event of damage by a Covered Cause of Loss to a building that is Covered Property, we will pay the increased costs incurred to comply with enforcement of an ordinance or law in the course of repair, rebuilding or replacement of damaged parts of that property.

The ISO policy further specifies that such coverage extends only to ordinances or laws that are "in force at the time of loss."

3.  <u>IRI</u>

The IRI policy includes replacement cost coverage, as well, although it is granted through language somewhat different from that used in the Travelers and ISO documents.[12]  The IRI Replacement Cost Endorsement provides that

the coverage under this policy ... is hereby extended to cover such property to the amount actually expended by or in behalf of the Insured to repair, rebuild or replace within two (2) years from the date of loss or damage, at the same or at another site, such property which has been damaged.

---

policy).

[12] <u>See generally</u> IRI Statement of Facts ¶¶ 1, 3-7, and Exhibits 1, 3-6 (copies of relevant sections of IRI policy).

Such coverage is subject to certain additional conditions, including that it:

shall not exceed <u>the smaller of the following</u>:

1. the cost to repair, rebuild or replace <u>on the same site with new materials of like kind and quality</u>, whichever is smallest;

2. the actual expenditure incurred in repairing, rebuilding or replacing on the same or another site, whichever is the smallest.

(Emphasis supplied.)

The IRI policy also includes a number of provisions that exclude from replacement cost any expenses related to law or ordinance enforcement.  For instance, both the Replacement Cost Coverage Endorsement and the Comprehensive All Risk Form ("CAR"), which are incorporated in the policy, state that the policy

does not insure against any increase of loss resulting from enforcement of any law, ordinance, regulation or rule, regulating the construction, installation, repair, replacement, demolition, occupancy, operation or other use of  property on Described Premises.

The CAR, however, extends coverage to include "additional costs ... occasioned by the enforcement of any law or ordinance regulating the construction, repair, replacement, use or demolition of building(s) or structure(s) which is in force at the time of loss and necessitates such costs."[13]

**B.      The Appraisal Process and the Lease Section 6 Costs**

The Panel began work on the replacement cost phase of the Appraisal in September 2004.[14]  The parties agreed to divide this phase into fourteen segments, each focused on a single topic: Steel, Plumbing & Fire Protection, HVAC & Electrical, Other Trades, General Conditions,

---

[13] Although IRI notes in its briefs that the IRI policy "contains a provision that adopts sublimits for the insurance program," it, unlike the other Appraising Insurers, has not identified any such limit that applies specifically to the law and ordinance coverage.

[14] See generally Insurers' Statement of Facts ¶¶ 23-27; Insureds' Statement of Facts ¶¶ 23-27.  The "actual cash value" and "rental value" phases of the Appraisal have yet to begin.  See id.

Construction Duration, Pre-Construction Duration, Construction Manager Fee, Escalation, Contingency, Insurance and Bonds, Indirect Costs, Lease Section 6, and Tenant Improvements. Seven of the fourteen segments have been resolved through settlements among the parties. Two – Steel and Escalation – were decided by the Panel in written opinions. Five – including the Lease Section 6 costs – remain unresolved.

Section 6 of the Insureds' leases with the Port Authority for the WTC complex requires compliance "with the Port Authority Manual and all Governmental Requirements."[15] Governmental Requirements are further defined as

> any present or future governmental law, rule, regulation, ordinance, requirement, order or direction (including compliance with the enactments, ordinances, resolutions and regulations of the City of New York and its departments ... ) which would be applicable to the Building if the Port Authority were a private entity.[16]

In addition, the Port Authority Manual requires compliance "with the provisions of all federal, state, municipal, local and departmental laws, ordinances, rules, regulations and orders that may affect the construction or alteration contract."[17] Moreover, a November 1993 "Memorandum of Understanding" between the Port Authority and the City of New York notes that while the Port Authority is "an agency of the States of New York and New Jersey" and is therefore "not technically subject to the requirements of local building codes," "the long-standing policy of the Port Authority has been to assure that its facilities meet and, where appropriate, exceed Code requirements."[18]

In effect, then, Lease Section 6 requires the Insureds to comply with the New York City Building Code and other state and local statutes – although this obligation is contractual, rather than legal, in nature.[19] In its initial August 2002 replacement cost estimate, Silverstein included

---

[15] See Insurers' Statement of Facts, Tab 9, § 6.2 (copy of lease between Insureds and Port Authority).

[16] See Insurers' Statement of Facts, Tab 9, § 1.132.

[17] Moses Decl., Ex. 24 at 3-2 ¶ VI.

[18] See Insurers' Statement of Facts, Tab 8.

[19] The Insureds stated this position in their briefs. "None of the Lease Section 6 costs are caused by 'enforcement of any ordinance or law.' Rather, they arise out of contractual commitments and real-world imperatives." Insureds'

$74 million for "Lease Section 6 Compliance."[20]  Silverstein's expert described this amount as an estimate of the cost of "any necessary code upgrades that would be required by the New York City building code."[21]

In early 2006, Silverstein provided new expert reports to the Appraising Insurers.[22] These reports increased the approximation of the Lease Section 6 costs nearly tenfold (by $696 million) and extended the estimated time that would be required to reconstruct the WTC by over a year.[23]  The new estimates were based on a hypothetical redesign of the WTC that Silverstein claims would be necessary in order to comply not only with the lease obligations to build code-compliant[24] structures, but also to "address life safety, security, and public policy imperatives."[25] Among the proposed changes to the original design of the WTC are: (1) an eighteen-inch increase in the height of each floor, and the addition of nine new floors, which would result in each of the two new towers being 258 feet higher than the original Twin Towers; (2) addition of a 200-foot "blast wall" to the base of each tower; (3) use of "embassy glass"; (4) elimination of the Twin Towers' steel truss-based floor design; (5) movement of the new towers outside the original buildings' footprints.[26]  Thus, in the context of this litigation, the term "Lease Section 6 costs" has come to encompass all the changes to the WTC that the Insureds contend are dictated by building codes, prudence, and the practical realities of post-9/11 New York.

## II.        STANDARD OF REVIEW

---

Memorandum In Opposition to the Summary Judgment Motion…, May 31, 2006 ("Insureds' Opposition"), at 45.

[20] See Insurers' Statement of Facts, Tab 17 (expert report of Daniel Tishman and William Endres).

[21] See Insurers' Statement of Facts, Tab 30 (deposition of William Endres).

[22] See generally Insureds' Statement of Facts ¶ 37.

[23]  The length of time necessary to complete rebuilding a hypothetical WTC affects the amount of rental losses the Insureds seek to recover.

[24]  New York City amended its Building Code in October 2004.  Silverstein's expert reports on the Lease Section 6 costs are built in part on these code changes, which occurred more than three years after the loss of the WTC.

[25] See Insurers' Statement of Facts, Tab 30 (letter from Lois Thompson to John Massopust, January 13, 2006, describing 2006 expert reports).

[26] See generally Insurers' Statement of Facts ¶¶ 38-42; Insureds' Statement of Facts ¶¶ 38-42.

The parties agree that the policies are to be construed in accordance with New York law.[27]  "Under New York law, the interpretation of an insurance policy generally presents a question of law."  Allianz Ins. Co. v. Lerner, 416 F.3d 109, 115-16 (2d Cir. 2005).[28]  The principal rule that governs such interpretation is the same one that applies to all contracts, namely, "the intentions of the parties should control."  World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co., 345 F.3d 154, 184 (2d Cir. 2003) (citation omitted).  Furthermore,

> [u]nless otherwise indicated, words should be given the meanings ordinarily ascribed to them and absurd results should be avoided. ... [T]he meaning of particular language found in insurance policies should be examined in light of the business purposes sought to be achieved by the parties and the plain meaning of the words chosen by them to effect those purposes.

Id. (citation omitted).

The threshold issue in interpreting an insurance policy – whether a term in the contract is ambiguous – is also "a question of law for a court to determine."  Id.  Much turns on the determination, since "an unambiguous provision must be given its plain and ordinary meaning," Lerner, 416 F.3d at 116 (citation omitted), whereas a court may "look to extrinsic evidence to determine the parties' intended meaning" when construing an ambiguous provision.  World Trade Ctr. Props., 345 F.3d at 184.  Ambiguity exists "where a contract term could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."  Id. (citation omitted).

---

[27]  Through their consent, parties may resolve the choice-of-law issue.  British Intern. Ins. Co. Ltd. v. Seguros LA Republica, S.A., 342 F.3d 78, 81 (2d Cir. 2003).

[28]  Because an appraisal panel cannot decide questions of law, such issues must be resolved by a court.  Duane Reade Inc. v. St. Paul Fire & Marine Ins. Co., 411 F.3d 384, 389 (2d Cir. 2005).   As Judge Mukasey recently observed, "a court generally reviews disputed questions of law after an appraisal is complete, [but] this timing is not mandatory."  SR Int'l, 445 F.Supp.2d 320, 330.  Because resolution of the instant motions will have a substantial impact on the work of the Panel, they will be addressed now.

Summary judgment is only appropriate when all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Rule 56(c), Fed. R. Civ. P.  The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination the court must view all facts in the light most favorable to the nonmoving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 (1986).  In the context of a contract dispute, summary judgment is improper when "contractual language is susceptible of at least two fairly reasonable interpretations."  <u>Ametex Fabrics v. Just in Materials</u>, 140 F.3d 101, 107 (2d Cir. 1998).

### III.    DISCUSSION

The issue here is whether the replacement cost coverage provided by the policies encompasses all the costs necessary for the Insureds to construct a hypothetical complex of buildings that would be functionally equivalent to the original WTC, given the present-day political and technological conditions.  Because the site on which the WTC stood is not subject to New York City codes or New York State laws, the parties agree that none of these claimed Lease Section 6 expenses would result from the enforcement of ordinances or laws.  Therefore, the Appraising Insurers do not contend that the Insureds' claimed Lease Section 6 costs are excluded by the policies' "ordinance or law" exclusions;[29] and the Insureds do not contend that the costs are recoverable under the provisions that add to the policies limited amounts of "ordinance or law" coverage.  The parties focus their arguments on the scope of replacement cost coverage itself, with both sides arguing that the policies are unambiguous with respect to

---

[29] The Insurers argue in the alternative that the "ordinance or law" exclusion excludes, adds back, and then sublimits the Lease Section 6 costs. IRI, in its initial brief, argues that their "ordinance and law" exclusion excludes the Lease Section 6 costs entirely because the exclusion itself contains a "like height, floor area, and style" limiting clause, but abandons the argument in its reply.

In any event, as Insureds argue, the "ordinance or law" exclusion is not applicable here because of the Port Authority's exemption from local building codes.  <u>See</u> footnote 34, <u>infra</u>.

whether Lease Section 6 costs fall within that scope.  They have different views, however, of what the policies unambiguously say on the subject.

The parties highlight three portions of the Travelers policy[30] that speak to the reach of the replacement cost coverage.  First, the policy states generally that any insurer bound by it "will determine the value of Covered Property at replacement cost as of the time and place of loss." Second, it states that replacement cost "does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property." Third, it limits the Insureds' recovery to no more than "[t]he cost to rebuild or replace, at the same site, the lost, damaged or destroyed property, with other property of comparable size, material and quality."

There is no ambiguity to these provisions.  The plain meaning of each one of these provisions is consistent with the Insurers' view – and inconsistent with the Insureds' view – of the permissibility of the Lease Section 6 costs.[31]  Further, the Insureds have proffered no reasonable interpretation of the policy language that would support recovery of their asserted Lease Section 6 costs as replacement costs.  Separately and together, the provisions unambiguously establish that the <u>most</u> the Insureds can recover on a replacement cost basis is the amount it would cost to reproduce the WTC beam-for-beam, pane-for-pane, as it stood early on the morning of September 11, 2001.

---

[30]  Although the Travelers policy is analyzed here, the analysis applies with equal force to the ISO and IRI policies. As noted above, the ISO Form is nearly identical in all relevant respects to the Travelers Form.  And while the IRI policy uses somewhat different language, there is no reason to conclude that the differences would have any material effect on the outcome here.

[31]  The Insureds argue that the doctrine of *contra proferentem* – i.e., that ambiguities in an insurance contract are to be construed against the insurer – supports their position that their claimed Lease Section 6 costs are covered by the policies at issue, notwithstanding the Insureds' sophisticated nature and their use of an insurance broker.  <u>See Morgan Stanley v. New England Ins. Co.</u>, 225 F.3d 270, 279 (2d Cir. 2000) (holding that "there is no general rule in New York denying sophisticated businesses the benefit of contra proferentem," but noting that *contra proferentem* might not apply if the insured fully negotiated the contract); <u>Duane Reade v. St. Paul Fire and Marine Ins. Co.</u>, 411 F.3d 384, 390 (2d Cir. 2005) (citing <u>Morgan Stanley</u>, and applying *contra proferentem* in favor of insured corporation Duane Reade for losses arising out of the 9/11 attacks).

However, before applying *contra proferentem*, "[w]hether a contract is ambiguous is a threshold question of law to be determined by the court." <u>Duane Reade</u>, 411 F.3d at 390. This court finds that the "replacement cost" provisions at issue are unambiguous. Thus, it is unnecessary to consider the applicability of *contra proferentem* doctrine.

A.      "Replacement Cost as of the Time and Place of Loss"

The Travelers policy's first statement about replacement cost is a general one: the insurers "will determine the value of Covered Property at replacement cost as of the time and place of loss, without deduction for physical deterioration, depreciation, obsolescence and depletion."  The Insureds and the Appraising Insurers each argue that, if the policy said nothing more about replacement cost, this language alone would establish that their view of the Lease Section 6 costs is correct.

It has been observed that "the root concept of 'replacement cost' is not, upon close examination, necessarily self-defining."  Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 176:58 (3d ed. 2004).  This does not mean, however, that the term is ambiguous as applied to the claimed Lease Section 6 costs.   Indeed, when the words are given their most natural reading, and particularly when the term is read against the background of insurance industry practice and court decisions from around the country, it becomes clear that the pre-loss value of the WTC is the benchmark for establishing the Insureds' potential recovery.

There is nothing in the phrase "replacement cost as of the time and place of loss" that would suggest that these costs should include expenses occasioned by more recent changes in design or material.  Indeed, the requirement that replacement cost be determined "as of the time and place of loss" dictates that the relevant benchmark is the amount it would cost to reproduce the WTC as of the time and place of loss – i.e., as it existed early on the morning of September 11, 2001.  Simply to hammer home this common-sense understanding of replacement cost, see Judge Mukasey's recent holding regarding coverage for tenant improvements to the WTC: "Hypothetical replacement cost is an estimate of the costs of reproducing the destroyed property as it stood at the time of the loss, not a calculation of the projected cost of the actual replacement property."  SR Int'l, 445 F.Supp.2d 320, 333 (emphasis added).[32]

_____

[32] See also Penn. Co. for Ins. v. Philadelphia Contributorship, 51 A. 351 (Pa. 1902) ("[I]s the true result to be reached

13

This reading is also consistent with the history and purpose of replacement cost coverage in the insurance industry.  A traditional insurance policy, which measures the value of covered property on the basis of its actual cash value (i.e., the amount it is worth taking into account depreciation), can leave an insured in a precarious spot:

> If a policyholder only insures the property for its value in its depreciated state, if the property is destroyed, and if the policyholder can only restore her pre-loss position by replacing the property with new, undepreciated property, this policyholder suffers a potentially severe financial loss, even after the insurer performs its contractual obligation.  The policyholder loses – and must make up out of personal assets – the difference between the property's replacement cost and the property's value in a depreciated state.  Of course, the insured ends up with a new, improved property; but this improvement may be one for which at the time of loss the insured cannot afford to pay.

Robert H. Jerry, II, Understanding Insurance Law § 93[d] (3d ed. 2002).  Replacement cost coverage evolved to insure against this precise risk, reimbursing the policyholder for the costs necessary to replace the covered property, even though this is likely to leave the policyholder with a more valuable property – because it is brand new – than the one she owned before the loss.  As Leo John Jordan, an expert cited repeatedly by both the Insureds and the Appraising Insurers, has described it, replacement cost policies "go beyond the concept of indemnity and simply recognize that even expected deterioration of property is a risk which may be insured against. ... What is insured, simply put, is depreciation."  Leo John Jordan, What Price

---

by taking the cost of reconstruction according to the conditions existing and lawfully imposed at the time when the fire occurred") (emphasis added), discussed infra.

  The Insureds argue that Judge Mukasey's opinion is inapposite because Judge Mukasey considered a different issue – i.e., whether the value of tenant improvements as of the morning of September 11, 2001 should be included in the Panel's calculation of "replacement cost," even if such improvements would not actually be replaced.  See SR Int'l, 445 F.Supp.2d 320, 325.  It is true that the arguments then put forth by the parties were strategically different.  At that time, the Insureds argued that "replacement cost" should be valued at the time of the loss – i.e., the morning of September 11.  The Insurers, because some tenants had since abandoned their leases and would not actually replace their improvements, essentially argued that "replacement cost" should account for events transpiring after the time of the loss.  See Id. at 331-32.

  Judge Mukasey's reasoning is nevertheless apposite. Although the parties' arguments were different, the principle remains the same: "hypothetical replacement cost… does not turn on events that transpired after the loss." SR Int'l at 335-36 ("[I]t is the insurable interests existing at the time of loss which determine the rights and liabilities as between the insured and insurer.") (citations omitted). True, the Insureds benefited then from arguing that "replacement cost" should be valued as of the time of the loss, and do not benefit now regarding Lease Section 6 costs; but the legal principle in play is the same.

Rebuilding?, 19 Brief 17, 17 (Fall 1990); see also Hess v. N. Pac. Ins. Co., 859 P.2d 586, 587 (Wash. 1993).

This view of replacement cost insurance is consistent with the Appraising Insurers' position here.  Under their view of the Travelers policy, the Insureds can recover the amount it would cost to replace the Twin Towers, which were nearly 30 years old at the time they were destroyed, with brand new, but otherwise identical, buildings.[33]  In other words, the policy would provide coverage not just for the damage to the buildings, but for depreciation, as well.

The Insureds, on the other hand, attempt to use their replacement cost policy to recover much more.  They suggest that the term "replacement cost" in the Travelers policy requires the Appraising Insurers to reimburse the expenses associated not just with reconstructing WTC as it stood in September 2001, but with building it the way a savvy developer would build it in 2006.  The Insureds no doubt wish they had purchased such a policy, but they didn't.

Nor does the Insureds' position find support in the caselaw.  The Insureds attempt to demonstrate, through a raft of case citations, that "courts throughout the country" have endorsed the notion that replacement cost policies do not restrict recovery to replication cost alone; instead, they argue, these courts have allowed policyholders to recover for the costs "necessary to rebuild comparable structures that meet current safety standards, are permitted to be rebuilt, and are usable."  This mischaracterizes what the courts have held.

---

[33]  This view of replacement cost is also consistent with the parties' conduct in the Appraisal process until very recently.  For instance, the Panel's "Steel Opinion," which was issued after 16 days of hearings and 10 days of deliberations, calculated the quantity of structural steel in the WTC and the costs of purchasing, transporting, and erecting that steel.  The redesign advocated in the Insureds' 2006 Section 6 expert reports reflects an entirely different framing system from that employed in the WTC, adds nine stories, and increases the height of each story.  These changes would effectively gut the Steel Opinion.

Moreover, as Insurers' counsel noted at oral argument, the Insureds' current operative pleading asks for a "declaratory judgment as to Replacement Cost" and alleges that the correct number "…is to be determined based on what it would cost to rebuild the destroyed properties as they existed before the loss, without any deduction for physical deterioration, depreciation, obsolescence or depletion…" Silverstein Parties' Supplemental and Second Amended Answer and Counterclaims, January 6, 2004, ¶¶ 569, 572.  The Insureds' currently requested definition of "replacement cost" comports with the traditional definition of "replacement cost," as well as Judge Mukasey's interpretation of "replacement cost," as noted above.

New York courts have had occasion to construe replacement cost coverage only infrequently.  In the leading case on the subject, <u>Midwood Sanatorium v. Fireman's Fund Ins. Co. of San Francisco</u>, 261 N.Y. 381 (1933), the Court of Appeals endorsed the notion that code-compliance costs could be read into a replacement cost policy, stating that "the owner's loss or damage [cannot] be measured by the cost of repairs which he is forbidden to make."  <u>Id.</u> at 385. The Court refused to go farther, however, and (in <u>dicta</u>) supported the Appellate Division's view that the policyholder was not entitled to recover the additional amount necessary to build a structure that could be used for the same commercial purpose as it had been before the loss.  <u>Id.</u> at 386.

This view is consistent with those of other state and federal courts that have confronted the question of whether replacement cost policyholders can recover for expenses related to changes in the design and material of the replaced property.  When courts have allowed such recovery, these changes have, virtually without exception, been mandated by law.  <u>See, e.g.,</u> <u>Tenley v. Harbor Ins. Co.</u>, 1986 U.S. Dist. LEXIS 19275, at *5 (E.D.Pa. 1986) (replacement cost policy covers "whatever changes from the original design were necessitated by interim changes in governmental regulations"); <u>Bering Strait School Dist. v. RLI Ins. Co.</u>, 873 P.2d 1292, 1295 (Alaska 1994) (replacement cost policy covers payment of code upgrade cost "so that new building would be able to replace in function the building which was destroyed"); <u>Dupre v. Allstate Ins. Co.</u>, 62 P.3d 1024, 1031-32 (Col. Ct. App. 2002) (replacement cost policy includes the cost of complying with regulations necessary to render plaintiff's house habitable); <u>Hewins v. London Assur. Corp.</u>, 68 N.E. 62, 63-64 (Mass. 1903) ("increased cost of repairing the building by reason of the building laws" recoverable under a replacement policy); <u>Penn. Co. for Ins. v. Philadelphia Contributorship</u>, 51 A. 351 (Pa. 1902) (insurer liable for increased losses that arise as "consequence of a state of the law existing at the time of the fire").

Because changes in building codes and other ordinances often apply only to newly built structures, it is not uncommon for a property owner to be barred from replicating a covered

building after it is damaged or destroyed, even though it was perfectly legal for him to occupy and use it before the loss.  It is therefore not surprising that courts confronted with this situation have often found that when building codes or other ordinances make it <u>illegal</u> for a property owner to replicate the lost or damaged building, the insurer must pay for the alterations necessary to make the building code-compliant, at least as to those building codes that existed at the time of the loss.

Here, however, the Insureds construe these cases to stand for a much broader principle – namely, that a replacement cost insurer must cover the expenses necessary to ensure that a rebuilt structure is "modern" and "safe," and that the policyholder is able to comply with contractual obligations to third parties.  Nowhere in any decision anywhere has a court endorsed such an expansive view of replacement cost insurance as advocated by the Insureds.

First, it would be strange indeed if a policyholder were able to affect the amount of an insurer's obligation by entering into a third-party contract.  Yet that is precisely what the Insureds advocate here.  As noted above, the land on which the WTC was built is owned by the Port Authority and, as a result, is exempt from the New York City Building Code and any otherwise applicable state laws.[34]  Therefore, by the Insureds' own admission, none of the Lease

---

[34] "Upon entering into an interstate compact, a state effectively surrenders a portion of its sovereignty…" Matthew S. Tripolitsiotis, <u>Bridge over Troubled Waters: The Application of State Law to Compact Clause Entities</u>, 23 YALE L. & POL'Y REV 163, 167 (2005).  As a bi-state compact, the Port Authority is "not subject to the unilateral control" of either New York or New Jersey. <u>Suggs v. Port Auth.</u>, 1999 U.S. Dist. LEXIS 6319, at *7 (S.D.N.Y. 1999), <u>citing</u> <u>Hess v. Port Auth. Trans-Hudson Corp.</u>, 513 U.S. 30, 42 (U.S. 1994). Thus, New York state (or city) laws are presumptively not binding within Port Authority land, unless both New York and New Jersey pass similar legislation specifically stating that the legislation applies to the Port Authority. <u>Malverty v. Waterfront Com. of New York Harbor</u>, 524 N.E.2d 421, 421 (N.Y. 1988); <u>see also</u> <u>Suggs v. Port Auth.</u>, 1999 U.S. Dist. LEXIS 6319, at *7-9 (New York Human Rights Law does not apply to Port Authority); <u>In re September 11 Prop. Damage & Bus. Loss Litig., Inc. v. Port Auth.</u>, 2006 U.S. Dist. LEXIS 749, at *51-52 (S.D.N.Y. 2006) (Hellerstein, J.) (noting that "all buildings at the World Trade Center site owned and operated by the Port Authority… are and were exempt from regulation by New York City or State and are instead subject only to the exclusive jurisdiction of the Port Authority.).  Indeed, a federal report noted that the original World Trade Center did not meet New York City building codes in some respects.  <u>See</u> Jim Dwyer, Towers Should Have Had One More Staircase, N.Y. Times, June 24, 2005, at B7.

  However, in the enabling legislation creating the World Trade Center project, both New York and New Jersey explicitly stated that New York City regulations apply to the World Trade Center "if so provided in any agreement between the [P]ort [A]uthority and the city and to the extent provided in any such agreement."  N.Y. UNCONSOL. LAW § 6612 (2006); N.J. STAT. ANN. § 32:1-35.61 (2006). In 1993, the Port Authority signed a Memorandum of Understanding ("MOU") with the New York City Department of Buildings "to provide specific commitments…

Section 6 costs are attributable to the enforcement of ordinances or laws.  Certain of those costs are necessary, however, because the leases require construction on the property to be done in conformity with codes, orders, and regulations.  That is to say, these additional costs are the result of contracts to which the Appraising Insurers are not a party.  It is one thing for a court to read code-compliance into a replacement cost policy, and quite another to infer that such coverage extends to expenses arising out of a private contract.  However "necessary" it might be for the Insureds to honor their obligations to the Port Authority, they are not <u>legally</u> required to do so, and they have identified no caselaw to support the proposition that the Appraising Insurers should be required to pay for these expenses.[35]

Further, the Insureds' attempt to recover expenses "required to address life safety,

---

regarding procedures to be undertaken by the Port Authority for any Project at its facilities in the City to assure that the buildings owned or operated by the Port Authority within the City are in conformance with the Building Standards contained in the [New York City Building] Code." The MOU makes clear, however, that "the facilities of the Port Authority, an agency of the States of New York and New Jersey, are not technically subject to the requirements of local building codes."

   The Port Authority's actions since signing the 1993 MOU appear consistent with the interpretation that New York City Building Codes are not legally binding upon the Port Authority.  For example, the Lease Section 6 between the Port Authority and the World Trade Center states that "the Lessee shall promptly comply with the Port Authority Manual and all Governmental Requirements," and Governmental Requirements are further defined to include "regulations of the City of New York." However, Lease Section 6 also expressly disclaims that its provisions "are not to be construed as a submission by the Port Authority to the application to itself of such governmental laws, rules, regulations…" Additionally, the Insurers provide as evidence letters from Port Authority representatives to governmental authorities reiterating the "voluntary" nature of the Port Authority's actions.  <u>See</u> Letter from Francis Lombardi, Chief Engineer, to New York Council Member Alan Gerson, February 28, 2003, at Insurers' SUF, Tab 6 ("[T]he Port Authority, as a matter of longstanding policy, voluntarily meets or exceeds local… building safety codes."); Letter from Paul Bea, Jr., Washington Representative, to New York and New Jersey Delegation [undated], at Insurers' SUF, Tab 5 ("The Port Authority… is exempt from local laws and ordinances including building codes.").

   No court has held that the 1993 MOU establishes the New York City building codes as binding upon the World Trade Center, pursuant to the statutory grant of authority in the World Trade Center enabling legislation. Because both parties here agree that New York City building codes are not legally binding upon the Port Authority, and thus its lessees, it is unnecessary to reach the issue. However, in an abundance of caution, this Court follows the traditional view and holds that the specific disclaimer by the Port Authority within the 1993 MOU evinces the contractual intent of the Port Authority and New York City to the effect that the World Trade Center is legally "not subject" to the New York City Building Codes.

[35] Beyond this, to the extent that the Insureds' claimed Lease Section 6 expenses are connected – albeit indirectly – to codes and ordinances, many of the relevant requirements took effect <u>after</u> September 11, 2001.  When courts have required insurers to cover the costs associated with code compliance, however, they have done so only with respect to codes in effect as of the date of loss.  <u>See</u>, <u>e.g.</u>, <u>Bering Strait Sch. Dist. v. RLI Ins. Co.</u>, 873 P.2d at 1293; <u>Penn. Co. for Ins. v. Philadelphia Contributorship</u>, 51 A. 351 (insurer liable for increased losses due to "consequence of a state of the law existing at the time of the fire").

security, public policy and pragmatic imperatives" is simply inconsistent with the principles

underlying replacement cost coverage.  Replacement cost, after all, aims to "put the insured in

the position the insured would have occupied if the loss had not occurred."  Russ & Segalla §

176:58.  The Insureds, however, contend they are entitled to recover the expenses that they

would incur in redesigning the WTC to account for

> advances in construction and the understanding of extremely tall buildings; public
> policy imperatives, such as ensuring that the footprints of the fallen towers not be
> rebuilt upon; and safety imperatives such as ensuring that the buildings are
> designed and situated in a manner to best protect against the potentiality of any
> future possible terrorist attack.

In short, they claim the Appraising Insurers should be required to pay not just for brand new

buildings, but for far better properties than the Insureds would have owned if the attacks of

September 11 had never occurred.  Boiled down to its essence, the logic of the Insureds' claim is

that the WTC was considered safe, modern, and politically acceptable when it was built;

therefore, the measure of replacement cost is the amount that would be required to erect safe,

modern, and politically acceptable buildings today.  This is incorrect.  Insurance against

technological change and shifts in the political winds may very well exist in the marketplace.

But no court has ever found that such coverage is included in a replacement cost policy. See

Roberts v. Allied Group Ins. Co., 901 P.2d 317, 326 (Wash. Ct. App. 1995) (homeowners'

replacement cost policy does not cover engineers' recommended structural changes, "however

advisable [they] may be…"); cf. Celebrate Windsor, Inc. v. Harleysville Worcester Ins. Co.,

2006 U.S. Dist. LEXIS 27043 (D. Conn. 2006) (denying coverage under replacement cost policy

to remedy design defects "needed to protect public safety," where policy specifically excluded

coverage for design defects).[36]

---

[36] One case does not explicitly foreclose the possibility that physical necessity, even at the time of rebuilding, might justify the inclusion of design changes in "replacement cost." See Roberts v. Allied Group Ins. Co., 901 P.2d 317, 326 (even if engineers' recommended structural changes "would be required by current codes prior to rebuilding the house, they are not physically required for reconstruction"). To the extent, if at all, that this case might be applicable here, the Insureds' arguments, e.g., that their claimed costs owing to "advances in construction," "public policy imperatives," and "safety imperatives," may, as the Roberts court put it, be "advisable," they are nonetheless not

B.       The "Ordinance or Law" Exclusion

The second provision at issue in the Travelers binder excludes "the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property" from the calculation of replacement cost.  The Insureds argue that this provision demonstrates that replacement cost coverage extends well beyond the expenses associated with rebuilding the covered property as it stood before the loss.  After all, they say, if "replacement cost" really meant "replication cost," no such exclusion would be necessary; any expenses associated with changes to the original design – whether or not mandated by law – would already fall outside the bounds of the policy.[37]  Since the Insureds' claimed Lease Section 6 costs arise

_____

"physically required for reconstruction."

[37] Insureds argued strenuously at oral argument that "an exclusion is unnecessary unless the excluded event would otherwise fall within the coverage provisions." Dupre v. Allstate Ins. Co., 62 P.3d at 1029; see also Bering Strait, 873 P.2d 1292, 1296 n.4.  Insurers disagree and rebut that an exclusion cannot create coverage by "negative inference." See, e.g., Raymond Corp v. Nat'l Union Fire Ins. Co., 833 N.E.2d 232, 235 (N.Y. 2005).

   The Insurers have the better of this argument. The Insureds mischaracterize the caselaw they cite. The caselaw cited by Insureds seeks to define the exclusion by the nature of the coverage, not to define the coverage by the nature of the exclusion. For example, the Dupre court found that where the policy explicitly covered "physical loss," the "ordinance or law" exclusion validly excluded only damage due to "physical loss." Dupre at 1029. Thus, since the enforcement of ordinances or laws did not directly cause the physical loss at issue (i.e., the building inspectors did not order the building demolished), the exclusion, although valid, was inapplicable to the insured in Dupre. Id. Notably, the Dupre court addressed the issue of replacement cost in a separate section of the opinion.

   Thus, Dupre stated the Insureds' cited language to define the terms of the exclusion by the explicit coverage of the policy.  But Insureds argue the cited language defines the implicit coverage of the policy by the terms of the exclusion.  This is, as Insurers correctly note, an attempt to create coverage by "negative inference." See Raymond Corp v. Nat'l Union Fire Ins. Co., 833 N.E.2d at 235 ("[I]t is a "basic principle that exclusion clauses subtract from coverage rather than grant it") (citation omitted, emphasis intact). And, as Insurers also note, it is an insureds' burden to first prove coverage before considering any exclusions.  See Consol. Edison Co. v. Allstate Ins. Co., 774 N.E.2d 687, 690 (N.Y. 2002).

   It is clear, from examining the Insureds' other cited cases, that the Insureds' cited language merely states the obvious – that exclusions take out what coverage puts in.  For example, the Insureds cite American & Foreign Ins. Co. v. Colonial Mortg. Co., 936 F.2d 1162, 1169 (11th Cir. 1991), for the proposition that "[t]he essential purpose of an exclusion is to limit the scope of coverage granted in the coverage section of the policy."  Id. However, American & Foreign Ins. Co. stated that simple proposition only to establish that exclusions are not per se ambiguous, and that the presumption that ambiguous exclusions should be interpreted narrowly is not an automatic one. "By definition, any exclusion is in direct conflict with the coverage section of the policy, but this conflict does not make the policy ambiguous." Id.

   (Again, it bears repeating that both parties agree here that the "ordinance or law" exclusion does not apply to the Insureds' claimed Lease Section 6 costs, and is not at issue in this motion.)

from contractual obligations and prudential considerations, they are not excluded by this provision, and therefore must be covered by the policy.

While there is a certain formal logic to this argument, it fails the only test that matters here: Could this have been the parties' understanding of the policy when it was signed? According to the Insureds' interpretation, "replacement cost," standing alone, includes all "necessary" changes to the design of the covered property.  Some such changes might be required by ordinance or law, while others could arise because of contractual obligations, commercial imperatives, or safety concerns.  Here, argue the Insureds, the parties <u>carved out</u> of the coverage all expenses associated with legally mandated changes, but they <u>left in</u> coverage for the other, far less precisely defined category of costs.  In other words, under the Insureds' reading of the policy, if the law requires them to make changes to the design or construction of the WTC, the associated costs are <u>not</u> reimbursed (except to the extent of the supplemental "ordinance or law" coverage); but if they decide to alter the design or construction because they think it advisable, or because they entered into a contract that necessitates such changes, the expenses <u>are</u> covered, apparently without limitation.  Put simply, discretionary replacement costs would be covered, but mandatory replacement costs would not. This reading of the policy is simply too implausible to be credited.

The only sensible interpretation of the "ordinance or law" exclusion is that it serves to eliminate the primary ambiguity that courts have found in replacement cost policies – namely, whether a policyholder can be reimbursed for the costs required to bring the reconstructed property up to code.  As noted above, a number of courts have interpreted replacement cost insurance policies to cover those expenses.  The Travelers form, however, attempts to ensure that such expenses are not construed as part of recovery cost.  Instead, the costs arising from the enforcement of ordinances or laws are treated as a separate category of expenses – one for which

the policyholder can either accept or decline coverage.[38]  Thus, the "ordinance or law"

provisions of the Travelers policy are consistent with the Insurers' view of the policy: Recovery

is limited to the amount it would cost to replace the WTC as it stood prior to the September 11

attacks.


C.      "Property of Comparable Size, Material and Quality"

The final provision at issue in the Travelers policy limits the coverage to no more than

the least of: (a) "[t]he cost to repair, rebuild or replace, at the same site, the lost, damaged or

destroyed property with other property of comparable size, material and quality"; (b) the amount

actually incurred by the Insureds on the necessary repair, rebuilding or replacement; or (c) the

insurance limits.  The Insureds argue that the allowance for replacement with "property of

comparable size, material and quality" demonstrates that cost of exact replication is not the

relevant measure of recovery.  Instead, they claim, a policyholder has some flexibility to improve

the replaced property, so long as it remains "comparable" to the original structure.  In short, the

Insureds' claim, as Insureds' counsel stated at oral argument, is that "replacement is not

replica."[39]

The Insureds' argument relies on a fundamental misconstruction of the policies.  As the

Insurers correctly note, the reference to "property of comparable size, material and quality" is

made in the context of a <u>limiting</u> provision of the contract.  That is to say, it provides one of

three potential caps on recovery.  The clause does not function as a definition of "replacement

cost as of the time and place of loss," which is the operative policy language granting

replacement coverage.  It is inconsistent with the plain terms of the policy to find a definition of

replacement costs in a section of the contract that unequivocally aims to limit recovery.  The

---

[38]  Here, although the Insureds purchased such coverage, subject to a sub-limit, they do not argue that this coverage is what entitles them to recover the Lease Section 6 costs.

[39] <u>See</u> Transcript of Oral Argument, October 24, 2006, at p. 6, line 5.

only rational reading of this provision is that, while an insured may be able to recover its "replacement cost," he will not recover more than the cost of reproducing the building at the same site with materials that are substantially equivalent to those used in the destroyed property. See Tenley, 1986 U.S. Dist. LEXIS 19275, at *4-5.

The limitation clause, therefore, sheds little light on the content of the term "replacement costs."  Cases on which the Insureds rely do discuss the interaction of these two policy provisions, however, and in doing so provide no basis to find that the Lease Section 6 costs claimed by Insureds are encompassed within either "replacement cost" coverage or the limitation on recovery of the costs for construction of a "comparable" structure.

It is true that some caselaw has held that "comparable size, material, and quality" does not necessarily mean "identical."[40] However, these cases provide – at most – for coverage in two situations where replacement might not be exactly "identical." First, where replacement cost includes the cost associated with complying with building codes that were in force at the time of the loss, then limitation clauses will be construed to permit recovery of those same costs.  See, e.g., Dupre, 62 P.3d at 1031; Bering Strait, 873 P.2d at 1298.

Additionally, some caselaw allows for the possibility that where replacement is physically impossible without different materials, limitation clauses might be construed to permit recovery for the use of those materials. See Penn. Co., 51 A. 351 ("It would seem, also, if the materials out of which the building was originally constructed were not to be obtained at the time of the fire and reconstruction, that the insurers would be liable for the cost of reconstruction out of such materials as were reasonably proper and adequate at the time of rebuilding.").[41]  For example, as Insurers' counsel noted at oral argument, the Appraisal Panel has considered as

---

[40] See Celebrate Windsor, Inc. v. Harleysville Worcester Ins. Co., 2006 U.S. Dist. LEXIS 27043, at *59 ("[this] Court does not interpret… 'like kind and quality' to mean 'identical'."); Tenley Enterprises v. Harbor Ins. Co., 1986 U.S. Dist. LEXIS 19275, at *5 ("substantial equivalents, rather than literal identity, would suffice"); Bering Strait, 873 P.2d at 1297 ("[A] replacement building is not a clone of the building which was destroyed").

[41] Note, however, that the policy at issue in Penn. Co. did not appear to contain a "comparable size, material, and quality" limiting clause.

within "replacement cost" the Insureds' anticipated use of different steel because the original WTC steel is no longer manufactured.[42]

But caselaw makes clear that while different *materials*, if legally or physically unavailable to the insured, might still be covered under a liberal reading of a "comparable size, material, and quality" limiting clause, a wholly different *structure* would not be covered.  See Tenley, 1986 U.S. Dist. LEXIS 19275, at *4-5 (replacement cost policy with limiting clause covered "identical structure… with differences in design or materials which did not substantially increase the cost…"); Bering Strait, 873 P.2d at 1297 (suggesting that "like kind and quality" limiting clause bars recovery under "replacement cost" when "a fundamental and quantum difference in the nature of the building is sought to be made or when a totally new component is sought to be added to the building…").

Here, the Insureds seek to recover for such a "fundamental and quantum difference in the nature of the building." They argue their "replacement costs," as limited by the "comparable size, material, and quality" clause, include: (1) an eighteen-inch increase in the height of each floor, and the addition of nine new floors; (2) addition of a 200-foot "blast wall" to the base of each tower; (3) use of "embassy glass"; (4) elimination of the Twin Towers' steel truss-based floor design; and (5) movement of the new towers outside the original buildings' footprints.  No American court has ever held that structural changes of the scale and cost that Silverstein envisions are included within "replacement cost," let alone "replacement cost" limited by a "comparable size, material, and quality" clause. Although the "comparable size, material, and quality" limiting clause might contain some "leeway," see Republic Underwriters Ins. Co. v. Mex-Tex, Inc., 150 S.W.3d 423 (Tex. 2004), to include different legally or physically

---

[42] The Panel has also considered as within "replacement cost" the anticipated use of different replacement materials for asbestos. This would presumably be covered within "replacement cost" either as a cost of complying with building codes in effect at the time of loss or as a cost of replacing old materials with unavailable, but comparable, new materials.  See Transcript of Oral Argument, October 24, 2006, at p. 38-39 ("There is some leeway permitted, and it is that leeway that has allowed [Insureds] to replace asbestos tiles with vinyl tiles.... But that leeway… does not provide an opening… for the Insureds' present effort to redesign the buildings… [and] change the fundamental character of what was there on 9/11…").

unavailable materials, if "comparable," such a clause does not provide the Insureds with a basis to recover their claimed Lease Section Six costs here.[43]  Rather, the "comparable size, material, and quality" limiting clause serves only to reinforce and limit the traditional definition of "replacement cost" that provides the Insureds with a new building – not a new, improved building.[44]

***

At the end of the day, the Court's job in interpreting the WTC insurance contracts is to discern the intent of the parties as of the time the policies were signed.  As discussed above, the Appraising Insurers' view – that the Lease Section 6 costs were never understood to fall within the scope of the policies – finds support in the plain meaning of each of the relevant provisions of the Travelers, ISO and IRI binders.  Of equal importance is that it also finds support in what the policies do _not_ say.  Specifically, there is no mention in any of the contracts of pragmatic imperatives, contractual obligations to third parties, or public policy concerns.  If the parties had intended to allow the Insureds to take those factors into account – i.e., to build a bigger and better building and thereby recover an additional $700 million – it stretches credulity to suggest

---

[43]  The Insureds cite Republic Underwriters Ins. Co. v. Mex-Tex, Inc., 150 S.W.3d 423 (Tex. 2004), for the proposition that a "like kind and quality" provision in an insurance contract allows an insured to recover the costs of replacing damaged property with a "similar" but improved structure, even if replication of the original building would be less expensive.  In Mex-Tex, the insurer was required to pay for replacing a roof held down by ballast (rocks) with one attached to the building.  Mex-Tex involved uncontroverted evidence at trial that the new roof at issue was "comparable," involving an extra cost of $33,540. Mex-Tex, 150 S.W.3d 423, 425. The Texas Supreme Court held that the trial court "could find" a breach of contract by the insurer based on that uncontroverted evidence. Id.  The policy "clearly allow[ed] more leeway" than requiring an identical roof.  Id.  Additionally, the lower Texas appellate court noted that the insured was contractually obligated to "protect the Covered Property from further damage" by timely replacing the roof, else he might lose coverage – a concern not present in the instant case. Republic Underwriters Ins. Co. v. Mex-Tex, Inc., 106 S.W.3d 174, 180 (Tex. App. 2003).

  Mex-Tex is factually distinguishable because of its deferential review of a trial court's finding of "comparability" based on uncontroverted evidence. In any event, the holding of Mex-Tex will not be followed here. Cf. Celebrate Windsor, Inc. v. Harleysville Worcester Ins. Co., 2006 U.S. Dist. LEXIS 27043, at *59 (declining to follow Mex-Tex, noting in part, "in this case no one testified at trial that [the new] design was even 'comparable' to [the old] design.").

[44]  Put another way, the Insureds are entitled to recover, under "replacement cost" coverage, the amount it would cost to reproduce the WTC beam-for-beam, pane-for-pane, as it stood early on the morning of September 11, 2001. Hypothetically, that amount might encompass beams made of different steel, if different steel was legally mandated or physically unavailable. But that amount does not encompass taller beams to support additional floors of a different WTC.

intended to allow the Insureds to take those factors into account – i.e., to build a bigger and better building and thereby recover an additional $700 million – it stretches credulity to suggest that they would not have made this understanding explicit. Read as a whole, then, the Travelers, ISO and IRI policies are each unambiguous with respect to the issue before me: the Lease Section 6 costs claimed by the Insureds simply are not covered as part of the replacement cost of the WTC.[45]

## IV.    CONCLUSION

For the foregoing reasons, the Appraising Insurers' motion for a declaration that the Insureds' maximum recovery on a replacement cost basis should be measured by the cost to replace the WTC on an "as was" basis is granted. The remainder of the Appraising Insurers' motion, and the entirety of the Insureds' motion, is denied. The Clerk of the Court is instructed to close this motion and remove it from my docket.

**SO ORDERED:**

**Dated: New York, New York**
    **October 31, 2006**

HAROLD BAER, JR.
United States District Judge

---

[45] Because the Insureds cannot recover for any of the Lease Section 6 costs as replacement costs under any of the policies, it is unnecessary to reach IRI's argument that its policy would exclude those costs on the additional ground that the Insureds did not expend the money within two years of the loss.

26